NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

COMMONWEALTH OF KENTUCKY
LAUREL CIRCUIT COURT
DIVISION: _____
CIVIL ACTION NO.: _____


NICKI LAWSON and MONA ALSIP,                                   PLAINTIFFS
as co-administratrices of the
ESTATE OF DOUGLAS HARLESS
and individually,


v.                                    **COMPLAINT**


LONDON POLICE DEPARTMENT,                                      DEFENDANTS

    Serve:  Bobby Day, Acting Chief of Police
           503 S Main St, London, KY 40741

CITY OF LONDON, KENTUCKY,

    Serve:  Tracie Handley, Acting Mayor
           501 S. Main St., London, KY 40741

JERRY HOLLON,
in his individual capacity,

    Serve: 827 Highway 1023
         Lily, KY 40740

ANDREW JACKSON,
in his individual capacity,

    Serve:  Andrew Jackson
          503 S Main St, London, KY 40741

ASHLEY TAYLOR,
in her individual capacity,

    Serve:  Ashley Taylor
          501 S. Main St., London, KY 40741

ELBERT RILEY,
in his individual capacity,

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000001 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

Serve: Elbert Riley
503 S Main St, London, KY 40741

LANDRY COLLETT,
in his individual capacity,

Serve: Landry Collett
503 S Main St, London, KY 40741

WESLEY WOLFE,
in his individual capacity,

Serve: Wesley Wolfe
503 S Main St, London, KY 40741

TROY TRUETT,
in his individual capacity,

Serve: Troy Truett
503 S Main St, London, KY 40741

JONATHAN JACKSON,
in his individual capacity,

Serve: Jonathan Jackson
503 S Main St, London, KY 40741

JOSH MORGAN,
in his individual capacity,

Serve: Josh Morgan
503 S Main St, London, KY 40741

-and-

UNKNOWN DEFENDANTS,
in their individual capacities.

Serve: 503 S Main St
London, KY 40741

*****

**Exhibit A**

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000002 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

Come the Plaintiffs, Nicki Lawson and Mona Alsip, individually, and as co-administratrices of the Estate of Douglas Harless ("Plaintiffs"), by counsel, and bring the following Complaint against the above Defendants:

## **INTRODUCTION**

1.      Douglas Harless was a 63-year-old man who had lived in Laurel County, Kentucky. He was a loving friend, father, and grandfather who lived peacefully and in accordance with the law.

2.      On December 23, 2024, London Police Department officers, some armed with AR-15 style rifles, pounded on Mr. Harless' door to conduct a search in the middle of the night.

3.      Upon information and belief, a search warrant was allegedly issued for a property located at 489 Vanzant Road in Lily, Laurel County, Kentucky, and related to stolen property allegedly in the possession of a man named James Steele.

4.      Mr. Harless did not live and had never lived at 489 Vanzant Road. Rather, Mr. Harless lived at 511 Vanzant Road in Lily, Laurel County, Kentucky.

5.      At the time of the events alleged in this Complaint, "511 Vanzant Road" was clearly visible on the outside of Mr. Harless' home.

6.      Despite these clear markings, London Police Officers attempted to execute a search warrant in the middle of the night on 511 Vanzant Road, the wrong home.

7.      In serving the alleged search warrant on the wrong address, one or more London Police Officers opened fire, killing Mr. Harless. According to the autopsy report from the Office of the State Medical Examiner, Mr. Harless died of multiple gunshot wounds, including rounds that perforated his right lung, head, heart, aorta, and pulmonary artery.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

8.     The Defendants' conduct, individually or in concert of action with one another, was deliberately indifferent, wanton, malicious, willful, oppressive, motivated by evil motive or intent, involved the reckless and/or callous indifference to federally protected rights, and/or was grossly negligent or reckless, and represents clear violations of Mr. Harless' rights under the United States Constitution and the Kentucky Constitution, including his freedom from unreasonable search and seizure under the Fourth and Fourteenth Amendments, and freedom from excessive force under the Fourth and Fourteenth Amendments.

9.     The London Police Department, Jerry Hollon, and the City of London's unlawful policies and customs were the moving force behind the violations of Mr. Harless' constitutional rights. These unlawful policies include actions taken by the London Police Department and the City of London's officials with final decision-making authority, policies of inadequate training or supervision, and a custom of tolerance or acquiescence of federal rights violations.

10.     The Defendants' conduct, individually or in concert with one another, was deliberately indifferent, wanton, malicious, willful, oppressive, motivated by evil motive or intent, involved the reckless and/or callous indifference to Mr. Harless' civil rights, and/or was negligent, grossly negligent or reckless, and represents clear violations of state law and policies of the London Police Department, including, excessive force, assault, battery, trespass to land, wrongful death, false imprisonment, outrage, invasion of privacy, emotional distress, and breaches of ministerial duties.

11.     These violations were a substantial contributing factor in causing DAMAGES to Mr. Harless, including his death, as pleaded more thoroughly below.

12.     Despite months passing since Mr. Harless' death, the Kentucky State Police have yet to make public records relevant to his death on the basis that an investigation is still ongoing.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

Documents yet to be produced include, but are not limited to, any and all video, photographic, and audio evidence, interviews, statements, documents, diagrams, measurements, investigatory findings, and the original and all known copies of the alleged search warrant and affidavit supporting that alleged search warrant, which, by Rule 13.10(4) of the Kentucky Rules of Criminal Procedure, should be in the possession of the Circuit Court Clerk within a reasonable time upon execution. Plaintiffs anticipate discovering more facts supportive of their claims in the course of this litigation through discovery.

### THE PARTIES

13.     Plaintiffs Nicki Lawson and Mona Alsip are the co-administratrices of the Estate of Doug Harless. They were appointed as co-administrices of the Estate of Doug Harless on 02/24/2025 by the Laurel County District Court (25-P-00004). They bring this action under KRS 411.130 *et. seq.* and 42 U.S.C. § 1983, and individually.

14.     Defendant London Police Department is the municipal police department of London, Kentucky, located in Laurel County. Defendant London Police Department is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. It is being sued in its official capacity. It may be served with process at 503 S Main St, London, KY 40741, to its interim Chief of Police, Bobby Day.

15.     The City of London, Kentucky, is a municipality in London, Kentucky, located in Laurel County. Defendant London Police Department is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. It is being sued in its official capacity. It may be served with process to its chief executive officer, acting-mayor Tracie Handley, at 501 S Main St, London, KY 40741.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

16.     Defendant Jerry Hollon is the former chief of police at the London Police Department. Defendant Jerry Hollon is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued in his individual capacity. Upon information and belief, he may be served with process at 827 Highway 1023, Lily, KY 40740.

17.     Defendant Andrew Jackson was, at all times relevant to this action, a law enforcement officer employed by the London Police Department. Defendant Andrew Jackson is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued in his individual capacity. Defendant Andrew Jackson held the rank of Lieutenant at the time of the facts of this case. Upon information and belief, Defendant Andrew Jackson is a London Police Officer who participated in the procurement of the search warrant and/or conducted the search at issue in this case. Upon information and belief, he may be served with process at the London Police Department, located at 503 S Main St, London, KY 40741.

18.     Defendant Ashley Taylor was, at all times relevant to this action, a law enforcement officer employed by the London Police Department. Defendant Ashley Taylor is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. She is being sued in her individual capacity. Defendant Ashley Taylor held the rank of Sergeant at the time of the facts of this case. Upon information and belief, Defendant Ashley Taylor is a London Police Officer who participated in the procurement of the search warrant and/or conducted the search at issue in this case.  Upon information and belief, she may be served with process at 98 Maylene Drive, London, KY 40744.

19.     Defendant Elbert Riley was, at all times relevant to this action, a law enforcement officer employed by the London Police Department. Defendant Elbert Riley is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000006 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

in his individual capacity. Defendant Elbert Riley held the rank of Sergeant at the time of the facts

of this case. Upon information and belief, Defendant Elbert Riley is a London Police Officer who

participated in the procurement of the search warrant and/or conducted the search at issue in this

case. Upon information and belief, he may be served with process at the London Police

Department, located at 503 S Main St, London, KY 40741.

20.     Defendant Landry Collett was, at all times relevant to this action, a law enforcement

officer employed by the London Police Department. Defendant Landry Collett is a "person" under

42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. Defendant Landry

Collett held the rank of Detective at the time of the facts of this case. He is being sued in his

individual capacity. Upon information and belief, Defendant Landry Collett is a London Police

Officer who participated in the procurement of the search warrant and/or conducted the search at

issue in this case. Upon information and belief, he may be served with process at the London Police

Department, located at 503 S Main St, London, KY 40741.

21.     Defendant Wesley Wolfe was, at all times relevant to this action, a law enforcement

officer employed by the London Police Department. Defendant Wesley Wolfe is a "person" under

42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued

in his individual capacity. Defendant Wesley Wolfe held the rank of Detective at the time of the

facts of this case. Upon information and belief, Defendant Wesley Wolfe is a London Police

Officer who participated in the procurement of the search warrant and/or conducted the search at

issue in this case. Upon information and belief, he may be served with process at the London Police

Department, located at 503 S Main St, London, KY 40741.

22.     Defendant Troy Truett was, at all times relevant to this action, a law enforcement

officer employed by the London Police Department. Defendant Troy Truett is a "person" under 42

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000007 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CC

U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued in his individual capacity. Defendant Troy Truett held the rank of Lieutenant at the time of the facts of this case. Upon information and belief, Defendant Troy Truett is a London Police Officer who participated in the procurement of the search warrant and/or conducted the search at issue in this case. Upon information and belief, he may be served with process at the London Police Department, located at 503 S Main St, London, KY 40741.

23.     Defendant Jonathan Jackson was, at all times relevant to this action, a law enforcement officer employed by the London Police Department. Defendant Jonathan Jackson is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued in his individual capacity. Defendant Jonathan Jackson held the rank of Sergeant at the time of the facts of this case. Upon information and belief, Defendant Jonathan Jackson is a London Police Officer who participated in the procurement of the search warrant and/or conducted the search at issue in this case. Upon information and belief, he may be served with process at the London Police Department, located at 503 S Main St, London, KY 40741.

24.     Defendant Josh Morgan was, at all times relevant to this action, a law enforcement officer employed by the London Police Department. Defendant Josh Morgan is a "person" under 42 U.S.C. § 1983 and acted under color of law at all times relevant to this case. He is being sued in his individual capacity. Defendant Josh Morgan held the rank of Patrolman at the time of the facts of this case. Upon information and belief, Defendant Josh Morgan is a London Police Officer who participated in the procurement of the search warrant and/or conducted the search at issue in this case. Upon information and belief, he may be served with process at the London Police Department, located at 503 S Main St, London, KY 40741.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

25.     Unknown Defendants are yet to be ascertained police officers who worked for the London Police Department at the time of Mr. Harless' death, who participated in the raid upon Mr. Harless' home, in the procurement of the alleged search warrant for which the underlying search was executed, encouraged the specific incident of misconduct or in some other way directly participated it, and/or were involved in any way in the acts and occurrences alleged in this Complaint, including in the supervision of others, including Police Officer Defendants, and yet to be ascertained individuals with policymaking and/or supervisor authority over the Defendants in this case. The identities of these Unknown Defendants shall be revealed through the course of discovery.

26.     Defendants Jerry Hollon, Andrew Jackson, Ashley Taylor, Elbert Riley, Landry Collett, Wesley Wolffe, Troy Truett, Jonathan Jackson, Josh Morgan, and Unknown Defendants who were police officers shall be collectively referred to as "Police Officer Defendants" unless named individually. Because Mr. Harless is dead and cannot testify as to the identity of the officers, no official information regarding the identities of each officer involved in the killing of Mr. Harless has been released, the police officers wore masks, and all Defendants have taken action with the intent to conceal their identities; it is currently impossible for Plaintiffs to precisely determine which of the Police Officer Defendants is responsible for which acts.

27.     Upon information and belief, Defendants Jerry Hollon, Andrew Jackson, Troy Truett, and Unknown Police Officer Defendants had supervisory authority over one or more London Police officers and/or Police Officer Defendants. They, and all Defendants with a supervisor position over all or some of Police Officer Defendants, shall be referred to collectively as "Supervisor Defendants."

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

## JURISDICTION AND VENUE

28.     Defendants London Police Department, the City of London, and Jerry Hollon are based in Laurel County, Kentucky.

29.     Upon information and belief, all Police Officer Defendants reside in Laurel County, Kentucky, and/or are or were employed in the county at the time of the events alleged herein.

30.     Jurisdiction is proper in this Court as the amount in controversy exceeds the jurisdictional amount of this general trial court. Further, this Court has concurrent jurisdiction over all federal claims alleged.

31.     Venue is proper in this Court as all, or a substantial portion, of the events giving rise to this action occurred in Laurel County, Kentucky.

32.     This Complaint is thus timely and properly commenced on all claims.

## FACTS

33.     Plaintiffs incorporate all other facts and allegations contained in this Complaint.

### 511 Vanzant Road and Mr. Doug Harless

34.     At the time and place of his death, Doug Harless was 63 years old, an American citizen, and a Laurel County, Kentucky resident.

35.     Doug Harless was employed as a maintenance man and lived lawfully and peacefully in his private residence at 511 Vanzant Road, Lily, Laurel County, Kentucky.

36.     At the time of the events alleged in this Complaint, Mr. Harless lived at 511 Vanzant Road for about 8 years.

37.     Throughout that time, Mr. Harless received mail from the United States Postal Service at 511 Vanzant Road in Lily, Kentucky.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000010 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

38.     Mr. Harless' trailer home at 511 Vanzant Road had not moved at any point during his residency there.

39.     No other trailer home on Vanzant Road had been moved throughout the time Mr. Harless lived on Vanzant Road.

40.     Doug Harless did not live or reside at 489 Vanzant Road, nor had he ever lived there.

41.     Doug Harless was not a suspect in the alleged theft of property at 508 Taylor Drive, London, Kentucky, or otherwise.

42.     Doug Harless was not suspected of possessing stolen property.

43.     Doug Harless was not suspected of purchasing stolen property.

44.     Doug Harless was not suspected of possessing, purchasing, selling, or intending to sell illegal drugs.

45.     Doug Harless has never been charged with, accused of, or found guilty of any crime besides a minor traffic infraction.

**Vanzant Road and Mr. James Steele**

46.     James Steele (also known as Jim Steele) lived at 621 Vanzant Road at the time of the incident at issue in this case.

47.     James Steele had never lived or resided at 511 Vanzant Road.

48.     James Steele was once a resident of 489 Vanzant Road.

49.     Upon information and belief, James Steele allegedly was involved in the sale of illegal drugs, and such transactions would occur on the property of 489 Vanzant Road.

50.     James Steele was evicted from 489 Vanzant Road on or around August 9, 2023. *See,* **EXHIBIT 1**, Laurel Co. District Court, 23-C-00875.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000011 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

51.     While he lived at 489 Vanzant Road, Mr. Steele called 911 on at least three occasions for the Laurel Ambulance Service to come to the property. *See* **EXHIBIT 2**, 489 Vanzant Road Service Calls.

52.     Upon information and belief, the Laurel Ambulance Service was able to locate 489 Vanzant Road each time.

53.     Upon information and belief, the Laurel Ambulance Service did not mistakenly go to 511 Vanzant Road when responding to 911 calls for an ambulance before the incident in this case.

54.     Upon information and belief, the Laurel Ambulance Service and the London-Laurel 911 Dispatch Communication Center were aware of the correct location of 489 Vanzant Road.

55.     Both 489 Vanzant Road and 511 Vanzant Road are located more than 8 miles south of London, KY, outside the city limits of London, KY, and beyond the jurisdictional boundaries of the London City Police Department and Police Officer Defendants.

### The Investigation of the Burglary at 508 Taylor Drive

56.      On December 23, 2024, at around 9 a.m., London Police Department Officers began investigating an alleged burglary at 508 Taylor Drive, London, KY. *See* **EXHIBIT 3**, Redacted KYIBRS report.

57.     Several items of lawn care equipment were stolen in this alleged burglary.

58.     508 Taylor Drive, London, KY, is real property owned by Judge-Executive David Westerfield, and each of the alleged stolen items belonged to Judge-Executive Westerfield or members of his family.

59.     While investigating the alleged burglary, London Police Officers identified Hobert Buttery as a suspect.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000012 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

60.     At about 1:00 pm on December 23, 2024, a London Police Department Officer, Jared Hale, personally visited the neighborhood where 489 Vanzant Road and 511 Vanzant Road are located to investigate 515 Vanzant Road, the address for which the vehicle allegedly used in the theft was registered.

61.     Officer Jared Hale asked Monty Hart, the property manager for many of the trailers on Vanzant Road, and son of the property owner, if he had seen Hobert Buttery in the area recently, and inquired about Mr. Hobert Buttery's residence.

62.     Mr. Hart informed Officer Hale that he had not seen Mr. Buttery.

63.     Mr. Hart informed Officer Hale that Mr. Buttery does not live in the area.

64.     Mr. Hart informed Officer Hale that 489 Vanzant Road was vacant and showed the officer its physical location in the area.

65.     Upon information and belief, Mr. Hart informed Officer Hale that Mr. Buttery did not live and never lived at 511 Vanzant Road (Mr. Harless' home address) or 489 Vanzant Road.

66.     Officer Jared Hale observed that 515 Vanzant Road was vacant.

67.     Upon information and belief, one or more London Police Department officers later found Hobert Buttery through their investigation and interviewed him. During the interview, Buttery advised officers that he had stolen items from the 508 Taylor Drive property.

68.     Upon information and belief, Buttery allegedly told the officers that he took one of the items to a residence in Lily, Kentucky, and exchanged it for drugs.

69.     Upon information and belief, Buttery did not provide officers with a specific address, but he instructed one or more officers that the residence was on Vanzant Road.

70.     There are numerous trailer homes on Vanzant Road.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

71.     Upon information and belief, Buttery told the officers that he exchanged the stolen item for drugs with a man named James Steele.

72.     Mr. Buttery was then placed under arrest by one or more London Police officers. *See* **EXHIBIT 4**, Buttery's Uniform Citation.

### The Alleged Search Warrant and the Failure to Confirm the Address

73.     Upon information and belief, one or more Police Officer Defendants allegedly obtained a search warrant for a property located at 489 Vanzant Road in Lily, Kentucky.

74.     It is not known how Police Officer Defendants identified 489 Vanzant Road as the suspected property. However, the property was vacant on the date of the search, and public court records indicate that Mr. Steele had long since been evicted from the premises.

75.     Upon information and belief, this alleged search warrant has not been returned to the Laurel County Circuit Court Clerk or is otherwise not in possession of the Clerk.

76.     The failure to return the above-mentioned search warrant is a violation of Rule 13.10(4) of the Kentucky Rules of Criminal Procedure, which requires that search warrants, upon execution, be returned to the Court within a reasonable time of their execution.

77.     Since the alleged search warrant was not returned to the Laurel County Circuit Court Clerk as required by law, the existence of the search warrant and the veracity of any future production of the alleged search warrant are put into doubt.

78.     Upon information and belief, the Police Officer Defendants who testified in the affidavit supporting the search warrant knowingly made false and/or misleading statements or omissions under oath, and/or made statements or omissions with a reckless disregard for the truth, which were material to the Court's finding of probable cause and the issuance of the search warrant.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

79.     Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to the Police Officer Defendants making such statements to procure the search warrant.

80.     Upon information and belief, this alleged search warrant was intended for the property where Mr. Buttery allegedly exchanged the stolen items for drugs with Mr. James Steele.

81.     Upon information and belief, the only evidence that the London Police Department had to justify any search was the vague statement of Hobert Buttery.

82.     Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to the Police Officer Defendants to seek a search warrant, despite having insufficient evidence of probable cause, as the Supervisor Defendants approved of pursuing the search warrant without probable cause.

83.     Upon information and belief, this alleged search warrant was intended to search the home of Mr. James Steele.

84.     Upon information and belief, this alleged search warrant was not intended to search the home of Mr. Doug Harless.

85.     Defendants lacked probable cause to enter 511 Vanzant Road, Lily, Kentucky.

86.     Defendants lacked probable cause to search 511 Vanzant Road, Lily, Kentucky.

87.     Defendants lacked probable cause to search the home of Mr. Doug Harless.

88.     Defendants lacked probable cause to suspect Mr. Doug Harless of committing any crime.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000015 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

89.     Police Department Defendants took no reasonable action to confirm the address and the location to be searched before seeking a search warrant and/or executing it.

90.     Police Department Defendants took no reasonable action to confirm the identity of the resident of the property that they intended to search before seeking a search warrant and/or executing it.

91.     Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to Police Officer Defendants in their failure to confirm the proper address for the search, as Supervisor Defendants approved of pursuing the warrant for the address without probable cause.

92.     Late in the evening on December 23, 2024, Police Officer Defendants arrived at 511 Vanzant Road.

93.     Some of the Police Officer Defendants were armed with rifles to conduct this search.

94.     Some of the Police Officer Defendants' weapons were loaded with Hollow Point or Polymer Point bullets.

95.     Upon information and belief, up to nine officers were on the scene to conduct the search pursuant to a search warrant for 489 Vanzant Road.

96.     511 Vanzant Road is clearly marked as such, with the address number visible from the driveway and upon approaching the front porch. *See* **EXHIBIT 5**, Photo of 511 Vanzant Road.

97.     511 Vanzant Road has a motion-activated light above the address numbers that was functioning at the time of the search.

Presiding Judge: HON. GREGORY A. LAY (627226)

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

98.     The light above the address number illuminated it, making the address number 511 visible to all in the area at the time of the events alleged in this Complaint.

99.     Two of Mr. Harless' vehicles were parked in the driveway of 511 Vanzant Road.

100.    These vehicles were registered with the Kentucky Department of Transportation and had license plates affixed to them.

101.    Police Officer Defendants parked their vehicles in the driveway of 511 Vanzant Road, behind Mr. Harless' vehicles, when they entered the property on December 23, 2024.

102.    Upon information and belief, Police Officer Defendants' vehicles had functioning headlights that were on when the officers approached the porch of 511 Vanzant Road to conduct the search.

103.    Upon information and belief, these headlights illuminated the address number of 511 Vanzant Road prior to the execution of the warrant.

104.    Upon information and belief, these headlights illuminated the license plates of Mr. Harless' vehicles.

105.    Police Officer Defendants saw, or should have seen, that the home was affixed with the number "511" on or near the entrance of the home they were attempting to search.

106.    Police Officer Defendants executed a search warrant upon 511 Vanzant Road, despite explicit or implicit knowledge that they were at the wrong address.

107.    Additionally, or in the alternative, Police Officer Defendants acted with recklessness, wantonness, malice, oppression, and/or deliberate indifference as to the identity of the property they were about to conduct the search upon.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

108.     Additionally, or in the alternative, Police Officer Defendants did not attempt to confirm the address of the property before executing the search warrant for 489 Vanzant Road upon 511 Vanzant Road.

109.     Additionally, or in the alternative, Police Officer Defendants did not check the license plate numbers of the vehicles parked at 511 Vanzant Road to confirm the owner of the vehicles before conducting the search.

110.     Additionally, or in the alternative, Police Officer Defendants took no action to confirm the resident of the property before conducting the search of 511 Vanzant Road.

111.     Police Officer Defendants lacked probable cause to support a search of Mr. Harless' property at 511 Vanzant Road.

112.     Police Officer Defendants acted with recklessness, wantonness, malice, oppression, and/or deliberate indifference to Mr. Harless' rights when they failed to confirm the property address before conducting the search.

113.     Police Officer Defendants acted with recklessness, wantonness, malice, oppression, and/or deliberate indifference to Mr. Harless' rights when they failed to confirm the resident of the property before conducting the search.

114.     Upon information and belief, Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to Police Officer Defendants in continuing to search 511 Vanzant Road, despite knowing that they were at the wrong address, and ignoring all evidence that the occupant of the home was Doug Harless, and not the individual that was the subject of the search warrant.

115.     Upon information and belief, the Police Officers Defendants did not coordinate with the Laurel County Sheriff's Department in procuring or executing the search warrant.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000018 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

116.    Upon information and belief, Police Officer Defendants did not inform the Laurel County Sheriff's Department that they were going to conduct a search within their jurisdiction before conducting the search.

117.    No exigent circumstances existed to justify the search of Mr. Harless' home.

### The Execution of the Warrant and the Killing of Mr. Harless

118.    At around 11:50 pm on December 23, 2024, one or more of the Police Officer Defendants walked onto the porch of 511 Vanzant Road to execute a search warrant for 489 Vanzant Road.

119.    Police Officer Defendants walked by the identifying address number (511) of Mr. Harless' home, which was illuminated by automatic lights, prior to attempting to execute the search warrant.

120.    Police Officer Defendants who entered onto the private property and porch of Mr. Harless' home did not have permission from Mr. Harless to be there, were there without probable cause for their presence or entry, and/or had no search warrant authorizing their entry upon the residence, and were therefore trespassing.

121.    Just before the execution of the search warrant, several Police Officer Defendants stood in the driveway of 511 Vanzant Road, while others encircled the sides of the property.

122.    At one point, each Police Officer Defendant had a clear view of the visible and illuminated address numbers affixed to the side of the trailer at 511 Vanzant Road.

123.    Each Police Officer Defendant saw, or should have seen, the address marker affixed on 511 Vanzant Road.

124.    Each Police Officer Defendant failed to intervene to stop the search despite having notice that they were at the wrong property.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000019 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

125.    Additionally, or in the alternative, each Police Officer Defendant failed to confirm the address and identity of the property before executing the search warrant.

126.    Police Officer Defendants proceeded with the search, despite notice that they were at the wrong address.

127.    Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to the Police Officer Defendants in continuing to search 511 Vanzant Road, despite knowing that they were at the wrong address.

128.    One or more of the Police Officer Defendants banged on Mr. Harless' door.

129.    Police Officer Defendants did not state why they were at 511 Vanzant Road.

130.    Police Officer Defendants did not state which police department or law enforcement entity they belonged to.

131.    Police Officer Defendants did not announce that they had a search warrant.

132.    Police Officer Defendants did not announce what they were looking for.

133.    Police Officer Defendants did not state whose property they were seeking to search.

134.    The stolen property that Police Officer Defendants were purportedly looking for, stolen lawncare equipment, is not readily destroyed or disposed of.

135.    There was no evidence that there were any illegal drugs at 489 Vanzant Road or 511 Vanzant Road at the time of the search.

136.    The Police Officer Defendants pounded on the door in the middle of the night, which startled Mr. Harless and awoke him from his sleep.

137.    Police Officer Defendants announced their presence, but did not identify the purpose of their attempted entry, nor did they wait a reasonable time before breaching the premises.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000020 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

138.    Mr. Harless had no criminal history besides minor traffic infractions.

139.    Mr. Harless had no reason to believe that his home would be raided by the police in the middle of the night.

140.    Mr. Harless reasonably feared imminent peril of death or great bodily harm by those who appeared to be breaking into his home in the middle of the night.

141.    Just seconds after banging on Mr. Harless' door, one or more of the Police Officer Defendants breached the door of Mr. Harless' home.

142.    Seconds later, one or more Police Officer Defendants shot and killed Mr. Harless.

143.    Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to the Police Officer Defendants in their failure to sufficiently knock and announce the purpose of the search, and in their failure to wait a sufficient amount of time before forcing their way onto the premises.

144.    Upon information and belief, five shots were fired from one of the Police Officer Defendants' assault rifles at Mr. Harless.

145.    The only spent casings recovered from the scene of the events described herein were .223 cases found on the porch of 511 Vanzant Road.

146.    Upon information and belief, the Police Officer Defendant who shot Mr. Harless used a DDM4 Multi-Caliber rifle loaded with .223 polymer-point ammunition.

147.    Mr. Harless was shot in the torso, arm, and head.

148.    Mr. Harless was pronounced dead at the scene.

149.    A 9mm pistol was recovered on the floor of Mr. Harless' trailer after one or more Police Officer Defendants shot him.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

150.    No spent 9mm casings were recovered from the scene.

151.    Upon information and belief, the Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged, or knowingly acquiesced to the Police Officer Defendants in the excessive force used against Mr. Harless.

**The London Police Department and its Chief Policymakers**

152.    At all times relevant to this Complaint, the Police Officer Defendants, the Supervisor Defendants, and the Unknown London Police Officer defendants were acting as duly appointed law enforcement officers for the London Police Department, were acting under the direction and control of the London Police Department, and under color of law.

153.    At all times relevant hereto, then-Acting London Police Chief Jerry Hollon, and other Unknown Defendant(s) were the chief policymakers for the London Police Department.

154.    Upon information and belief, Defendant Jerry Hollon made policymaking decisions that led to the violation of Mr. Harless' constitutional rights listed above, or was otherwise the moving force behind the violations against Mr. Harless.

155.    Upon information and belief, a widespread and recurring pattern, practice, custom, and/or informal policy of violating the rights mentioned above exists at the London Police Department that is so permanent and settled that it constitutes a formal policy of the Department. The adherence to these patterns, practices, customs, and/or informal policies led to, or was the moving force behind, the violation of Mr. Harless' constitutional rights.

156.    By way of example, Jerry Hollon and/or other chief policymakers enacted a policy and/or implemented a widespread and recurring pattern, practice, custom, and/or informal policy of executing unreasonable and impermissible nighttime searches and raids, without probable

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

cause, upon property outside of the London City boundaries, and without justification or regard to the added risks that such raids pose to officers, members of the public, and to the rights of the citizens of Laurel County. Upon information and belief, such raids were conducted for purposes not related to law enforcement activity, but rather in bad faith, and without the required notification to the Laurel County Sheriff's Department. This action by individuals with policymaking authority, and others which will be revealed in discovery, was the moving force behind the violations of Mr. Harless' rights as alleged in this Complaint.

157.     Upon information and belief, the City of London and the London Police Department, with deliberate indifference to the constitutional rights of the public, engaged in inadequate training, supervision, screening, and retention of police officers to ensure that their officers do not violate the rights of citizens as alleged in this Complaint.  This conduct contributed to or led to the violations of Mr. Harless' constitutional rights.

158.     By way of another example, all Police Officer Defendants who were present on the scene during the unlawful encounter at Mr. Harless' home saw the illuminated address number on Mr. Harless' home, indicating that they were at the wrong property, and every single officer ignored that evidence and continued to execute the warrant. Had the London Police Department provided adequate training, supervision, screening, and retention policies for its officers, the unlawful search of Mr. Harless' home would have never occurred, and his rights would not have been violated. This violation is such that it is likely to recur.

159.     Further, the London Police Department and the City of London made personnel decisions contrary to the city's and/or departments' written policies, selected unqualified officers to be on a unit that conducts dangerous evening raids and searches, and attempted to conceal the hiring of police officers for positions and salaries not authorized by the City of London. This policy

Presiding Judge: HON. GREGORY A. LAY (627226)

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

of promoting unqualified officers to these high-risk positions was the moving force behind the violations of Mr. Harless' rights.

160.     Additional evidence of the London Police Department and its chief policymakers' unlawful and unconstitutional conduct will be ascertained in the course of discovery.

161.     Upon information and belief, the City of London and the London Police Department have had prior instances of similar misconduct, which put them on notice that the training, supervision, screening, and retention of its Police Officers were deficient. For example, upon information and belief, Police Officer Defendants and other London Police Officers have engaged in other unreasonable and impermissible nighttime searches and raids, without probable cause, upon property outside of the London City boundaries, and without justification or regard to the added risks that such raids pose to officers, members of the public, and to the rights of the citizens of Laurel County. Upon information and belief, such raids were conducted for purposes not related to law enforcement activity, but rather in bad faith, and without proper notification to the Laurel County Sheriff's Department.

## CAUSATION AND DAMAGES

162.     As a direct, legal, and proximate result of Defendants' acts and/or omissions, Mr. Harless sustained violations of his constitutional rights, conscious pain, suffering, mental and emotional distress in his dying moments, and his ultimate death. Defendants' conduct was a substantial contributing factor in causing all of Mr. Harless' DAMAGES, including his death.

163.     Because of his death, Mr. Harless suffered such DAMAGES, including but not limited to:

    a.  TOTAL DESTRUCTION OF THE POWER TO EARN MONEY;

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000024 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

b.  CONSCIOUS PAIN and SUFFERING, including FEAR, APPREHENSION, and

TERROR from the illegal entry and multiple gunshot wounds to his person and body,

c.  FUNERAL EXPENSES;

d.  PUNITIVE DAMAGES; and

e.  COSTS and ATTORNEY FEES as allowed by law

164.    As a direct, legal, and proximate result of Defendants' acts and/or omissions,

Plaintiffs seek all damages and remedies allowable pursuant to 42 U.S.C. § 1983, 42 U.S.C. §

1988, and Kentucky law.

## CAUSES OF ACTION

### COUNT 1 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS UNDER 42 U.S.C. § 1983  – UNREASONABLE SEARCH, INVALID WARRANT, AND INSUFFICIENT KNOCK AND ANNOUNCE
### (Against Police Officer Defendants)

165.    Plaintiffs incorporate by reference all other facts and allegations contained in this

Complaint.

166.    At all times herein mentioned, Police Officer Defendants were acting under color

of law.

167.    At all times herein mentioned, Police Officer Defendants had an obligation to

comply with the Fourth and Fourteenth Amendments to the United States Constitution.

168.    Police Officer Defendants failed to meet this obligation as to Doug Harless on

December 23, 2024.

169.    Police Officer Defendants violated Mr. Harless' clearly established Constitutional

rights under the Fourth Amendment to be free from unreasonable searches.

170.    Police Officer Defendants' search of Mr. Harless' home was unreasonable, as it

was not based upon a valid search warrant, and was not conducted in a reasonable manner.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

171.    Upon information and belief, Police Officer Defendants' search of Mr. Harless' home was not based upon a valid search warrant in that:

a.  The alleged warrant did not describe the place to be searched with sufficient particularity such that there was a reasonable probability that another premises may be searched by mistake;

b.  The alleged warrant did not describe the person or places to be searched and the items to be seized with particularity, it was obtained by Police Officer Defendants making false statements or omissions knowingly, intentionally, or with reckless disregard for the truth in obtaining the search warrant at issue in this case, and these false statements were necessary to the finding of probable cause, and;

c.  The alleged warrant lacked probable cause, or;

d.  Or, no search warrant exists to search Mr. Harless' property, and there were no exigent circumstances justifying the search.

172.    Upon information and belief, Police Officer Defendants' search of Mr. Harless' home was not conducted in a reasonable manner in that:

a.   Police Officer Defendants failed to announce their purpose for seeking entry into Mr. Harless' home, and failed to wait a reasonable amount of time before entering into Mr. Harless' home, without any justification or exigent circumstances;

b.  Police Officer Defendants executed the search warrant without assessing the affidavit upon which the warrant was based;

c.  Police Officer Defendants knew they were at the wrong property upon arrival at 511 Vanzant Road, but executed the search warrant anyway;

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000026 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

d.   Police Officer Defendants acted with a reckless disregard for the truth that they were at the wrong property upon arrival at 511 Vanzant Road and the execution of the warrant;

e.   Police Officer Defendants failed to confirm the address of the property prior to the search;

f.   Police Officer Defendants knew that they lacked legal justification to enter the trailer, that the occupant had no reason to expect a police search upon his home in the middle of the night, that the occupant was likely sleeping, that the occupant resided in a state with "Stand Your Ground" laws, that in executing the search warrant at around midnight, Police Officer Defendants were placing Mr. Harless, nearby residents, and themselves in danger, and that a reasonable person who hears commotion and banging outside of his door at around midnight would fear for his life;

g.   Police Officer Defendants failed to retreat from executing the search warrant or to intervene to stop the execution of the search warrant once it became clear that they were at the wrong property;

h.   Police Officer Defendants conducted the search without probable cause, therefore violating Mr. Harless' clearly established constitutional rights, and;

i.   Police Officer Defendants executed a warrantless search upon Mr. Harless' property without exigent circumstances justifying the search.

173.   Because of the failure alleged in this Complaint, Police Officer Defendants' search of Mr. Harless' home was unreasonable and in violation of his Fourth Amendment rights.

174.   Because of Police Officer Defendants' unconstitutional search, Doug Harless suffered all DAMAGES contained in this Complaint, including his death.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

175.    All of the Police Officer Defendants either personally participated in the specific constitutional violations alleged or witnessed the constitutional violations and failed in their duty to intervene.

176.    Based on Sixth Circuit case law, Police Officer Defendants had a fair and clear warning that their conduct violated constitutional law, such that every reasonable official would have understood that their conduct violates the Fourth and Fourteenth Amendment right to freedom from unreasonable search. *See e.g., Walker v. Louisville/Jefferson Cnty. Metro Govt.*, 583 F. Supp. 3d 887 (W.D. Ky. 2022); *Elliott v. City of Clarksville*, No. 3:05-0138, 2007 WL 470467 (M.D. Tenn. Feb. 9, 2007); *Cline v. Myers,* 495 Fed. Appx. 578 (6th Cir. 2012); *Greer v. City of Highland Park*, No. 15-CV-12444, 2017 WL 5653356 (E.D. Mich. Mar. 13, 2017), *Smith v. City of Detroit*, 238 F. Supp. 2d 896 (E.D. Mich. 2003); *Cohn v. DeWeese,* No. 09-12187, 2010 WL 3906227 (E.D. Mich. Sept. 30, 2010); and *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019).

177.    The above conduct was a substantial contributing factor in causing the harm to, and eventual death of, Doug Harless.

178.    Thus, Defendants are liable for all DAMAGES proximately caused by Police Officer Defendants' conduct, including Mr. Harless' death.

### COUNT 2 - FOURTH AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 – UNREASONABLE SEIZURE AND EXCESSIVE FORCE
### (Against Police Officer Defendants)

179.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

180.    At all times herein mentioned, Police Officer Defendants were acting under color of law.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

181.    At all times herein mentioned, Police Officer Defendants had an obligation to comply with the Fourth and Fourteenth Amendments to the United States Constitution.

182.    Police Officer Defendants failed to meet this obligation as to Doug Harless.

183.    Police Officer Defendants used more force against Mr. Harless than what was objectively and subjectively reasonable under the circumstances.

184.    In the seconds preceding Police Officer Defendants' entry into Mr. Harless' home, the officers knew or were reckless in failing to know that they had created circumstances that rendered the amount of force they then used unreasonable.

185.    Police Officer Defendants' knew or should have known that they lacked legal justification to enter the trailer, that the occupant had no reason to expect a night time police raid or search, that the occupant was likely sleeping, that the occupant resided in a state with strong "Stand Your Ground" laws, that in executing the search warrant at around midnight, Police Officer Defendants were placing Mr. Harless, nearby residents, and themselves in danger, and that a reasonable person who hears aggressive commotion outside of his door at around midnight would fear for his life.

186.    The action and/or inaction of the Police Officer Defendants were immediately connected to their disproportionate and excessive use of force against Mr. Harless.

187.    Police Officer Defendants who did not discharge their firearms observed or had reason to know that excessive force would be or was being used and had the opportunity and means to prevent the harm from occurring, but failed or refused to act.

188.    All of the Police Officer Defendants either personally participated in the specific constitutional violations alleged or witnessed the constitutional violations and failed to intervene.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

189.     Based on Sixth Circuit case law, Police Officer Defendants had a fair and clear warning that their conduct violated constitutional law, such that every reasonable official would have understood that their conduct violates the Fourth and Fourteenth Amendment right to freedom from unreasonable seizure. *See e.g, Walker v. Louisville/Jefferson Cnty. Metro Govt*., 583 F. Supp. 3d 887 (W.D. Ky. 2022); *Smith v. City of Detroit*, 238 F. Supp. 2d 896 (E.D. Mich. 2003); *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584 (W.D. Ky. 2020); *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019).

190.     The above conduct was a substantial contributing factor in causing the harm to, and eventual death of, Doug Harless.

191.     Thus, Defendants are liable for all DAMAGES that resulted from this unreasonable seizure and excessive force, including his death.

## COUNT 3 - FOURTH AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 – SUPERVISORY LIABILITY
### (Against Supervisor Defendants)

192.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

193.     At all times herein mentioned, Supervisor Defendants were acting under color of law.

194.     At all times herein mentioned, Supervisor Defendants had an obligation to comply with the Fourth and Fourteenth Amendments to the United States Constitution.

195.     Supervisor Defendants failed to meet this obligation as to Doug Harless.

196.     Supervisor Defendants violated Mr. Harless' clearly established Constitutional right of freedom from unreasonable search, seizure, and excessive force.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

197.    Supervisor Defendants had the duty to supervise Police Officer Defendants through their positions in the London Police Department and the City of London government.

198.    Upon information and belief, Supervisor Defendants had knowledge of the unconstitutional conduct being undertaken by Police Officer Defendants, including that they lacked probable cause to search Mr. Harless' property, that the alleged search warrant was improper and contained false statements or omissions, that the Police Officer Defendants were at the wrong property while conducting the search, that the property for which the search warrant was being executed was not the property described in the warrant, that Police Officer Defendants did not properly announce their presence and purpose, and did not wait a reasonable time before breaching, that Police Officer Defendants failed to retreat from executing the search warrant when doubt arises as to whether they are at the correct property, that Police Officer Defendants made false statements in their affidavit for a warrant, either knowingly or with reckless disregard for the truth, that Police Officer Defendants were executing a search warrant when it was not reasonable under the circumstances, that Police Officer Defendants were not executing search warrants in a manner that is reasonable under the circumstances, and that Police Officer Defendants were using and amount of force that was not reasonable under the circumstances.

199.    Upon information and belief, Supervisor Defendants, through active unconstitutional behavior, either explicitly or implicitly authorized, approved, encouraged or knowingly acquiesced to Police Officer Defendants in the above unconstitutional conduct, including by actively participating in unconstitutional actions, by instructing and encouraging Police Officer Defendants to undertake unconstitutional actions, and by failing to intervene when they know that unconstitutional actions are taking place or will soon take place.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

200.     This conduct by Supervisor Defendants was a proximate cause of Mr. Harless' constitutional rights violations, his injuries, and his death.

201.     The above conduct was a substantial contributing factor in causing the harm to, and eventual death of, Doug Harless.

202.     Thus, Supervisor Defendants are liable for all DAMAGES that resulted from this search, seizure, and excessive force, including his death.

### COUNT 4 –FOURTH AND FOURTEENTH AMENDMENT VIOLATION PURSUANT TO 42 U.S.C. § 1983 – MUNICIPAL LIABILITY
#### (Against Defendants London Police Department and The City of London)

203.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

204.     Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny, Plaintiffs make the following additional allegations.

205.     At all times relevant to this Complaint, the Police Officers Defendants were acting as duly appointed law enforcement officers for the London Police Department, under the direction and control of the London Police Department, and under color of law.

206.     At all relevant times, then Chief of the London Police Department, Jerry Hollon, and other Unknown Defendant(s) were the chief policymakers for the London Police Department.

207.     Acting under color of law and in violation of London Police Department's law enforcement rules and policies and/or pursuant to official or unofficial policy or custom, Jerry Hollon and/or other unnamed chief policymakers, and/or the London Police Department and/or the Police Officer Defendants, through its policy makers, knowingly, recklessly, or with gross negligence and deliberate indifference, failed to instruct, supervise, control, deploy, investigate, and/or discipline the Police Officer Defendants in their duties regarding obtaining and executing

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

search warrants, criminal investigations, the use of lethal force, and as a result, deprived Doug Harless of his Constitutional and statutory rights, privileges, and immunities. The conduct and failures of the London Police Department, through their chief policymakers, were the moving force behind the constitutional violations asserted in this Complaint.

208.     Upon information and belief, individuals with policymaking authority, including, but not limited to, Defendant Jerry Hollon, made policy decisions that caused the violation of Mr. Harless' constitutional rights listed above.

209.     Upon information and belief, a widespread and recurring pattern, practice, custom, and/or informal policy of violating the rights mentioned above exists at the London Police Department. It is so permanent and settled that it constitutes a formal policy of the Department. The adherence to these patterns, practices, customs, and/or informal policies caused the violation of Mr. Harless' constitutional rights.

210.     Upon information and belief, the City of London and the London Police Department, with deliberate indifference to the constitutional rights of the public, engaged in inadequate training, supervision, screening, and retention of police officers to ensure that their officers do not violate the rights of citizens as alleged in this Complaint.  This conduct was the moving force causing the violations of Mr. Harless' constitutional rights.

211.     The above conduct was a substantial contributing factor in causing the harm to, and eventual death of, Doug Harless.

212.     As a direct and proximate cause of these failures on the part of the London Police Department, Doug Harless suffered significant DAMAGES as alleged herein.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

## COUNT 5 – STATE LAW NEGLIGENCE FOR BREACH OF MINISTERIAL DUTIES
### (Against Police Officer and Supervisory Defendants)

213.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

214.     The London Police Department has a series of policies and procedures that London Police Officers must comply with. *See* **EXHIBIT 6**, London Police Policies and Procedures excerpts.

215.     Police Officer Defendants were required by state law and the policies and procedures of the London Police Department to comply with all ministerial duties, including, but not limited to, the following:

a)  To attempt to execute the search warrant only at the exact and particular address specifically described and authorized by the search warrant;

b)  To absolutely identify and confirm the proper and particular address described and authorized by the search warrant;

c)  To execute the search warrant only at the specific and particular address authorized by the search warrant;

d)  To NOT attempt to execute the search warrant at any other address NOT particularly described and authorized by the search warrant;

e)  To only execute a search when there is probable cause for that search;

f)  To not make false statements under oath;

g)  To not make materially false statements in an application for a warrant;

h)  To not make materially false statements under oath with the intent to mislead a public servant in the performance of his official duties;

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000034 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

i)  To only present a search warrant application and search warrant directed to the law enforcement agency of the jurisdiction in which it is to be served;

j)  To only present a search warrant application and search warrant, particularly describing what law has been violated and evidence indicating that the person or premises to be searched is involved;

k)  To identify any hazards that might exist when executing a search warrant;

l)  To review a sketch of the premises to be searched, verifying the building description, and the address if available;

m)  To make every effort to ensure that the correct premises and only the correct premises are being entered;

n)  To stop entry into the premises if there are any doubts about whether or not a correct entry is being made;

o)  To identify the tenant of record for the premises;

p)  To prepare a risk assessment matrix;

q)  To designate a search supervisor in writing;

r)  To designate an entry team leader in writing;

s)  To ensure that a search file containing an incident report documenting the search, copies of photographs, search warrant, booking cards, property sheets, and any other pertinent information is started and completed;

t)  To submit that search file to the approving supervisor who approved the execution of the warrant for review. The incident report should include the names of officers announcing entry, what was said, and the length of time elapsed from verbal demand

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

for entry until the time entry was permitted or forcible entry had to be made, and why the entry was made;

u) To ensure the search warrant is returned to the Court designated with a written inventory of the property seized within the required time of ten (10) days from the date the warrant was issued, and place a copy in the search file;

v) Hiring and paying persons to positions not established by the City of London and/or its City Council;

w) Misusing police department resources for personal reasons, and;

x) Other violations of law, statute, regulation, and/or policies not named herein.

216.    Further, one or more of the Police Officer Defendants acting as the Search Supervisor was required by London Police Department Policy to do the following when the Search Supervisor anticipates forcible entry into a structure or the use of force against the occupants:

a) To coordinate communications and equipment;

b) To coordinate assistance from specialized support units;

c) To consider the availability of medical resources;

d) To develop strategies for approaching, entering, securing, and leaving the structure that will minimize the risk of injury;

e) To discuss the threat potential and anticipated force with all members of the entry and search team; and

f) To review the situation with their immediate supervisor and the Chief of Police, and consider using extra officers as outlined in the risk assessment matrix when the potential for violence is imminent or significant.

217.    Each of the above duties is fixed, certain, and/or ministerial in nature.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000036 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

218.    Police Officer Defendants acted in bad faith in the performance of these duties.

219.    Upon information and belief, one or more of Police Officer Defendants negligently breached some or all of these ministerial duties and, as a result, Mr. Harless suffered DAMAGES, including his untimely death.

220.    The above conduct was a substantial contributing factor in causing the harm to, and eventual death of, Doug Harless.

## COUNT 6 – VICARIOUS LIABILITY FOR BREACHES OF MINISTERIAL DUTIES
### (Against Defendant London Police Department and the City of London)

221.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

222.    Police Officer Defendants were, at all times relevant to this Complaint, employees of the London Police Department.

223.    The London Police Department is an agency of the city incorporated under the laws of the Commonwealth of Kentucky. It is therefore subject to the provisions of Kentucky's Claims Against Local Government Act, or "CALGA." *See* KRS 65.200-2006.

224.    The London Police Department is therefore vicariously liable for Police Officer Defendants' breach of ministerial duties. *See Morales v. City of Georgetown*, 709 S.W.3d 146 (Ky. 2024).

225.    One or more of Police Officer Defendants breached some or all of these duties and such breach was substantial contributing factor in Mr. Harless causing significant DAMAGES, including his untimely death.

## COUNT 7 – ASSAULT AND BATTERY
### (Against Police Officer Defendants)

226.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

227.   The acts and omissions of one or more of the Police Officer Defendants constitute the tort of assault and battery, and the assault and battery was a substantial contributing factor in the harm to, and eventual death of, Doug Harless.

228.   The Police Officer Defendants are liable to the Plaintiffs for all DAMAGES caused by their acts and omissions in such sum as shall be determined by a jury, and the London City Police Department and City of London are vicariously liable for the same.

### COUNT 8 – TRESPASS TO LAND
**(Against Police Officer Defendants)**

229.   Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

230.   Police Officer Defendants intentionally entered Mr. Harless' property without his consent.

231.   Police Officer Defendants had no lawful purpose for being at 511 Vanzant Road and entering the property.

232.   This intrusion was a substantial contributing factor in causing Doug Harless to sustain DAMAGES for which the Police Officer Defendants are liable.

### COUNT 9 – FALSE IMPRISONMENT
**(Against Police Officer Defendants)**

233.   Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

234.   Police Officer Defendants deprived Mr. Harless of his liberty without his consent and against his will.

235.   This restraint of Mr. Harless' liberty was wrongful, improper, and/or without a claim of reasonable justification, authority, or privilege.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000038 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

236.     This restraint was a substantial contributing factor in causing DAMAGES sustained by Doug Harless for which Police Officer Defendants are liable.

## COUNT 9 – OUTRAGE
### (Against Police Officer Defendants)

237.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

238.     The acts and omissions of the Police Officer Defendants constitute the tort of outrageous conduct/ outrage in that the Police Officer Defendants acted recklessly with extreme and outrageous conduct intended to or likely to cause bodily harm and severe emotional distress to the Plaintiffs, and which in fact were a substantial contributing factor in causing bodily harm and severe emotional distress to the Plaintiffs.

239.     Police Officer Defendants are liable to the Plaintiffs for all DAMAGES caused by their negligence and wrongful acts, in such sum as shall be determined by a jury.

## COUNT 10 – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against Police Officer Defendants)

240.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

241.     The acts and omissions of the Police Officer Defendants constitute negligent infliction of emotional distress upon the Plaintiffs who have suffered great, grievous and incalculable emotional distress upon learning that their father had been shot and killed in his private residence in the middle of the night, right before Christmas, by Police who were at the wrong house, looking for a weed eater allegedly stolen by a different man.

242.     The above conduct was a substantial contributing factor in causing the harm to the Plaintiffs.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000039 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

243.    Police Officer Defendants are liable to the Plaintiffs for all DAMAGES caused by their negligence and wrongful acts, in such sum as shall be determined by a jury.

### COUNT 11 – INVASION OF PRIVACY
**(Against Police Officer Defendants)**

244.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

245.    The acts and omissions of the London City Police Department constitute the tort of invasion of privacy as guaranteed to citizens when the constitution of the Commonwealth of Kentucky, the United States, and common law.

246.    Police Officer Defendants are liable to the Plaintiffs for all DAMAGES caused by their negligence and wrongful acts, in such sum as shall be determined by a jury.

### COUNT 12 – WRONGFUL DEATH
**(Against All Defendants)**

247.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

248.    KRS 411.130 provides that whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered from the person who caused it or whose agent or servant caused it. If the act was willful or gross negligence, punitive damages may be recovered.

249.    Based on the facts alleged herein, Plaintiffs allege that one or more of the Defendants' actions were negligent, wrongful, and/or willful, malicious, and/or reckless, and Plaintiffs are thus entitled further to pursue claims for the wrongful death of Doug Harless.

250.    Such DAMAGES include, but are not limited to:

    i.  TOTAL DESTRUCTION OF THE POWER TO EARN MONEY,

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000040 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

    ii.   CONSCIOUS PAIN and SUFFERING, including FEAR, APPREHENSION, and TERROR from the illegal entry and multiple gunshot wounds to his person and body;

    iii.   FUNERAL EXPENSES;

    iv.   PUNITIVE DAMAGES and

    v.   COSTS and ATTORNEY FEES as allowed by law.

251.    Plaintiffs suffered these DAMAGES as a result of the injuries inflicted upon Doug Harless by one or more of the Defendants as alleged hereinabove.

### COUNT 13 – CONCERT OF ACTION
**(Against All Defendants)**

252.    Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

253.    At all relevant times Defendants, and each of them, engaged in a "concert of action" in that they committed tortious acts in concert with the other individual Defendants, pursuant to a common plan or design, knew or should have known that the other individual Defendants' conduct constituted a breach of duty, and gave substantial assistance or encouragement to the other individual Defendants in accomplishing a tortious result, and their own conduct separately considered, constitutes a breach of duty to Doug Harless.

254.    Such concert of action was a substantial contributing factor in causing the death of Doug Harless and all DAMAGES to Plaintiffs for which they are liable to Plaintiffs in such sum as shall be determined by a jury, and the City of London and London City Police Department are vicariously liable for the same.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000041 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

## COUNT 14 – PUNITIVE DAMAGES
### (Against All Defendants)

255.     Plaintiffs incorporate by reference all other facts and allegations contained in this Complaint.

256.     One or more of the Defendants' acts and omissions were grossly negligent, reckless, wanton, committed with oppression, fraud, and malice, willful, oppressive, motivated by evil motive or intent, callously indifferent to federally protected rights, and in violation of Mr. Harless' rights. Thus, the Defendants are liable to the Plaintiffs for Punitive Damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendants, granting Plaintiffs the following relief:

1.     Trial by jury;

2.     The entry of judgment in favor of Plaintiffs on each and every cause of action;

3.     The award of compensatory damages in an amount to be shown at trial;

4.     The award of punitive damages in an amount to be shown at trial;

5.     Pre and post judgment interest at the maximum legal rate;

6.     Costs as allowed by law;

7.     Attorney's fees under 42 U.S.C. § 1988;

8.     Such other relief Plaintiffs is entitled to or as the Court deems just and proper.

Presiding Judge: HON. GREGORY A. LAY (627226)

COM : 000042 of 000043

NOT ORIGINAL DOCUMENT
09/10/2025 11:35:23 AM
CHRIS@SHANNONFIRM.CO

Respectfully Submitted,

/s/ Tad Thomas
**Tad Thomas (KY #88577)**
**Ashley Abaray (KY #96715)**
**Nick Horne (KY #100328)**
THOMAS LAW OFFICES, PLLC
9418 Norton Commons Boulevard, Ste. 200
Louisville, Kentucky 40059
(502) 473-6540
tad@thomaslawoffices.com
ashley.abaray@thomaslawoffices.com
nicholas.horne@thomaslawoffices.com


/s/ Howard Mann
**Howard Mann (KY #43710)**
Law Offices of Howard O. Mann, PSC
104 N. Kentucky Avenue
Corbin, Kentucky 40701
(606) 528-0616
hmannlaw@bellsouth.net


/s/ Amanda Hill
**Amanda Hill (KY# 90260)**
**Jeff Hill (KY #90656)**
Hill & Hill
PO Box 1605
400 South Main Street
Corbin, KY 40702
(606) 528-7181
amanda@hill.legal
jeff@hill.legal

NOT ORIGINAL

DOCUMENT

09/17/2025 03:03:55

PM

84997-7

# Exhibit 1

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000002

DOCUMENT

PM

**NOT ORIGINAL**

09/17/2025 03:03:55

84997-7

*HART, MONTY VS. STEEL, JIM*

**LAUREL DISTRICT COURT**
Filed on **07/24/2023** as **FORCIBLE DETAINER** with **HON. JOHN PAUL CHAPPELL**
Disposition on **08/07/2023** of **OTHER** by **HON. JOHN PAUL CHAPPELL**
**\*\*\*\* NOT AN OFFICIAL COURT RECORD \*\*\*\***

**KENTUCKY COURT OF JUSTICE**

**23-C-00875**

| Case Memo | 23-C-00875 |
|---|---|

*30 DAYS TO VACATE*

| Parties | 23-C-00875 |
|---|---|

**HART, MONTY** as **PLAINTIFF / PETITIONER**

| Address |
|---|

272 H GAIL LANE
CORBIN KY 40701

**STEEL, JIM** as **DEFENDANT / RESPONDENT**

| Address |
|---|

489 VANZANT RD
LILY KY 40740

| Summons |
|---|

**EVICTION NOTICE** issued on **07/24/2023** for **07/31/2023 09:30 AM** in room **D** served / recalled on **07/25/2023** by way of **RETURNED TO ATTORNEY/PETITIONER**
*LSO*

| Documents | 23-C-00875 |
|---|---|

**PETITION FOR WRIT OF FORCIBLE DETAINER** filed on **07/24/2023**

**JUDGMENT FOR PLAINTIFF IN FORCIBLE ENTRY & DETAINER - GUILTY** entered on **08/01/2023**
*30 DAYS TO VACATE*

**EVICTION WARRANT** filed on **08/08/2023**
*EXECUTED BY DK DINSMORE ON 08/09/2023*

| Events | 23-C-00875 |
|---|---|

**COURT TRIAL** scheduled for **07/31/2023 09:30 AM** in room **D** with **HON. JOHN PAUL CHAPPELL**

| Images | 23-C-00875 |
|---|---|

There are no images found for this case.

**\*\*\*\* End of Case Number : 23-C-00875 \*\*\*\***

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000002 of 000002

**NOT ORIGINAL**

**DOCUMENT**

**09/17/2025 03:03:59**

**PM**

**84997-7**

# Exhibit 2

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000006

# Laurel Ambulance Service

NOT ORIGINAL
DOCUMENT

PM

## CALL FOR SERVICE

Case:

Incident:      202300007341



04/07/2025

09/17/2025 03:03:59

84997-7

---

**CALL FOR SERVICE**

Activity  M▮▮▮▮▮▮▮ Patient

| | | | | Priority | 3 | When Available | | |
|---|---|---|---|---|---|---|---|---|
| 3737SS | Dspchr D3737 | | Rept | 8/4/23  9:14 | | Shift | 1 | 0600-1400 |
| 3737SS | By D3737 | | How | | | Dispo | C | Completed |

---

**COMPLAINANT**

Steele, Jim                              Type                        Tel  ▮▮▮▮▮▮▮

                                                                    KY

**LOCATION:**

489 Vanzant Rd                           Lily                        L

**Common Place**

| Route | Beat | Fire | EMS | Zone |
|---|---|---|---|---|
| LSO | LIFD | LAS2 | LCRS | |

**FINAL DISPOSITION/ACTIVITIES**

Dispo

Activity

Reports                                  Arrests

---

**Transport**

| | | | Suffix | | |
|---|---|---|---|---|---|
| Unit | Miles | Start | End | | Tot |
| Patient | | | Type | | Sex |
| Reason | | | Care | | |

---

**Blotter**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

grey singlewide trailer, silver nissan rouge, white cad

---

**Log**

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 8/4/2023  09:16:48 | 3737SS | D3737 | Removed Unit - LAS2 |
| 8/4/2023  09:58:19 | 3742JH | D3742 | Incident Closed |

---

| TimeChanged | Dispatcher | Agency | UnitID | Status | Officer1 | Officer2 | Officer3 |
|---|---|---|---|---|---|---|---|
| 8/4/2023  09:14:35 | 3737SS | LAS | LAS2 | W Dispatch | | | |
| 8/4/2023  09:15:59 | 3737SS | LAS | LA51 | 2 Enroute | | | |
| 8/4/2023  09:16:48 | 3737SS | LAS | LAS2 | 1 10-8 (Ava | | | |
| 8/4/2023  09:25:57 | 3742JH | LAS | LA51 | 3 1097 (Sce | | | |
| 8/4/2023  09:43:51 | 3737SS | LAS | LA51 | 9 Enr ▮▮ | | | |
| 8/4/2023  09:58:09 | 3742JH | LAS | LA51 | C Arrv Hosp | | | |
| 8/4/2023  09:58:19 | 3742JH | LAS | LA51 | 1 10-8 (Ava | | | |

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000002 of 000006

# Laurel Ambulance Service

NOT ORIGINAL

**DOCUMENT**

## CALL FOR SERVICE

04/07/2025

09/17/2025 03:03:59

**PM**

Case:

84997-7

**Incident:**     202200001187



---

## CALL FOR SERVICE

| Activity | M | | | | Priority | 1 | Immediate | | |
|---|---|---|---|---|---|---|---|---|---|
| 3714JP | Dspchr | D3714 | | Rept | 2/4/22 16:48 | Shift | 2 | 1400-2200 | |
| 3714JP | By | D3714 | | How | | Dispo | C | Completed | |

## COMPLAINANT

| Steele, Jim | | Type | C | Complainant | Tel | |
|---|---|---|---|---|---|---|
| | | | | | KY | |

## LOCATION:

489 Vanzant Rd                         Lily                         L
Common Place

| Route | Beat | Fire | EMS | Zone |
|---|---|---|---|---|
| LSO | | LIFD | LAS2 | LCRS |

**FINAL DISPOSITION/ACTIVITIES**

Dispo
Activity

| Reports | Arrests |
|---|---|

## Transport

| | | | Suffix | | |
|---|---|---|---|---|---|
| Unit | Miles | Start | End | | Tot |
| Patient | | | Type | | Sex |
| Reason | | | Care | | |

## Blotter

gray and white trailer ; first one on the right on the lane its on

## Log

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 2/4/2022 16:50:03 | 3714JP | D3714 | Removed Unit - LAS2 |
| 2/4/2022 17:20:30 | 3715TW | D3715 | la40 adv road sign in gone |
| 2/4/2022 18:13:42 | 3713CR | D3713 | Incident Closed |

| TimeChanged | Dispatcher | Agency | UnitID | Status | Officer1 | Officer2 | Officer3 |
|---|---|---|---|---|---|---|---|
| 2/4/2022 16:48:07 | 3714JP | LAS | LAS2 | W Dispatch | | | |
| 2/4/2022 16:49:23 | 3714JP | LAS | LA40 | 2 Enroute | | | |
| 2/4/2022 16:50:03 | 3714JP | LAS | LAS2 | 1 10-8 (Ava | | | |
| 2/4/2022 17:03:46 | 3715TW | LAS | LA40 | 3 1097 (Sce | | | |
| 2/4/2022 17:18:34 | 3713CR | LAS | LA40 | 9 Enr | | | |
| 2/4/2022 18:13:42 | 3713CR | LAS | LA40 | 1 10-8 (Ava | | | |

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000003 of 000006

# Laurel Ambulance Service

## CALL FOR SERVICE

**Case:**

**Incident:**          **202200001187**

NOT ORIGINAL
04/07/2025
09/17/2025 03:03:59

DOCUMENT

PM

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000004 of 000006

# Laurel Ambulance Service

DOCUMENT

PM

NOT ORIGINAL 04/07/2025

09/17/2025 03:03:59

84997-7

## CALL FOR SERVICE

Case:



**Incident:** 202200000283

---

Presiding Judge: HON. GREGORY A. LAY (627226)

### CALL FOR SERVICE

| Activity | M▓▓▓ | | | | | | |
|---|---|---|---|---|---|---|---|
| 3706TP | **Dspchr** D3706 | | **Rept** | **Priority** 1 | Immediate | **Shift** 2 | 1400-2200 |
| 3706TP | **By** D3706 | | **How** | 9 911 | | **Dispo** C | Completed |

### COMPLAINANT

| Steele, Jim | | **Type** C Complainant | **Tel** ▓▓▓ |
|---|---|---|---|
| 980 OAK RIDGE | | CORBIN | KY |

### LOCATION:

489 Vanzant Rd                              Lily                         L
Common Place

| Route | Beat | Fire | EMS | Zone |
|---|---|---|---|---|
| LSO | | LIFD | LAS2 | LCRS |

### FINAL DISPOSITION/ACTIVITIES

Dispo
Activity

Reports                                    Arrests

### Transport

| | | | Suffix | |
|---|---|---|---|---|
| Unit | Miles | Start | End | Tot |
| Patient | | | Type | Sex |
| Reason | | | Care | |

### Blotter

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓gray and white trailer.

### Log

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 1/9/2022 22:57:22 | 3706TP | D3706 | Removed Unit - LAS2 |
| 1/9/2022 23:43:32 | 3720sc | D3720 | Incident Closed |

| TimeChanged | Dispatcher | Agency | UnitID | Status | Officer1 | Officer2 | Officer3 |
|---|---|---|---|---|---|---|---|
| 1/9/2022 22:54:08 | 3706TP | LAS | LAS2 | W Dispatch | | | |
| 1/9/2022 22:56:18 | 3706TP | LAS | LA42 | 2 Enroute | | | |
| 1/9/2022 22:57:22 | 3706TP | LAS | LAS2 | 1 10-8 (Ava | | | |
| 1/9/2022 23:11:06 | 3706TP | LAS | LA42 | 3 1097 (Sce | | | |
| 1/9/2022 23:24:17 | 3718PC | LAS | LA42 | 9 Enr▓▓ | | | |
| 1/9/2022 23:43:28 | 3720sc | LAS | LA42 | C Arrv Hosp | | | |
| 1/9/2022 23:43:32 | 3720sc | LAS | LA42 | 1 10-8 (Ava | | | |

EXH : T000005 of 000006

# Laurel Ambulance Service



NOT ORIGINAL
04/07/2025
DOCUMENT
09/17/2025 03:03:59
PM
84997-7

## CALL FOR SERVICE

**Case:**

**Incident:**     202100003387

---

**CALL FOR SERVICE**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Activity | MALAR | Alarm | | | | | | |
| 3710TW | **Dspchr** | D3710 | **Rept** | **Priority** 1 | Immediate | **Shift** | 1 | 0600-1400 |
| 3710TW | **By** | D3710 | **How** | | **Dispo** | AA | Accid Actvtn | |

---

**COMPLAINANT**

| | | | | | |
|---|---|---|---|---|---|
| Care Center | | **Type** | C | Complainant | **Tel** 8005086370 |
| | | | | | KY |

**LOCATION:**

489 Vanzant Rd                          Lily                               L
**Common Place**

| **Route** | **Beat** | **Fire** | **EMS** | **Zone** |
|---|---|---|---|---|
| LSO | | LIFD | LAS2 | LCRS |

**FINAL DISPOSITION/ACTIVITIES**

Dispo    AA    Accid Actvtn
Activity

Reports                              Arrests

---

**Transport**

| | | | **Suffix** | | |
|---|---|---|---|---|---|
| Unit | **Miles** | **Start** | **End** | | **Tot** |
| Patient | | | **Type** | | **Sex** |
| Reason | | | **Care** | | |

---

**Blotter**

████████████████████████████████

NO KEY LOCATION NOTED.

---

**Log**

| Date/Time | Officer Id | | Log Entry |
|---|---|---|---|
| 4/13/2021  08:57:28 | 3710TW | D3710 | ████████████ RESIDENCE |
| 4/13/2021  08:58:05 | 3710TW | D3710 | MADE CONTACT WITH ██████ |
| 4/13/2021  08:58:34 | 3710TW | D3710 | SON STATED IT WAS ACCIDENTAL ACTIVATION |
| 4/13/2021  08:58:37 | 3710TW | D3710 | Incident Closed |

---

| TimeChanged | Dispatcher | Agency | UnitID | Status | Officer1 | Officer2 | Officer3 |
|---|---|---|---|---|---|---|---|
| 4/13/2021  08:36:52 | 3710TW | LAS | LAS2 | W Dispatch | | | |
| 4/13/2021  08:37:33 | 3710TW | LAS | LA47 | 2 Enroute | | | |
| 4/13/2021  08:50:13 | 3710TW | LAS | LA47 | 3 1097 (Sce | | | |
| 4/13/2021  08:58:37 | 3710TW | LAS | LA47 | 1 10-8 (Ava | | | |
| 4/13/2021  08:58:37 | 3710TW | LAS | LAS2 | 1 10-8 (Ava | | | |

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 0000006 of 0000006

NOT ORIGINAL

09/17/2025 03:04:02

84997-7

**DOCUMENT**

**PM**

# Exhibit 3

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000009

DOCUMENT     **DRAFT**  <u>**KYIBRS REPORT**</u>   NOT ORIGINAL

COMMONWEALTH OF KENTUCKY

09/17/2025 03:04:02

PM

| AGENCY ORI/NAME | 0630100 LONDON POLICE DEPARTMENT | | | INCIDENT NUMBER | KY 2024-0476 | | |
|---|---|---|---|---|---|---|---|

| | INCIDENT DATE/TIME | EXACT / ESTIMATE | REPORT DATE | RECEIVED | DISPATCHED | ARRIVED | CLEARED |
|---|---|---|---|---|---|---|---|
| | 12/21/2024 08:00 TO 12/23/2024 09:00 | ESTIMATE | 12/23/2024 | 09:21 | 09:21 | 09:30 | 10:12 |

| REPORTED BY: HENSLEY, CHARLES W. | | HOW REPORTED | PHONE | VIDEO TAKEN ☐ |
|---|---|---|---|---|

**LICENSE/ID STATE:** KY    **LICENSE/ID NUMBER:** H92450890

**ADDRESS:** Privacy Information

**CITY:** Privacy Information    **STATE:** KY  **ZIP CODE:** 40906    **PHONE NUMBER:** Privacy

EXACT LOCATION OF OFFENSE
- 508 TAYLOR DR
- **ADDRESS** 508 TAYLOR DR   **SECTOR NO:**
- **CITY** LONDON   **STATE:** KY  **ZIP CODE:** 40741
- **COUNTY** LAUREL   **LATITUDE** 37 DEG  6.933 MIN   **LONGITUDE** 84 DEG  5.925 MIN

| SEQUENCE # | 1 OF 1 | LOCATION TYPE: NON-ATTACHED RESIDENTIAL GARAGE/SHED/OUT BUILDING | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|---|

**OFFENSE DESCRIPTION:** BURGLARY, 3RD DEGREE   1-UNKNOWN

| OFFENSE CODE: 22062 | ASCF CODE: 0 | KRS CODE: 511.040 | CLASS: D | DEGREE: F | COUNTS: 1 |
|---|---|---|---|---|---|

**BIAS MOTIVATION:** NONE (NO BIAS)    **METHOD ENTRY:** NO FORCE    **NUMBER PREMISES:** 0

**SCHOOL NAME:**    **SCHOOL TYPE:**    **CAMPUS?**

**OFFENDER SUSPECTED OF USING:** NOT APPLICABLE    **COURT ORDER TYPE:**

| SEQUENCE # | OF | LOCATION TYPE: | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|---|

**OFFENSE DESCRIPTION:**

| OFFENSE CODE: | ASCF CODE: | KRS CODE: | CLASS: | DEGREE: | COUNTS: |
|---|---|---|---|---|---|

**BIAS MOTIVATION:**    **METHOD ENTRY:**    **NUMBER PREMISES:**

**SCHOOL NAME:**    **SCHOOL TYPE:** ☐ Res Hall ☐ Separate Campus  **CAMPUS?**  ☐ Public Property ☐ Non-Campus Property

**OFFENDER SUSPECTED OF USING:** ☐ VAWA ☐ Title IX  **COURT ORDER TYPE:**

| SEQUENCE # | OF | LOCATION TYPE: | TYPE WEAPON/FORCE INVOLVED | CRIMINAL ACTIVITY/GANG IFO |
|---|---|---|---|---|

**OFFENSE DESCRIPTION:**

| OFFENSE CODE: | ASCF CODE: | KRS CODE: | CLASS: | DEGREE: | COUNTS: |
|---|---|---|---|---|---|

**BIAS MOTIVATION:**    **METHOD ENTRY:**    **NUMBER PREMISES:**

**SCHOOL NAME:**    **SCHOOL TYPE:** ☐ Res Hall ☐ Separate Campus  **CAMPUS?**  ☐ Public Property ☐ Non-Campus Property

**OFFENDER SUSPECTED OF USING:** ☐ VAWA ☐ Title IX  **COURT ORDER TYPE:**

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 1 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $575.00 | | | |

PROPERTY DESCRIPTION: TRIMMER

| OWNER APPLED NUMBER | | SERIAL NUMBER | |
|---|---|---|---|
| | | U33815033785 | |
| MAKE | | MODEL | OWNER |
| ECHO | | 3020T | Victim 1 |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 2 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $475.00 | | | |

PROPERTY DESCRIPTION: TRIMMER

| OWNER APPLED NUMBER | | SERIAL NUMBER | |
|---|---|---|---|
| | | U09715009500 | |
| MAKE | | MODEL | OWNER |
| ECHO | | 3020 | Victim 1 |

| TOTAL STOLEN VALUE: $4,000.00 | TOTAL RECOVERED VALUE: | TOTAL VEHICLES STOLEN: | TOTAL VEHICLES RECOVERED: |
|---|---|---|---|

| INCIDENT STATUS | CLOSED DATE | CLEARANCE TYPE | CLEARED EXCEPTIONALLY | EX. CLEARANCE DATE | UCR REPORTING FOR OTHER AGENCY |
|---|---|---|---|---|---|
| OPEN | | | | ☐ YES | |

| ORIGINATING OFFICER | ASSIGNED TO | UNIT/BADGE # | REVIEWED BY | SUPPLEMENTED BY |
|---|---|---|---|---|
| Etherton, Jamie | Etherton, Jamie | 3188 | | |

*Presiding Judge: HON. GREGORY A. LAY (627226)*

*EXH : 000002 of 000009*

# KYIBRS REPORT
## COMMONWEALTH OF KENTUCKY

NOT ORIGINAL

DOCUMENT
**DRAFT**

09/17/2025 03:04:02 PM

| VICTIM SEQUENCE | | VICTIM NAME | | | PHONE |
|---|---|---|---|---|---|
| 1 of 1 | WESTERFIELD, DAVID C. | | | | Privacy |

| LICENSE/ID STATE: KY | LICENSE/ID NUMBER: W95533896 | | |
|---|---|---|---|

| ☐ Address Unknown | ADDRESS: Privacy Information | | VICTIM TYPE: INDIVIDUAL |
|---|---|---|---|

| CITY: LONDON | STATE: KY | ZIP CODE: Privac | KY RESIDENT: RESIDENT |
|---|---|---|---|

| DATE OF BIRTH | SSN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|
| Privacy | Privacy | 5' 09" | | BLUE | GRAY OR PARTIALLY GRAY |

| GENDER | RACE | ETHNIC ORIGIN | PEACE OFFICER? |
|---|---|---|---|
| MALE | WHITE | NOT HISPANIC | ☐ YES |

| NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | OFFENDER # | VICTIM RELATIONSHIP TO OFFENDER: VICTIM WAS | NBR | INJURY TYPE |
|---|---|---|---|---|---|---|---|
| 1 | 1 | OTHERWISE KNOWN | | | | | |

| VICTIM OF OFFENSE(S) | AGG ASSAULT/ HOMICIDE CIRC | ADDTL JUSTIFIABLE HOMICIDE CIRC |
|---|---|---|
| 22062 | | |

| LEOKA ASSIGNMENT | LEOKA ACTIVITY |
|---|---|
| | |

| SUSPECT SEQ. # | NAME: BUTTERY, HOBERT G. | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|
| 1 of 1 | ALIAS: | | ☐ YES | |

| LICENSE/ID STATE: KY | LICENSE/ID NUMBER: B06429573 | | |
|---|---|---|---|

| ADDRESS Privacy | | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|---|

| CITY: LONDON | STATE: KY | ZIP CODE: Privac | Privacy | RESIDENT |
|---|---|---|---|---|

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|
| | MALE | WHITE | UNKNOWN | 5' 11" | | BROWN | BROWN |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | 1 | 4 | 8 |
|---|---|---|---|---|---|
| of | | | 2 | 5 | 7 |
| ARRESTEE ARMED WITH | | | 3 | 6 | 9 |

RELATED CITATION NUMBERS

| SUSPECT SEQ. # | NAME: | | ARRESTED? | ARREST DATE |
|---|---|---|---|---|
| of | ALIAS: | | ☐ YES | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | | |
|---|---|---|---|

| ADDRESS | | DATE OF BIRTH: | PHONE: | KY RESIDENT: |
|---|---|---|---|---|

| CITY: | STATE: | ZIP CODE: | |
|---|---|---|---|

| SSN | SEX | RACE | ETHNIC ORIGIN | HEIGHT | WEIGHT | EYE COLOR | HAIR COLOR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| ARRESTEE SEQ. # | MULTIPLE ARREST IND. | ARREST TYPE | 1 | 4 | 7 |
|---|---|---|---|---|---|
| of | | | 2 | 5 | 8 |
| ARRESTEE ARMED WITH | | | 3 | 6 | 9 |

RELATED CITATION NUMBERS

| WITNESS/OTHER SEQ | WITNESS NAME | PHONE |
|---|---|---|
| 1 of 1 | HALE, OFFICER JARED | |

| LICENSE/ID STATE: | LICENSE/ID NUMBER: | |
|---|---|---|

| ADDRESS: 503 S MAIN ST | | DATE OF BIRTH |
|---|---|---|

| CITY: LONDON | STATE: KY | ZIP CODE: 40741 | SSN: |
|---|---|---|---|

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000003 of 000009

# KYIBRS REPORT: PROPERTY/DRUG SUPPLEMENT

**DRAFT**

## COMMONWEALTH OF KENTUCKY

NOT ORIGINAL DOCUMENT

09/17/2025 03:04:02 PM

84997-7

**PROPERTY DATA**

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 3 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $775.00 | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| BLOWER | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | P52315010682 |

| MAKE | MODEL | OWNER |
|---|---|---|
| ECHO | 8010H | Victim 1 |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 4 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $600.00 | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| BLOWER | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | P56415001655 |

| MAKE | MODEL | OWNER |
|---|---|---|
| ECHO | 7910T | Victim 1 |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 5 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $775.00 | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| BLOWER | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | P56015016210 |

| MAKE | MODEL | OWNER |
|---|---|---|
| ECHO | 9010T | Victim 1 |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| 6 | TOOLS (Hand Tools and Power Tools) | STOLEN (NOT RECOVERED) | $800.00 | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| POLE SAW | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | UNKNOWN |

| MAKE | MODEL | OWNER |
|---|---|---|
| STIHL | HT135 | Victim 1 |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| | | | | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | |

| MAKE | MODEL | OWNER |
|---|---|---|
| | | |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| | | | | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | |

| MAKE | MODEL | OWNER |
|---|---|---|
| | | |

| SEQ # | PROPERTY DESCRIPTION | TYPE OF LOSS | VALUE | RECVRD VALUE | REC. COND. | DT RECOVERED |
|---|---|---|---|---|---|---|
| | | | | | | |

**GENERAL**

| PROPERTY DESCRIPTION | | | | |
|---|---|---|---|---|
| | | | | |

| OWNER APPLED NUMBER | SERIAL NUMBER |
|---|---|
| | |

| MAKE | MODEL | OWNER |
|---|---|---|
| | | |

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000004 of 000009

# KYIBRS REPORT: NARRATIVE

### COMMONWEALTH OF KENTUCKY

NOT ORIGINAL

DOCUMENT
**DRAFT**

PM

09/17/2025 03:04:02

84997-7

## *SYNOPSIS:*

On 12/23/2024 at approximately 0921 hours, officers were dispatched to 508 Taylor Dr. in reference to a burglary at the property. Upon arrival at the scene, officers made contact with the caller, Charles Hensley ( victim's nephew) and began obtaining information for the report.

## *INVESTIGATION:*

Hensley stated the residence, and the outbuildings on the property is owned by his uncle David Westerfield. Hensley stated the house at 508 Taylor Dr. is currently vacant and no one resides there, but Westerfield allows him to keep items inside of his garage for work. Hensley stated he was last at the location and observed the items in the garage on 01/21/2024 at approximately 0800 hours. Hensley stated he arrived back at the residence on 12/23/2024 at approximately 0900 hours, to retrieve items from the garage to go to work. Hensley stated he observed the side door on the non attached residential garage was standing open. Hensley stated once he walked into the garage he observed several items had been unlawfully removed from the garage. Hensley stated he also observed doors on a separate out building on the property were open and there were items that had been unlawfully removed from the building, but those items belonged to Westerfield, and he is unaware of the items. Hensley stated he would compile a list of items and provide to this officer.

While on scene, Hensley stated to officers, if he was able to locate a white older model Chevrolet Blazer on the video, he knows who is responsible. Hensley stated he had a male subject who worked for him named Hobert Buttery who worked for him in the past, who has knowledge of what is in the garage. Hensley stated the Buttery had asked him to get his job back, and when he advised him no, Buttery had became mad at him, and they have had issues since.

While on scene officers were able to view tire in the tracks, that went around the buildings and in to the parking lot of Phil McDonald State Farm located on W. 5th St. Prior to clearing the scene, officers made contact with Phil McDonald who stated he would view video footage from the business cameras and would allow this officers know if he was able to locate anything.

### 12/23/2024 at approximately 1200 hours:

This officer was contacted by Phil McDonald who stated he had located video of a vehicle entering the parking lot and wanted officers to come by and view the video. This officer responded to State Farm and made contact with Phil McDonald, who was able to allow this officer view the video, showing a white SUV square style, on 12/23/2024 12/22/2024 at approximately 2208 hours. The video showed the vehicle traveling in the direction matching the tracks in the yard, and leaves the parking lot towards W. 5th St. McDonald stated to this officer he would get a better video, and have it placed on a thumb drive and provide to this officer on this date.

### 12/23/2024 at approximately 1340 Hours:

Hensley came in to the London Police Department and provided officers with a detailed list of items he observed missing from the building, including serial numbers for the items. While on scene, Hensley also completed a witness statement form for officers, stating who he believes is responsible for the theft and why. Hensley stated the vehicle that Buttery drives was sold to him by Hensley. Hensley provided this officer with phone numbers for Westerfield to contact for further information.

# KYIBRS REPORT: NARRATIVE

## COMMONWEALTH OF KENTUCKY

NOT ORIGINAL

DOCUMENT
DRAFT

09/17/2025 03:04:02
PM

**12/23/2024 at approximately 1420 Hours:**

This officer made contact with Westerfield by phone. Westerfield stated the residence belongs to him, that he used to live in, but had built a new house, and has just been unable to sell the residence to this time. Westerfield stated Hensley is his nephew and he has given him permission to leave his items in the garage. Westerfield stated he is currently in Lexington with his wife having surgery, and has been unable to observe what he may have missing from the buildings. Westerfield stated he would attempt to compile a list of items the next date and provide to this officer.

**12/23/2024 at approximately 1600 hours:**

This officer attempted to make contact with Phil McDonald again to retrieve the thumb drive of video footage. McDonald was no longer in his office, and this officer was advised by a clerk that she believes McDonald was working on that at this time and would make contact with this officer when he gets it.

At the time of this report, this officer is working with Detective Riley London Police Department to further the investigation.

## *ATTACHMENTS:*

## *METHODS OF OPERATION:*

# CRIME SUPPLEMENT
## COMMONWEALTH OF KENTUCKY

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:02 PM

| CASE/INCIDENT NUMBER:   KY 2024-0476 | | REPORT DATE:   01/06/2025 | |
|---|---|---|---|
| REPORTING AGENCY ORI/NAME:   0630100 LONDON POLICE DEPARTMENT | | | |
| PRIMARY INVESTIGATING AGENCY ORI/NAME:   0630100 LONDON POLICE DEPARTMENT | | | |
| REPORTING OFFICER NAME:   Jamie Etherton | | REPORTING OFFICER UNIT BADGE ID:   3188 | |
| PRIMARY OFFICER UNIT BADGE ID:   834 | | | VIDEO |
| REVIEWED BY:  Ben Webb | | | ☐ YES  ☑ NO |

84997-7

| WITNESS SEQUENCE | WITNESS NAME | | PHONE |
|---|---|---|---|
| of | | | |
| ADDRESS: | | | DATE OF BIRTH |
| CITY: | STATE: | ZIP CODE: | SSN: | |
| WITNESS SEQUENCE | WITNESS NAME | | PHONE |
| of | | | |
| ADDRESS: | | | DATE OF BIRTH |
| CITY: | STATE: | ZIP CODE: | SSN: | |

### NARRATIVE

On 05/23/2024 after obtaining information for the case that is listed in the original case report, I began working with Detective Riley (London Police Department) who was called out to assist in the case, and relaying all information that I had obtained during the course of the investigation throughout the day. I was also able to make contact with Phil McDonald from State Farm who provided a flash drive containing the video footage of the vehicle traveling through their parking lot on the date of the theft. After obtaining the flash drive, I turned it over to Detective Riley.

While speaking with Detective Riley regarding this case, I was contacted by Captain Jackson (London Police Department) stating that Lt. Jackson (London Police Department) had located a vehicle matching the description of the vehicle located on video, and the male subject Buttery who was the suspect in this case, at Speedway in Manchester Kentucky. I was then informed the male subject was transported to Manchester Police Department to be interviewed in regards to this case. Myself, Detective Riley, and Captain Jackson left London Police Department and proceeded to Manchester Police Department where we made contact with the suspect to conduct an interview.

During the interview myself, Detective Riley, Captain Jackson and Lt. Jackson were all present in the room with the suspect during the interview. During the interview Buttery advised officers he had been in the area of the thefts the night prior, and in the area of the residence where the theft had occurred. Buttery stated to officers he had removed two items that were sitting outside of the white building with an air compressor behind it, that he stated belonged to the victim. Buttery stated he had taken one of the items to a pawn shop in Manchester, located near the Police Department, and the other item to a residence in Lily Kentucky and traded for dope. Buttery stated the name of the male subject where he traded the items was James Steele.

After the conclusion of the interview, Buttery was placed under arrest by Detective Riley, and was transported from Manchester Police Department and lodged in the Laurel County Detention Center by myself and Detective Riley. After Lodging Buttery in the Laurel County Detention Center, I dropped off Detective Riley at his vehicle. Detectives were continuing follow up in the case and preparing for a search warrant, at which time I was released from shift to go home and prepare for work the next morning.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000007 of 000009

On 12/24/2024 the victim of the case David Westerfield contacted Laurel County Dispatch requesting to speak with Officer Hale. Officer Hale patched in by phone through Laurel County Dispatch with the victim who stated he had time to go to the property and look inside the buildings. The victim stated he had multiple items that had been unlawfully removed from the buildings, but stated he did not know exactly what items he had inside of the buildings. The victim stated he was not worried about his own items, he was only worried about the items inside of the his buildings that belonged to his nephew. After completing the phone call, this officer was informed of the above information by Officer Hale.

NOT ORIGINAL DOCUMENT

09/17/2025 03:04:02 PM

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000008 of 000009

# Redaction Log

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:0

PM

| Reason | Page (# of occurrences) | Description |
|---|---|---|
| Privacy Information | **1** (3) **2** (8) | Per KRS 61.878(1)(a), "records containing information of a personal nature if disclosure would constitute a clearly unwarranted invasion of personal privacy." |

84997-7

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000009 of 000009

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:06

PM

84997-7

# Exhibit 4

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000003

COMMONWEALTH OF KENTUCKY

# UNIFORM CITATION

NOT ORIGINAL
DOCUMENT
11:55:34
DOCUMENT
PM
NOT ORIGINAL
NICKXHORNE
NOT ORIGINAL
01/22/2025
09/17/2025 03:04:0

**COURT**

## OFFENDER / VIOLATOR

| AGENCY | | | ORI |
|---|---|---|---|
| LONDON POLICE DEPARTMENT | | | 0630100 |

| NAME: LAST, FIRST, MI, FILIAL | ATTN | HOME PHONE |
|---|---|---|
| BUTTERY, HOBERT | ☐ | UNKNOWN |

| ALIAS NAME: LAST, FIRST, MI, FILIAL | EMERGENCY PHONE |
|---|---|
| | UNKNOWN |

| ADDRESS (NUMBER, NAME, SUFFIX) | KENTUCKY RESIDENT STATUS |
|---|---|
| 33 BEACH CREEK RD, #115 | ☑ F: FULL-TIME   P: PART-TIME   N: NON RESIDENT |

| CITY | STATE | ZIP CODE/EXTENSION | MARITAL STATUS | VICTIM'S RELATIONSHIP TO OFFENDER |
|---|---|---|---|---|
| MANCHESTER | KY | 40962 | MARRIED | |

| ID TYPE | ID ST | ID NUMBER | S. S. NUMBER | HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|
| NONE | | | | 5' 08" | 190 | BROWN | BROWN |

☐ COMMERCIAL VEHICLE    ☐ PLACARDED HAZARDOUS VEHICLE

| ETHNIC ORIGIN | ALCOHOL/DRUG INVOLVEMENT |
|---|---|
| ☐ HISPANIC ☑ NON HISPANIC | |

| DATE OF BIRTH | SEX | RACE | | |
|---|---|---|---|---|
| 08 21 1975 | ☑ MALE ☐ FEMALE | ☑ WHITE ☐ BLACK | ☐ AM. INDIAN OR ALASKA | ☐ ASIAN |

B.A. RESULTS

☐ ALCOHOL
☐ DRUGS
☐ UNKNOWN

| PLACE OF EMPLOYMENT / OCCUPATION | CITY | STATE |
|---|---|---|
| | | |

BREATH
BLOOD
URINE

## VEHICLE

| VEHICLE MAKE | VEHICLE MODEL | VEH. YEAR | VEHICLE COLOR |
|---|---|---|---|
| | | | |

| VEH. TYPE | REGISTRATION: STATE, YEAR, NUMBER | VEHICLE IDENTIFIERS | MPH | IN MPH ZONE | VIOL. KEY |
|---|---|---|---|---|---|
| | | | | | |

## DATE / TIME

| VIOLATION DATE | VIOLATION TIME | EXACT LOCATION OF VIOLATION | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 12 22 2024 | 10:01 PM | TAYLOR DR | | | LONDON |
| | | | | COUNTY | SECTOR |
| | | | | LAUREL | |

| ARREST DATE | TIME OF ARREST | EXACT LOCATION OF ARREST | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 12 23 2024 | 7:34 PM | MANCHESTER POLICE DEPARTMENT | 15.0 | E | MANCHESTER |
| | | | | COUNTY | SECTOR |
| | | | | CLAY | |

## CHARGES AND POST-ARREST COMPLAINT

| NUMBER | | | VIOLATION CODE | ASCF | STATUTE/ORD. | CHARGE(S) | STARTING CASE | ENDING CASE | DRUG TYPE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | of | 1 | 24097 | 0 | 514.030 | 1 | | | |
| | of | | | | | | | | |
| | of | | | | | | | | |
| | of | | | | | | | | |

POST-ARREST COMPLAINT

Charge 1: TBUT OR DISP ALL OTHERS $1,000 < $10,000

On 12/22/2024 Officers received a complaint of a burglary at 508 Taylor Drive in London, Kentucky. Officers conducted a neighborhood canvas and was able to located camera footage in the area. The camera footage showed a older model white blazer in a residential drive way. The footage also shows the vehicle travel through the yard and into the parking lot of State Farm Insurance located on West 5th Street in London.

The owners of the residence stated that only someone that knew the items were there would have taken them because the house was vacant. The owners stated that Hobert Buttery was working for them before he was last arrested and had contacted them back for a job. They denied him the job and said that he wasn't happy with that decision and that he knew all of the items were there.

The vehicle was located in Manchester, Kentucky and a male subject was working on it. Officers were able to speak to the subject. He stated that he was in the area of Taylor Drive around the time of the thefts and had taken a heater and a Stihl weedeater from outside of a building in the back yard. He stated that he did not take anthing else.

The above listed subject stated that he had taken the weedeater to a house in Lily and the heater to DJ Pawn Shop in Manchester,

## COURT

| COURT DATE | COURT TIME | ☐ PAYABLE ☑ COURT | COURT LOCATION | |
|---|---|---|---|---|
| ARRESTED | | | LAUREL | |

| COURT CASE NUMBER | TOTAL PREPAYABLE AMOUNT | **NOT PREPAYABLE** |
|---|---|---|

## CASE

| WITNESS 1 NAME: LAST, FIRST, MI, FILIAL | STATE | ZIP CODE |
|---|---|---|
| | | |

| WITNESS 1 ADRRESS (NUMBER, STREET, SUFFIX) | CITY |
|---|---|
| | |

| WITNESS 2 NAME: LAST, FIRST, MI, FILIAL | STATE | ZIP CODE |
|---|---|---|
| | | |

| WITNESS 2 ADRRESS (NUMBER, STREET, SUFFIX) | CITY |
|---|---|
| | |

☐ SERVING WARRANT FOR OTHER AGENCY   SPECIFY: *

☐ VIDEO
☐ EVIDENCE HELD

| OFFICER SIGNATURE | BADGE/I.D. NUMBER | ASSIGNMENT |
|---|---|---|
| Riley, E. | 3170 | CITY |

Presiding Judge: HON. GREGORY A. LAY (627226)

**24** YEAR

**DX75007** CONTROL NUMBER

**2** TYPE

EXH : 000002 of 000003

COMMONWEALTH OF KENTUCKY

# UNIFORM CITATION

NOT ORIGINAL
DOCUMENT
01/22/2025
11:55:34 NOT ORIGINAL
NICKXHORNE
DOCUMENT 09/17/2025 03:04:0
PM

**OFFENDER / VIOLATOR**

| AGENCY | | ORI: | |
|---|---|---|---|
| LONDON POLICE DEPARTMENT | | 0630100 | |

| NAME: LAST, FIRST, MI, FILIAL | ATTN: | HOME PHONE |
|---|---|---|
| **BUTTERY, HOBERT** | ☐ | **UNKNOWN** |

| ALIAS NAME: LAST, FIRST, MI, FILIAL | EMERGENCY PHONE |
|---|---|
| | **UNKNOWN** |

KENTUCKY RESIDENT STATUS

| ADDRESS (NUMBER, NAME, SUFFIX) | ☑ F: FULL-TIME ☐ P: PART-TIME ☐ N: NON RESIDENT |
|---|---|
| **33 BEACH CREEK RD, #115** | |

| CITY | STATE | ZIP CODE/EXTENSION | MARITAL STATUS | VICTIM'S RELATIONSHIP TO OFFENDER |
|---|---|---|---|---|
| **MANCHESTER** | **KY** | **40962** | **MARRIED** | |

| ID TYPE | ID ST | ID NUMBER | S. S. NUMBER | HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR |
|---|---|---|---|---|---|---|---|
| **NONE** | | | | **5' 08"** | **190** | **BROWN** | **BROWN** |

| | | ETHNIC ORIGIN | ALCOHOL/DRUG INVOLVEMENT |
|---|---|---|---|
| ☐ **COMMERCIAL VEHICLE** | ☐ **PLACARDED HAZARDOUS VEHICLE** | ☐ HISPANIC ☑ NON HISPANIC | |

| DATE OF BIRTH | SEX | RACE | B.A. RESULTS | |
|---|---|---|---|---|
| 08 21 1975 | ☑ MALE ☐ FEMALE | ☑ WHITE ☐ BLACK ☐ AM. INDIAN OR ALASKA ☐ ASIAN | BREATH | ☐ **ALCOHOL** |
| PLACE OF EMPLOYMENT / OCCUPATION   CITY   STATE | | | BLOOD | ☐ **DRUGS** |
| | | | URINE | ☐ **UNKNOWN** |

**VEHICLE**

| VEHICLE MAKE | VEHICLE MODEL | VEH. YEAR | VEHICLE COLOR |
|---|---|---|---|
| | | | |

| VEH. TYPE | REGISTRATION: STATE, YEAR, NUMBER | VEHICLE IDENTIFIERS | MPH | IN MPH ZONE | VIOL. KEY |
|---|---|---|---|---|---|
| | | | | | |

**DATE / TIME**

| VIOLATION DATE | VIOLATION TIME | EXACT LOCATION OF VIOLATION | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 12 22 2024 | 10:01 PM | **TAYLOR DR** | | | **LONDON** |
| | | | | COUNTY | SECTOR |
| | | | | **LAUREL** | |

| ARREST DATE | TIME OF ARREST | EXACT LOCATION OF ARREST | MILES | DIRECTION | CITY |
|---|---|---|---|---|---|
| 12 23 2024 | 7:34 PM | **MANCHESTER POLICE DEPARTMENT** | 15.0 | E | **MANCHESTER** |
| | | | | COUNTY | SECTOR |
| | | | | **CLAY** | |

**CHARGES AND POST-ARREST COMPLAINT**

| NUMBER | VIOLATION CODE | ASCF | STATUTE/ORD. | CHARGE(S) | STARTING CASE | ENDING CASE | DRUG TYPE |
|---|---|---|---|---|---|---|---|
| of | | | | | | | |
| of | | | | | | | |
| of | | | | | | | |
| of | | | | | | | |

POST-ARREST COMPLAINT

Kentucky.

The value of the items stolen is over $1,000.

**COURT**

| COURT DATE | COURT TIME | ☐ PAYABLE | COURT LOCATION | | 24 | YEAR |
|---|---|---|---|---|---|---|
| **ARRESTED** | | ☑ COURT | **LAUREL** | | | |

| COURT CASE NUMBER | TOTAL PREPAYABLE AMOUNT | **NOT PREPAYABLE** |
|---|---|---|
| | | |

**CASE**

| WITNESS 1 NAME: LAST, FIRST, MI, FILIAL | STATE | ZIP CODE |
|---|---|---|
| | | |

| WITNESS 1 ADRRESS (NUMBER, STREET, SUFFIX) | CITY |
|---|---|
| | |

| WITNESS 2 NAME: LAST, FIRST, MI, FILIAL | STATE | ZIP CODE |
|---|---|---|
| | | |

| WITNESS 2 ADRRESS (NUMBER, STREET, SUFFIX) | CITY |
|---|---|
| | |

| ☐ SERVING WARRANT FOR OTHER AGENCY   SPECIFY: * | ☐ VIDEO |
|---|---|
| | ☐ EVIDENCE HELD |

| OFFICER SIGNATURE | BADGE/I.D. NUMBER | ASSIGNMENT |
|---|---|---|
| **Riley, E.** | **3170** | **CITY** |

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000003 of 000003   CONTROL NUMBER DX75007   TYPE 2

NOT ORIGINAL

09/17/2025 03:04:09

**DOCUMENT**

**PM**

84997-7

# Exhibit 5

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000002

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:09
PM



Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000002 of 000002

# Exhibit 6

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000001 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

# London Police Department Policy

84997-7

## Chapter 1

- **Policy 1.1 Authority and Jurisdiction**
- **Policy 1.3 Use of Force**
- **Policy 1.4 Search and Seizure**
- **Policy 1.6 Arrest**
- **Policy 1.7 Prisoner Transports**
- **Policy 1.8 Less Lethal Weapons**
- **Policy 1.9 Firearms and Ammunition**
- **Policy 1.10 Firearms Proficiency**
- **Policy 1.13 Duty to Intervene**

## Chapter 2

- **Policy 2.1 Legal Advice**

## Chapter 3

- **Policy 3.1 Organizational Structure**
- **Policy 3.2 Personnel Responsibilities**
- **Policy 3.3 Division Responsibilities**

## Chapter 4

- **Policy 4.4 Supervisor Accountability**
- **Policy 4.6 Written Directives**
- **Policy 4.7 Early Intervention System**

## Chapter 5

- **Policy 5.1 Administrative Reporting**

## Chapter 6

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000002 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

- **Policy 6.1 Planning and Research**

## Chapter 7

- **Blank**

## Chapter 8

- **Policy 8.1 Chief Executive Officer**
- **Policy 8.7 Inventory Control**

## Chapter 9

- **Policy 9.1 Assignment Openings**

## Chapter 10

- **Policy 10.5 Uniforms and Equipment**

## Chapter 11

- **Blank**

## Chapter 12

- **Policy 12.1 Code of Conduct**
- **Policy 12.2 Disciplinary System**
- **Policy 12.6 Personnel Complaint Procedures**

## Chapter 13

- **Policy 13.1 Selection Process – Applicants**

## Chapter 14

- **Policy 14.1 Training**

## Chapter 15

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000003 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

- **Policy 15.1 Probationary Period**

## Chapter 16

- **Policy 16.1 Annual Performance Evaluation**

## Chapter 17

- **Policy 17.1 Communication**
- **Policy 17.2 Patrol Shifts**
- **Policy 17.7 Informants**
- **Policy 17.9 K-9 Unit**
- **Policy 17.11 Eyewitness Identification**
- **Policy 17.12 Recording Police Activity**
- **Policy 17.13 Body Worn Video Recorders**
- **Policy 17.14 Use of Intranasal Naloxone**

## Chapter 18

- **Policy 18.1 Juvenile Operations Function**

## Chapter 19

- **Policy 19.1 Emergency Mobilization**
- **Policy 19.2 Unusual Occurrence Plan**
- **Policy 19.5 Correctional Facilities**
- **Policy 19.6 Tactical Team**

## Chapter 20

- **Policy 20.1 Public Information Function**
- **Policy 20.5 Social Networking – Internet Posts**

## Chapter 21

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000004 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

84997-7

- **Policy 21.1 Vehicle Policy**
- **Policy 21.2 Pursuit Driving**
- **Policy 21.3 Special Purpose Vehicles**
- **Policy 21.5 Vehicle Maintenance**

## Chapter 22

- **Policy 22.3 Traffic Law Enforcement**
- **Policy 22.6 Speed Measuring Devices**

## Chapter 23

- **Policy 23.1 Reporting/Investigating Accidents**

## Chapter 24

- **Policy 24.1 Traffic Direction**

## Chapter 25

- **Policy 25.1 Traffic Ancillary Services**
- **Policy 25.4 Abandoned Vehicles**
- **Policy 25.5 Towing**

## Chapter 26

- **Policy 26.1 Records Integrity**
- **Policy 26.2 Personnel Files**
- **Policy 26.3 Law Information Network**

## Chapter 27

- **Policy 27.1 Collection of Evidence**
- **Policy 27.2 Evidence Controls**
- **Policy 27.5 Sexual Assault Investigations**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000005 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

- **Policy 27.8 Prescription Drug Take-Back**

## Chapter 28

- **Policy 28.3 Misdirected Emergency Calls**
- **Policy 28.8 Security**

## Chapter 29

- **Policy 29.2 Haz Mat First Responders**
- **Policy 29.3 Hazard Communications**
- **Policy 29.7 Confined Space**

## Chapter 30

- **Policy 30.1 Domestic Violence**
- **Policy 30.2 Racial Profiling**
- **Policy 30.3 Forfeiture of Assets**
- **Policy 30.5 Golden Alert – Elderly Missing**
- **Policy 30.6 Baby Hand-Off**
- **Policy 30.7 Amber Alert**
- **Policy 30.8 Mental Illness**
- **Policy 30.9 Foot Pursuit**
- **Policy 30.10 Blue Alert**

## Chapter 50

- **Policy 50.1 Arson and Bomb**
- **Policy 50.2 Consular Notification**
- **Policy 50.3 Information System Responsibility**
- **Policy 50.4 Information Systems (Computers)**
- **Policy 50.5 Silent Alarms – Bank Alarms**
- **Policy 50.6 Commendations**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000006 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

- **Policy 50.7 Annual TB Test**
- **Policy 50.8 Service Animals**
- **Policy 50.9 In-House Training**
- **Policy 50.10 Uniform Citation Books**
- **Policy 50.12 Active Shooter – Aggressor**
- **Policy 50.13 Subpoenas and Court Appearances**
- **Policy 50.15 Ride-Along**
- **Policy 50.16 Health and Fitness Sworn Officers**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000007 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

## LONDON POLICE DEPARTMENT

| POLICY #   1.1 | TITLE: AUTHORITY AND JURISDICTION |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes: KRS CHAPTERS 70, 95.710, 95.019, 16.060, 17.110, 17.150, 95.760, 15A. 190, 441.046** | |
| **KACP Standards: 1.1, 1.2, 4.1, 4.2, 4.3, 4.5, 6.3** | |
| **Date Implemented: 5-9-2014** | **Review Date:** |
| **Revision Date:** | **Reviewed By:** |

I.    **POLICY**

The purpose of this policy is to state the authority, jurisdiction and mission of the London
Police Department. This policy will apply to all London Police personnel, effective,
until such time it is superseded, revoked or rescinded.

II.    **PROCEDURE**

   A.  **Authority**

   **The London Police Department is established by authority of Kentucky Revised Statutes 95.019. The authority of officers derives from this and is conferred by the Mayor and authority of the London City Council.**

      1. Sworn personnel are sworn by oath of office to enforce the laws of the
      Commonwealth of Kentucky, uphold the Constitution of the United States and the
      Constitution of the Commonwealth of Kentucky and enforce the ordinances of the

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000008 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

City of London, and to faithfully, impartially and diligently protect the public peace and safety, and to abide by the Police Officers Code of Ethics.

2. The London City Mayor appoints all personnel.

3. Sworn and Non-sworn personnel shall abide by:

    A. Federal Laws, State statutes, County and City Ordinances

    B. City of London Personnel Policies and Procedures Manual

    C. London Police Department Policies and Procedures Manual

4. Authority of the London Police Department

    a. Within the City limits, the London Police Department will enforce the ordinances of the City and the laws of the State of Kentucky and carry out all duties and responsibilities assigned to the Department by the Mayor and City Council.

    b. The London Police Department will enforce the traffic ordinances of the City of London and the state traffic laws on all City streets and State highways within the City limits.

    c. The London Police Department has jurisdiction and responsibility in matters concerning London City Ordinances within the City limits.

    d. The Department recognizes that off-duty officers may not be able to rely on the immediate assistance or application of police resources in the same capacity as while on duty. However, when off-duty, enforcement action is considered necessary, consistent with the tactical situation, any police action taken will be govern by the same policies, procedures, rules and regulations that apply to on-duty personnel in a similar situation. Officers are not to affect an arrest if the incident stems from the officer's personal involvement. (Personal involvement by definition is where the off-duty officer, a family member or a friend becomes

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000009 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

engaged in a dispute or incident with the person to be arrested or with any other person connected with the incident. This does not apply to situations where the police officer himself/herself is a victim of crime.)

**B. Command**

1. The Chief of Police possesses the authority and responsibility for the management, direction and control of the operations and administrations of the police department.

   A. The Chief of Police is responsible for the protection of lives and property within the City of London through the administration and supervision of all police related functions.

   B. The Chief of Police is responsible for organizing, controlling, and directing the personnel and resources of the London Police Department.

**C. Geographical Boundaries**

1. Each officer will be provided access to a detailed map of London showing the City limits and all jurisdictional boundaries. The map will be posted in a conspicuous location and will be updated whenever changes are made to these boundaries.

2. When there is a question concerning jurisdiction, a supervisor should be consulted.

3. All patrol officers will have access to a map with the City boundaries and should familiarize themselves with the geographical boundaries.

**D. The City of London is bounded on all sides by the county of Laurel.**

**E. Concurrent Jurisdiction**

1. Other agencies having jurisdiction within the City are the Laurel County Sherriff Department, Kentucky State Police, federal enforcement agencies.

2. Employees of this Department will offer complete cooperation when situations arise where these agencies must exercise their authority within the City limits.

**F. Interagency Cooperation**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000010 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

1. Effective law enforcement is not a solitary effort but requires the cooperation and interaction of all agencies. The London Police Department supports this concept and will cooperate fully with other agencies in the discharge of these duties.

2. KRS Chapters 70 & 95 grants the Laurel County Sheriff general law enforcement authority through the county, regardless of the presence of municipal subdivisions, etc.

3. KRS 16.060 grants the Kentucky State Police law enforcement authority on all roads and property within the state.

4. Nothing prohibits members of the municipal departments above the 6th class, the Laurel County Sheriff's Department, Kentucky State Police or Federal Agencies from taking action in situations that occur in their presence within the City limits. HIDA agents may exercise police authority in situations that occur in their presence in any areas of the City.

5. In any situation where a question arises concerning London Police jurisdiction outside of corporate city limits the shift supervisor will attempt to resolve the matter. If this is not possible the supervisor may approve the officer to do the report. The supervisor will then do a report about the incident and forward it to the Chief of police.

**G. Mutual Aid Agreements/ Intra-local Agreements**

1. The London Police Department and the Mayor and City Council may execute Mutual Aid Agreements with other law enforcement agencies outside Laurel County.

2. Copies of the agreement(s) will be kept on file in the Chiefs office or his designee office. The agreement(s) shall be reviewed annually to ensure it describes the current legal status of, as well as current information about the agencies that are parties to the agreement.

3. Mutual Aid Agreements Contents

The Mutual Aid Agreements provide all the necessary information to initiate mutual aid activities either on behalf of our Department or at the request of the neighboring law enforcement agency. This information addresses the following:

a. The legal status of agencies and agency personnel responding to mutual aid requests;
b. Procedures for investing provider agency personnel with the legal authority to act within the receiver agency jurisdiction;
c. Procedures for requesting mutual aid;

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000011 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

d. Identity of those persons authorized to request mutual aid;
e. Identity of persons to who outside personnel are to report;
f. Procedures for maintaining radio communication with outside personnel; and
g. Expenditures, if any, which should be borne by the receiver agency to compensate for the use of the provider agency's resources.
h. Evaluating the results and their continued necessity.

4. Mutual Aid Prisoner/Detention Assistance

Provisions are addressed in the Mutual Aid Agreements governing the assistance of outside agency personnel in:

a. Mass processing of arrestees,
b. Transporting prisoners; and
c. Operating temporary detention facilities.

## H. Request for Immediate Assistance

1. In the event we are contacted by another police department requesting immediate assistance, the shift supervisor will immediately notified the Chief of Police so that the situation can be reviewed and a determination made by the Chief as to the number of officers and what type of equipment will be sent to the requesting department.
It shall always be necessary to notify the Chief of Police immediately if the expected commitment turns out to be lengthy or extensive.
If the Chief is not available, then a member of command staff will make the decision on the assistance request as soon as practical and notify the shift supervisor of the situation.

2. The safety and security of the City is the Department's first concern and only that manpower and equipment which can be spared without leaving the City unprotected will be sent.

3. No commitment of manpower or equipment is to be made without the express permission of the Chief of Police or his designee.

4. The Chief of Police or his designee will determine whether any special manpower adjustments are necessary.

## I. Emergency Federal Law Enforcement Assistance

1. In the event of an emergency that, in the opinion of the Chief of Police, requires

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000012 of 000128

NOT ORIGINAL
09/17/2025 03:04:13
84997-7

DOCUMENT

PM

federal law enforcement assistance, aid will be solicited from the appropriate federal agency.

2. In the event of a criminal offense in which there is concurrent enforcement responsibilities, (i.e., bank robberies, drug violations, etc.) the supervisor may notify the FBI, DEA or other federal agency having concurrent jurisdiction.

### J. National Guard Emergency Assistance

An emergency may arise necessitating the call-out of the Kentucky National Guard. If so, the Chief or his designate must request the call-out from the Mayor. The Mayor must request the call-out from the Governor's Office.

### K. Statewide Fingerprint Records System

KRS 17.110 requires the submission of fingerprints to the Department of State Police of the Justice Cabinet upon arrest of any person on a felony charge. KRS 441.046 mandates this responsibility to the jailer.

### L. Statewide Criminal Information System

The Kentucky State Police maintain a centralized statewide criminal information system. Access to this system is through the Law Information Network of Kentucky (LINK) terminal in the London/Laurel County dispatch center. As required by U.S. Title 28 Code of Federal Regulations, this Department will participate in this system.
The Kentucky State Police maintain a statewide crime reporting system. The London Police Department shall participate by submitting all required reports, statistics, etc. on the Kentucky Uniform Offense Report in accordance with KRS 15A.190 and 17.150.

### III. MISSION AND VALUES STATEMENT, and CODE AND CANON OF ETHICS

### A. Mission Statement

The London City Police Department was created to provide protection and law enforcement services to the community of London, Laurel County. Major goals of the Department are:

To reduce crime through prevention, detection, and apprehension of offenders;

To provide for the orderly and safe movement of vehicular traffic through traffic law enforcement;

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000013 of 000128

NOT ORIGINAL
09/17/2025 03:04:13

84997-7

DOCUMENT

PM

Accident prevention and accident investigation;

To ensure public safety through regulation and control of hazardous conditions;

The recovery and return of lost and stolen property;

And to provide non enforcement services through programs designed to meet community needs and desires.

**B. Values Statement**

The London City Police Department will always treat everyone with the utmost respect and will make every effort to preserve the dignity of all members of society. We shall always be mindful of our responsibilities and duties as peace officers of our community and shall provide fair and impartial service to all.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000014 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

# LONDON POLICE DEPARTMENT

| POLICY #    1.3 | TITLE: USE OF FORCE |
|---|---|
| ● **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes: KRS CHAPTERS 503, 520, 500.080** | |
| **KACP Standards:** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date: 05-12-2023** | **Review Date:**<br><br>**Reviewed By:** |

### USE OF FORCE

#### Authorization

The London Police Department Chief of Police authorizes the use of force by officers of the London Police Department in those situations where force is reasonable to effect arrest.

Officers, while in the performance of their duties, may use only the force necessary to protect the deputy, or to protect another deputy, other law enforcement officer, or any other third party and to affect the arrest or other legal objective. Only personnel classified as London Police Department Officers shall be authorized to carry firearms or other weapons in connection with their employment with the London Police Department.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000015 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

**Purpose**

> The purpose of this section is to set forth the Chief of Police guidelines for the use of force by officers of the London Police Department, provide guidelines for the escalation of force and to establish reporting procedures for officers following a use of force

**Definitions**

> **Physical Force –** Force applied by an officer to a defendant in order to affect an arrest, protect the officer, or to protect a 3rd party.

> **Reasonable Force –** Force applied by a deputy on a defendant that the officer,with respect to his/her training and applicable Kentucky Revised Statutes, believes is the minimum necessary to subdue and arrest the defendant while sufficiently protecting himself/herself and others.

> **Deadly Physical Force –** Force applied by an officer to a defendant in order to affect an arrest, protect the officer, or protect a 3rd party that is designed to or is reasonably foreseeable to cause death or serious physical injury to a defendant.

> **Chemical Agent –** A London Police Dept. approved liquid chemical agent designed to be sprayed on the skin of a defendant to cause skin irritation and other responses for the purpose of providing the officer with a temporary advantage to allow the defendant to be apprehended and physically controlled without injury.

> **Police Baton –** A London Police Department approved straight or collapsible baton used for defensive maneuvers and strikes upon a defendant designed to subdue the defendant with minimal injury.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000016 of 000128

NOT ORIGINAL

09/17/2025 03:04:13 PM

DOCUMENT

**Taser** – A London Police Department owned and issued, Taser International manufactured model X26 designed to emit an electrical charge for the purpose of subduing a subject with less than lethal force.

**STATUTORY PROVISIONS (SUMMARY OF PERTINENT PROVISIONS)**

**KRS 500.080**

**(1) "Physical injury" means substantial physical pain or any impairment of physical condition; and**

**(2) "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ.**

**KRS 503.010**

**(1) "Deadly physical force" means force which is used with the purpose of causing death or serious physical injury or which the officer knows to create a substantial risk of causing death or serious physical injury.**

**(2) "Physical force" means force used upon or directed toward the body of another person and includes confinement.**

**(3) "Imminent" means impending danger.**

**KRS 503.040**

**(1) Conduct which would otherwise constitute an offense is**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000017 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

justifiable when it is required or authorized by a provision of law imposing a public duty or by a judicial decree;

(2) The justification afforded by subsection (1) applies when:

The officer believes his conduct to be in the lawful execution of legal process.

KRS 503.050

(1) The use of physical force upon another person is justifiable when the officer believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person;

(2) The use of deadly physical force upon another person is justifiable under subsection (1) only when the officer believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, or sexual intercourse compelled by force or threat.

KRS 503.070

(1) The use of physical force upon another person is justifiable when:

(a) The officer believes that such force is necessary to protect a third person against the use or imminent use of unlawful physical force by the other person; and

(b) Under the circumstances as the officer believes

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000018 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

them to be, the person whom he seeks to protect would himself have

been justified;

(2) The use of deadly physical force upon another person is

justifiable when:

(a) The officer believes that such force is necessary to

protect a third person against imminent death, serious physical injury,

kidnapping or sexual intercourse compelled by force or threat; and

(b) Under the circumstances as they actually exist, the

person whom he seeks to protect would himself have been justified.

KRS 503.090

(1) The use of physical force upon another person is justifiable

when the officer, acting under official authority, is making or assisting in

making an arrest, and he:

(a) Believes that such force is necessary to effect the

arrest;

(b) Makes known the purpose of the arrest or believes

that it is otherwise known or cannot reasonably be made known to the

person to be arrested; and

(c) Believes the arrest to be lawful.

(2) The use of deadly physical force upon another person is

justifiable under subsection (1) only when:

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000019 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

**(a) The officer, in effecting the arrest, is authorized to act as a peace officer; and**

**(b) The arrest is for a felony involving the use or threatened use of physical force likely to cause death or serious physical injury; and**

**(c) The officer believes that the person to be arrested is likely to endanger human life unless apprehended without delay**

**KRS 503.100**

**(1) The use of physical force upon another person is justifiable when the officer believes that such force is immediately necessary to prevent such other person from:**

**(a) Committing suicide or inflicting serious physical injury upon himself; or**

**(b) Committing a crime involving or threatening serious physical injury to person, substantial damage to or loss of property, or any other violent conduct.**

**(2) The use of deadly physical force upon another person is justifiable under subsection (1) (b) only when the officer believes that the person whom he seeks to prevent from committing a crime is likely to endanger human life.**

**KRS 520.090**

**(1) A person is guilty of resisting arrest when he intentionally**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000020 of 000128

NOT ORIGINAL
09/17/2025 03:04:13
84997-7

DOCUMENT

PM

prevents or attempts to prevent a peace officer, recognized to be acting

under color of his official authority, from effecting an arrest of the actor or

another by:

(a) Using or threatening to use physical force or

violence against the peace officer or another; or Using any other

means creating a substantial risk of causing physical injury to the

peace officer or another.


**Chief's Directive**


Officers of the London Police Department are encouraged to, when possible,

diffuse any confrontation verbally so long as it allows the officer to perform

any necessary arrests, resolve the situation appropriately, and provides

adequate protection to all involved. Officers are further encouraged to use all

time necessary to achieve any possible peaceful solution that meets the

aforementioned goals. Nothing in this section should be interpreted as

restricting the use of force on the part of any officer when the use of such

force is necessary and prudent.

In the event that it is impossible or imprudent for the officer to resolve a

situation without force, the officer should escalate and use force in

accordance with the training he/she received and all applicable Kentucky

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000021 of 000128

NOT ORIGINAL

DOCUMENT

Revised Statutes. Force employed by the officer should be the minimal force necessary to affect the arrest and should not be escalated past the point necessary to safely resolve the incident. The use of any restraint technique by an officer of the London Police Department involving the neck or throat area of a defendant is prohibited in all situations except those where the use of deadly force would be authorized.

If an officer determines the use of chemical agents against the defendant is called for, the officer is directed to use such agents in the manner the officer was trained to. The officer should use the agent only for such period as necessary to subdue the defendant. At no time should the deputy spray any other area of the body than he/she was trained to. The officer shall be responsible for initiating, or causing to be initiated, proper decontamination procedures.

If an officer determines that the use of a police baton is necessary, he/she should use the baton in accordance with training. The strikes shall be against approved areas of the body as determined in the aforementioned training. This force should be applied in such duration and intensity as is necessary to accomplish the arrest. Following the incident and provided the officer is capable, the officer shall provide or cause to be provided any necessary medical care for the defendant. Should the officer be unable, this responsibility shall fall on the first responding officer not involved in care for the wounded officer.

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

If an officer determines that the use of the Taser is necessary, he/she should do so in accordance with training. The officer employing the Taser shall issue a verbal warning of "taser" prior to deploying in order to warn other officers present and to allow the subject a final chance to surrender peacefully. As the officer approaches the subject he/she shall, when possible, have an officer for cover purposes capable of employing lethal force if it becomes necessary.

Once the charge is delivered the officer shall direct the subject with verbal commands until the subject becomes compliant and deliver additional charges as it becomes necessary. If the probes penetrate the subject's skin, and once the subject is under control and compliant, the officer shall notify the on-duty supervisor. The officer will also obtain any medical treatment necessary for the subject. The officer may remove the probes and provide first aid if the probes did not penetrate soft tissue areas such as the neck, face, groin, eyes, or other place that may cause lasting injuries if not treated by trained medical personnel. It is the responsibility of the arresting officer and/or on-duty supervisor to determine if the subject should be transported to the hospital for further treatment.

If an officer determines that deadly physical force is necessary the officer should employ such force in accordance with training and applicableKentucky Revised Statutes. The officer must have positive identification of the target, be legally justified in engaging the target, and should be cognizant of the surrounding environment as to avoid striking an unintended target. The officer shall use a department approved firearm and employ it in such a manner as to eliminate the threat to the officer and others. The officer, when safety allows and providing he/she is capable, shall render aid to the defendant or cause aid to be rendered to the defendant if such aid is necessary.

The London Police Department recognizes that in some circumstances it may be necessary for an officer to utilize items in place of a police baton other than those issued or approved for such use of force incidents. So long as the

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000023 of 000128

**NOT ORIGINAL**

use of such items constitutes reasonable force and is employed against areas of the

body identified in training for the use of the police baton, that action shall not be considered a violation of this policy.

The London Police Department further recognizes that in situations involving the use of deadly physical force that circumstances may dictate that the officer use items in his/her defense other than those issued or approved by this department. The Department further recognizes that in such incidents an officer may use departmentally approved or issued items in other than their approved manner. In this situation, providing the force employed was reasonable, this will in no way constitute a violation of this policy. This paragraph, however, in no way encourages or authorizes the officer to carry other than approved weapons.

Nothing in this policy shall be interpreted to impose an inflexible force continuum on the officers of the London Police Department. Neither, should this policy be interpreted to prohibit pre-emptive action on the part of any officer when that officer, acting in good faith, believes the action is necessary to protect himself/herself or a 3rd party or believes it is necessary to de-escalate, or prevent escalation, of any situation. Furthermore, no part of this policy should be interpreted to prevent any officer from appropriately defending himself/herself from any attack.

**Reporting**

**Responsibility of the Officer Involved**

In the event of any action covered under this policy the responsibility of the

officer or officers involved:

To resolve the incident with minimal injury to the officer and all others involved.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000024 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

To provide any necessary medical care for any injured defendant or other injured person.

84997-7

To notify his/her immediate supervisor of the incident.

To continue to monitor the condition of the defendant, if necessitated by injury or complaint of injury of the defendant, until properly relieved or the defendant has been turned over to competent medical personnel.

To decontaminate any defendant that a chemical agent was applied to, provided that defendant will allow the officer to decontaminate him/her without further attempt to assault the deputy.

**Responsibility of Immediate Supervisor**

To respond to the scene or the current location of the officer and the defendant.

To ensure the officer is following all policies pertaining to medical treatment and monitoring of the defendant.

To notify a Major of the incident and receive direction as it relates to

reporting the incident. To complete a Use Of Force form and submit the completed form, along with any photos and documents related to the incident to the Lieutenant.

**Responsibility of the Chief of Police or designee**

The Chief of Police or designee shall be responsible for determining any other personnel to be contacted.

The Chief of Police or designee shall be responsible for maintaining written documentation of any incident that involves the use of a weapon on the part of the officer or that results in injury to the officer of the defendant.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000025 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

**This documentation shall include a departmentally approved form for recording**

84997-7

**the details of the incident as determined by the Chief of Police or his designee. It shall further include the documentation of any wounds received by the officer, any statements (written, recorded, or summarized by interviewing officers) of bystanders or other witnesses, and any other documentation deemed necessary or appropriate.**

**The Chief of Police or designee shall compile this information and make it available to the London Police Department for review. The record of each incident shall be maintained in a separate file for use in any later proceedings.**

**The Chief of Police or designee may document this incident by personally responding to the scene and personally completing the above outlined steps. In the event this is impracticable the Chief of Police or designee may assign the initial steps of these duties to the immediate supervisor on duty so long as that supervisor was not involved in the incident, or to the senior uninvolved officer on duty.**

**Use of Deadly Force Reporting and Investigation**

**Following any instance that an officer with the London Police Department employs deadly physical force against another person the previously outlined notifications and documentation will be mandatory with consideration to the for the following additional procedures.**

**The London Police Department Chief of Police will be immediately notified.**

**In deadly physical force incidents resulting in death or serious physical injury to the suspect, officer involved, or others, the ranking officer on the scene shall request the Kentucky State Police Critical Incident Response Team respond and take charge of the criminal investigation.**

**Following a deadly physical force incident resulting in injury of another, the officer or officers involved shall be placed on paid administrative leave for a**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000026 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

**minimum period of five (5) days. Additional days of paid leave may be authorized at the discretion of the Chief of Police.**

**The officer or officers involved in the incident shall surrender their weapons to the Kentucky State Police CIRT upon request and only after the ranking LPD officer on scene or with the deputies has been made aware. It shall be the policy of the London Police Department to immediately replace the weapon with another once it is surrendered unless the investigation to that point determines this to be inappropriate.**

**No officer of the London Police Department shall be forced to submit to an interview pertaining to the investigation of a deadly physical force incident until a minimum of forty-eight (48) hours have expired since the incident. The officer will then submit the interview. The officer may employ an attorney to represent him/her and have that attorney present during the interview.**

**The London Police Department will require that all officers involved in a use of deadly force incident submit to at least one session with a mental health professional as soon as practical after the incident. Additional sessions and/or treatment may follow at no cost to the officer if the mental health professional deems it necessary and the officer onsents. No record of mental health treatment relating to a use of deadly force will be maintained by the London Police Department.**

**It shall be the responsibility of the Chief of Police or designee to ensure that all applicable parts of the LPD Policy were followed during any use of deadly force. This can be accomplished by 1) reviewing information obtained aspart of the KSP CIRT Investigation or 2) conducting an independent administrative investigation. If the Chief or designee is satisfied that the information obtained from the KSP CIRT investigation satisfies all policy concerns he/she may adopt the findings and close the investigation. If the Chief determines the KSP CIRT investigation does not satisfy the administrative requirements,**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000027 of 000128

**NOT ORIGINAL**

he/she may initiate an independent administrative review. Any statements taken in this review would be done under the Garrity provisions and cannot be released as part of the KSP CIRT investigation.

Pending a favorable outcome of the initial investigation, the officer should be returned to full duty as soon after the five (5) days paid administrative leave as possible.

**Special Considerations**

Warning shots are prohibited in all circumstances by the London Police Department.

Discharging a weapon from or toward a moving vehicle is inherently dangerous and in so recognizing the London PD shall require that the discharge of weapons in such situations be done only when required by circumstances that would be justified under the criteria of deadly physical force.

Each officer of the London Police Department has the obligation to report any discharge of a firearm while on duty through the chain of command. If a discharge should be accidental/negligent in nature, not in response to any incident being handled by this agency, and regardless of whether injury or damage result, the discharge still requires reporting. If not a use of deadly physical force as defined in this chapter, such a discharge requires the same administrative notification and reporting as a use of physical force.

The London Police Department has entered into agreements with other State and Federal agencies allowing deputies to fall under the supervision of other agencies for the purpose of continuing investigations in other jurisdictions. In the event that a LPD officer so assigned is involved in an incident covered in this chapter, the London Police Department will defer the investigation to that agency. The Chief of Police does expect,however, to be informed of the outcome and shall document that in the records of this department.

NOT ORIGINAL DOCUMENT

09/17/2025 03:04:13 PM

84997-7

The Chief of Police or his designee shall complete annually, a documented review of all Use of Force Reports and Administrative Reviews for patterns or trends which could indicate training needs, equipment upgrades, and/or policy modifications.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000029 of 000128

NOT ORIGINAL
09/17/2025 03:04:13
84997-7

DOCUMENT

PM

# LONDON POLICE DEPARTMENT

| POLICY #  1.4 | TITLE: SEARCH AND SEIZURE |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 1.3, 1.4, 1.14** | |
| **Date Implemented: 5-9-2014**<br>**Revision Date: 01-01-2021** | **Review Date:**<br>**Reviewed By:** |

**I. POLICY**

The purpose of this policy is to provide officers of the London Police Department with guidelines for search & seizure, and to ensure compliance with Constitutional rights.

**II. DISCUSSION**

The Fourth Amendment to the United States Constitution recognizes the right of persons to be free from unreasonable searches and seizures of their homes, persons and effects. Violations of such constitutional requirements are technically and ethically incorrect and are not in keeping with the mission of the London Police Department. As such, officers shall adhere to all requirements stringently.

**III.DEFINITIONS**

    **A. Body-cavity search** - A search involving not only visual inspection of skin surfaces but the internal physical examination of body cavities and, in some instances, organs such as the stomach cavity

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000030 of 000128

NOT ORIGINAL
09/17/2025 03:04:13

DOCUMENT

PM

84997-7

**B. Custody** - Status of suspect after arrest or in circumstances wherein a reasonable person would believe that his or her freedom of action has been restricted to the same degree as a formal arrest

**C. Interrogation** - Direct questioning (or its functional equivalent) about a crime or suspected crime as well as any words or conduct on behalf of The London City Police Department which may elicit an incriminating response from a suspect in custody. .

**D. Interview** - Any conversation with a suspect, witness, victim or citizen designated to gather information.

**E. Probable Cause** - Exists where the facts and circumstances within an officer's knowledge (and of which the officer has reasonably trustworthy information) are sufficient in themselves to warrant a reasonable person to believe that an offense has been committed or is being committed.

**F. Reasonable Suspicion** - A standard less than probable cause, generally defined by the courts as a circumstance that would lead a trained, experienced officer to believe that criminal activity is afoot

**G. Search** - Prying into hidden places, by a police officer, wherein the person whose premises or person is being searched has a reasonable expectation of privacy.

**H. Strip Search** - A search requiring the removal or rearrangement of some or all clothing to permit the visual inspection of a person's undergarments, buttocks, anus, genitals or the breast(s) of a female.

    1.  **NOTE: The following does NOT constitute a strip search:**

        **a. Removal or rearranging of clothing reasonably required to render medical**

        **treatment or assistance, or**

        **b. Removal of articles of outer clothing, such as coats, ties, belts, shoes or hats.**

**I. No-Knock Warrant –** A warrant where a judge or magistrate, upon cause shown in the arrant application, specifically authorizes the warrant to be executed in a "no-knock-and-announce" fashion.

## IV. PROCEDURE

### A. CONSENT SEARCHES

    1. No search warrant is required whenever a person with authority or control over the thing or place searched consents to the search. This consent must be voluntary. If the circumstances surrounding the consent would lead a reasonable person to believe coercion took place, officers must seek a

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000031 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

warrant. This freely given, knowing and intelligent consent is the sole Constitutional justification for consent to search.

2. Officers must be aware of the intrusion a search represents to law- abiding citizens. Because of this, they shall limit requests for consent to those situations where other, articulable facts have aroused the officer's suspicion, with the exception of departmentally sanctioned enforcement operations where the use of random consent request has been pre- approved by the Chief of Police (e.g. highway interdiction operations, etc.) Regardless, all London City Police Department consent searches will adhere to the following:

**a. Generally, the person granting consent must use, access or control the property. A person having exclusive possession of some part of jointly owned property can only give consent for a search of that part.**

**b. If two people have joint ownership of property, either can give consent. If possible, have the consenting party sign the London City Police Department Consent to Search Form. Officers, when seeking consent to search for evidence or contraband, may not conduct a search based on consent when a party with equal authority over the premises or effect is present and objects to the search.**

**c. A landlord, including a hotel or motel manager, cannot consent to a search of a tenant's premises unless the tenant has been evicted or has abandoned the property.**

**d. A husband or wife, or one member of a co-habiting unmarried couple, may consent to a search of areas in common ownership or use.**

**e. A parent may consent to a search of premises occupied by a dependent child if the parent also has access to the premises.**

**f. An employee cannot give valid consent to a search of his employer's premises unless he has been left in custody of the premises. An employer may generally consent to a search of premises used by employees, except premises used solely by an employee (e.g., a locker).**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000032 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

g. Consent cannot be presumed from silence.

h. Consent is to be specifically and intelligently given in clear concise language. A nod or slang phrase is not acceptable as it may be subject to alternate meanings.

i. Consent is to be obtained without misrepresentation or fraud.

j. A person who initially gives consent may withdraw it at any time. If probable cause has been developed, officers will secure the premises and obtain a warrant.

k. The scope of a consent search is limited to the area for which consent has been given. Within that area, the search will be limited to locations where the objects sought could reasonable be concealed.

l. Refusal to give consent, in itself, cannot justify further law enforcement action. Such refusals may be combined with other behaviors, facts and circumstances in an effort to articulate reasonable suspicion or probable cause.

m. Consent must be in writing on the approved Consent to search form. Exigent or unusual circumstances will exempt the written requirement; however, that information must be clearly articulated in a written report, (ie Case report, memo, incident report).

**B. STOP AND FRISK (Terry Pat Downs)**

1. Officers may, in certain instances, perform a limited pat down of an individual in accordance with the United States Supreme Court's Terry v. Ohio ruling. An officer may conduct field interviews or stops when the officer reasonably believes that some investigative inquiry is warranted. The Supreme Court has ruled that an officer "may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest." During a field contact, officers who develop articulable reasonable suspicion that an individual may be armed or possess some item on or about their person

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000033 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

which may be used to injure or assault the officer may perform a "Terry" pat down or stop and frisk.

2. A "Terry" pat down consists of the officer touching or patting areas on the suspected person capable of concealing an accessible weapon. Generally, pat downs may not, absent other justification such as consent or warrant, extend to the interior of the clothing, wallets, shoes, etc. However, if during a lawful pat down an officer detects an object that is or might reasonably be an item that is contraband or other criminal evidence, and then the object may be seized (this is referred to as the "plain feel" doctrine). Threatening items such as weapons may always be removed during a frisk. Non-threatening items may be removed only if their contraband or evidentiary nature is immediately apparent.

3. Once the objective of the frisk, the determination of whether or not the suspect is armed, is completed the search must end. If the search continues, any contraband or evidence seized may be considered inadmissible results of a pretense search.

4. Investigative detention, unlike other levels of field interviews, prevents a person from declining to participate in an inquiry supported by reasonable suspicion. If the suspect refuses to stop or attempts to leave, the minimal amount of force necessary to overcome the resistance of the suspect is permissible. It should be noted that the rules of "Terry" still apply.

**C. PLAIN VIEW**

1. In certain limited circumstances, an officer may make a warrantless seizure of objects in plain view. Three conditions, however, must be met before the plain view doctrine is applicable:

> **a. The initial intrusion that afforded the view must have been lawful**
> **b. Discovery of the evidence must have been inadvertent**
> **c. The incriminating nature of the evidence must have been immediately apparent.**

2. Whenever an officer, in good faith, enters upon private premises in the official performance of his/her duties, he/she is not a trespasser. Therefore, anything that is observed in plain view is subject to seizure without a warrant. In such cases, the usual requirements of search and seizure are not necessary because no "search" is conducted. A search implies looking into hidden places for concealed items. It is not a search to observe articles that are open to plain view. It is also permissible for an officer to use a flashlight to make such observations. Areas such as open fields, streets or roadways may be

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000034 of 000128

NOT ORIGINAL

DOCUMENT

PM

searched without a warrant. Any object, person or activity that can be detected by the five senses from public property, open fields or from lawful presence on private property is considered to be in plain view.

09/17/2025 03:04:13

84997-7

### D. EMERGENCY SEARCHES

1. The Supreme Court refers to emergencies where warrants are not required due to the relationship between specific public safety concerns and expediency as "exigent circumstances." This language indicates that circumstances are such that officers have no time to obtain a warrant. The following factors will be considered when determining if exigent circumstances are present:

**a. The degree of urgency involved and the time required to get a warrant**

**b. Officer's reasonable belief that contraband is about to be removed or destroyed. (Note not all crimes are serious enough to create exigent circumstances)**

**c. The possibility of danger to others including officer left to guard the site**

**d. Information that the possessors of contraband are aware that the police are on their trail**

**e. Whether the offense is serious, or involves violence**

**f. Whether officers reasonably believe that suspects are armed**

**g. Whether the officers have probable cause at the time of entry**

**h. Whether the officers have strong reason to believe the suspects are present on the premises**

**i. The likelihood that the suspects will escape**

**j. The suspects' entry onto premises after hot pursuit. To justify warrantless entry following hot pursuit, the arrest process must have begun away from the premises, and the offender knows that he or she is under arrest, and the offender tries to avoid arrest**

**k. A reasonable belief that someone on the premises is in distress and in need of emergency assistance.**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000035 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

### E. WARRANTLESS VEHICLE SEARCHES

1. The United States Supreme Court has modified and expanded the conditions under which officers may search vehicles. Warrantless searches of vehicles may take place under many conditions and circumstances. It is imperative that officers understand the different types of vehicle searches and their limitations.

2. When possible, searches of vehicles will be conducted during the same time as the stop, discovery or impoundment of the vehicle. Generally, vehicle searches will be conducted as soon as reasonably possible. Officers will avoid damaging a vehicle or its contents and will minimize the intrusiveness of the search and any inconvenience suffered by the passengers or owner.

3. If the vehicle subject to search has been totally immobilized or disabled, officers will secure it and obtain a search warrant. Searches executed with a search warrant may extend to anywhere within the vehicle unless limited by the warrant. Vehicles may be searched absent a search warrant in the following instances and subject to the following guidelines:

**a. When probable cause exists, a search may extend anywhere within the vehicle, unless the probable cause is limited to a specific part of the vehicle**

**b. When consent has been obtained from the driver, officer may search the vehicle subject to any limitations specified by the consenting person**

**c. Searches incident to the arrest of an occupant shall be limited to the area where there is probable cause to believe evidence of the crime charged is located.**

**d. Frisks for weapons shall be confined to the passenger area. Any place not immediately accessible to the occupants, such as a locked glove compartment, shall not be frisked. If the contents of a container are immediately accessible to the subject, a closed container may be searched for weapons. Note that an officer can order the suspect from the vehicle and frisk both the suspect and the vehicle. As is the case in all "Terry" stops, officers shall be prepared to articulate their reasonable suspicion or probable cause.**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000036 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

**e. An entry into the vehicle to examine the VIN or otherwise determine ownership must be limited to these purposes**

**f. An emergency search of the vehicle may be conducted, but the extent of the search must not exceed whatever is necessary to respond to the emergency**

**g. Unlocked containers located during probable cause searches or searches incident to arrest (limited to passenger area) may be opened wherever found. Containers located during consent searches may be opened if the terms of the consent permit or reasonably imply permission.**

**h. Locked containers should generally be searched with a warrant but may be opened if consent has been given or probable cause exists to search the vehicle and the object of the search might be located in the container. Locked containers may also be opened for inventory purposes.**

**F. OTHER WARRANTLESS SEARCHES**

1. Officers' duties upon arrival at crime scenes include the timely security of the entire scene as well as a brief examination of the area to determine if any victim may need assistance or if a dangerous situation exists that would require further investigation or action. These initial actions, while sometimes probative in nature, are considered by the courts to be emergency searches. If officers doubt the legality or propriety of their entry into a crime scene, they shall contact a supervisor before proceeding.

2. Officers may seize contraband and evidence found in plain view if they observe the items from a lawful vantage point and it is immediately apparent to the officer that the items may be contraband, evidence of a crime or otherwise subject to seizure (plain view doctrine).

3. Abandoned property does not require a search warrant. The courts state that property becomes abandoned when voluntarily abandoned outside an area in which someone has a reasonable expectation of privacy.

4. The Fourth Amendment does not protect open fields, but officers must distinguish them from curtilage, which requires a search warrant. Curtilage is the area of a dwelling that is necessary, convenient and habitually used by the family for domestic purposes. The extent of curtilage of a private residence is determined by whether the area is enclosed, the nature and use of the area, the proximity of the area to the home and any measures taken by

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000037 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

the owner to protect the area from observation.

5. An officer with an arrest warrant may search for the defendant in his or her own home provided that the warrant is valid, the officer searches the defendant's home, and probable cause exists that the defendant is home at the time of the search. The search for the defendant must be limited to places where he or she might be found.

6. Following the execution of an arrest warrant or arrest without warrant, officers may undertake a "protective sweep" of the premises where the arrest takes place without a warrant. Certain limitations must be observed:

> **a. The purpose of the protective sweep is to discover persons on the premises who might present a danger to officers**

> **b. Incident to arrest, officers may, without probable cause or reasonable suspicion, look into closets or other spaces immediately adjoining the place of arrest where threatening persons might be located**

> **c. In order to extend the protective sweep beyond closets and adjoining spaces, officers must have reasonable suspicion for fearing that persons may be on the premises who pose a threat. In such cases, the sweep is limited to examining places where a person might hide**

> **d. During a protective sweep, evidence discovered in plain view may be seized**

> **e. The sweep must cease when officers have dispelled a reasonable suspicion of danger.**

7. Officers may search detainees subsequent to arrest. Officers possess the authority to make a search, which may extend to articles carried by the suspect and to the suspect's immediate surroundings. Although an arrestee who is handcuffed at the time of search cannot reasonably reach into the area being searched, the search of the area is still legally justified. Officers conducting searches will adhere to the following guidelines:

> **a. Searches incident to arrest will be executed as soon as practicable after the arrest and at or near the place of the arrest.**

> **b. Officers conducting such searches are authorized to use only the degree of force reasonable and necessary at the time of arrest.**

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

**c. Chokeholds & Neck Restraints: An officer shall not use a chokehold or neck restrain the performance of his or her duties,** *unless deadly force is justified.*

**1.** Officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. Officers shall not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted for the purpose of seizing evidence or preventing the destruction of evidence by ingestion.

**d. Searches incident to arrest will include the entirety of the arrestee, the areas within the arrestee's immediate control and accessories carried by the arrestee.**

### G. STRIP SEARCHES

1. Strip searches will not be conducted of persons arrested for traffic offenses or violations of city ordinances unless the officer has an articulable, reasonable suspicion to believe that the person is concealing a weapon or contraband. Strip searches shall be conducted in accordance with these guidelines:

**a. Strip searches shall be performed by persons of the same sex as the person arrested. Strip searches will be conducted at the Laurel County Detention Center in an area where persons not physically conducting the search can observe the search. Only a supervisor can authorize a strip search. A minimum of two persons must also be present during the entire search.**

**b. When authorized, the strip search will be conducted by the least number of same-sex personnel present as necessary, in conformance with approved hygienic practices, and under circumstances that provide privacy for all but those authorized to conduct the search.**

**c. A strip search in the field will only be conducted under exigent circumstances where the life of the officer or others is at risk and the on-duty supervisor has expressly authorized it.**

**d. All strip searches will be documented in a memo and routed to the Chief of Police in the customary manner.**

### H. BODY CAVITY SEARCHES

1. Body cavity searches (other than those of the mouth) will be conducted only when there is probable cause to believe the arrestee may be concealing

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000039 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

contraband within a body cavity or otherwise about the person. Body cavity searches will only be conducted under the express direction of the Chief of Police, and supported by a search warrant issued by a Jurisdictional Judge. If approved, officers shall seek a search warrant and prepare the necessary affidavit.

2. The body cavity search may only be performed by a physician or other medically trained person as directed by a physician at a medical facility and will involve the same safeguards for privacy and hygiene as for strip searches. London City Police Department body cavity search procedures are as follows:

> **a. The officer shall inform the prisoner of his/her intention to conduct a body cavity search, thus giving the prisoner the opportunity to voluntarily surrender the suspected contraband.**
> **b. The prisoner will remove every article of clothing including wigs and dentures and will give them to the officer present for inspection.**

> **c. Should the prisoner resist the cavity search and become violent, additional officers of the same sex as the prisoner will restrain the prisoner and assist in stripping. Only sufficient force necessary under the circumstances will be applied to complete the search.**

> **d. Should a prisoner resist a cavity search and an insufficient number of same sex officers are available to restrain the prisoner, officers of the opposite sex may assist in subduing the prisoner before the prisoner is stripped. Officers shall subdue the prisoner and apply the necessary restraints and leave the room as soon as is practicable.**

**I. SEARCH WARRANTS**

1. Obtaining a Search Warrant

> **a. An officer requesting a search warrant must provide sufficient information from which a judge may find probable cause to believe that the objects sought are currently in the location to be searched.**

> **b. The search warrant affidavit should particularly describe the things for which the search is to be conducted.**

> **c. The search warrant affidavit should particularly describe, to the best of the officers' knowledge, what law has been violated and evidence indicating**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000040 of 000128

NOT ORIGINAL

that the person or premises to be searched is involved.

d. The search warrant affidavit should particularly describe the house or place to be searched, including address and physical description of the exterior. A photo of the location is often an invaluable aid.

e. The affidavit should, particularly describe and name any person to be seized or searched.

f. Prior to it being presented to any judicial official for consideration, a supervisor or detective will review all search warrants. If there is probable cause and sufficient evidence to obtain a search warrant, the supervisor will approve the request.

g. If an officer has reasonable information that the occupants of any premises may pose imminent danger to officers executing a search warrant, the officer may request from the judicial officer a "No Knock Warrant."

## J. EXECUTION OF SEARCH WARRANTS

1. The search warrant must be directed to the law enforcement agency of the jurisdiction in which it is to be served. The search must be conducted in concert with the police personnel from that jurisdiction.

2. Search warrants are good for only one search and once control of the premises has been relinquished, then a separate search warrant is required.

3. Search warrants not executed within 48 hours of issuance shall be considered void and returned to the issuing judge/clerk of courts.

4. After a supervisor or detective has reviewed and approved the request and a search warrant has been signed by a judicial officer, a supervisor or above must approve the service or execution of the search warrant.

5. The approving supervisor or their designee shall act as the Search Supervisor to be in charge of the on-scene execution of the search warrant.

6. The Search Supervisor will be responsible for:
   a. Reviewing the affidavit and search warrant for accuracy and validity.

**NOT ORIGINAL**

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

b. Identifying any hazards that exist.

c. Determining the type and number of personnel needed.

d. Selecting appropriate equipment.

e. Assigning each officer a role to perform during the execution;

f. Confirming that all non-uniformed personnel are wearing raid jackets with visible police shields and all members are wearing department approved body armor.

g. Positively identifying the location to be searched prior to the execution of the warrant.

h. Reviewing a sketch of the premises to be searched. Verifying building description and the address if available. The Search Supervisor will make every effort to ensure that the correct premises and only the correct premises are being entered.

i. The Search Supervisor will designate an Entry Team Leader who has the sole responsibility of confirming and directing the Entry Team to the actual entry area. The Entry Team Leader will have the absolute authority to stop the entry at any time if there are any doubts about whether or not a correct entry is about to be made. No other duties will be assigned to the Entry Team Leader until after entry is made and the premises are secured. The Entry Team Leader's name must be documented in the Search Supervisor's report along with any instructions given to the leader by the Search Supervisor.

j. Determine if any support units will be needed and coordinate necessary information.

k. Identify the tenant of record for the premises if at all possible.

l. Ensure that a search file is started and completed containing an incident report documenting the search, copies of photographs, search warrant, booking cards, property sheets and any other pertinent information. The file shall be submitted to the approving supervisor who approved the execution of the warrant for review and then filed. The incident report should include the names of officers announcing entry, what was said and the length of time elapsed from verbal demand for entry until the time

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000042 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

entry was permitted or forcible entry had to be made and why.

m. If an officer executing a search warrant discovers that an incorrect person, vehicle, or place has been searched, explain clearly that the Police Department made an error and, if possible, why the error was made. Apologize for any inconvenience. Notify the Chief of Police through the Chain of Command; starting with the approving supervisor and secure the residence if any damage occurred during entry.

n. After the search warrant is executed, ensure the warrant is returned to the court designated with a written inventory of the property seized within the required time of ten days from the date the warrant was issued and place a copy in the search file.

o. Ensure that all departmental procedures are followed and that all proper reports are completed including all reports of Use of Force.

7. Unless a judicial official has issued a No-Knock Warrant or exigent circumstances exist, officers shall knock and give notice of their intent to execute a search warrant before attempting forcible entry. Officers shall wait a reasonable time before making forcible entry.

   a. **No-Knock entry should only be made pursuant to a no-knock warrant signed by a judge of the relevant jurisdiction. If officers believe circumstances exist that justify a no-knock entry prior to obtaining the warrant, the investigating officer must obtain permission from the Chief of Police or his designee.**
   b. **If there is a change of condition that reduces the threat level and the need for a no-knock warrant no longer exists, the normal knock and announce procedures should be followed.**

      *** example: If a no-knock search warrant has been authorized on a residence for drugs and it is a no-knock warrant due to a particular individual inside that poses an extreme danger for the safety of the officers executing the warrant, and you know the person is no longer in the residence at the time of executing the warrant, officers should follow knock and announce procedure. ***

8. Only sworn officers will execute search warrants.

EXH : 000043 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

9. Before searching the premises or seizing evidence, an officer must read the warrant and give a copy to the person in charge of the premises. If unoccupied, a copy of the warrant must be attached to the premises in a conspicuous place.

10. Before searching the premises, any person present may be frisked if the officer reasonably suspects that the person is armed. Persons present at a search may be detained for a reasonable time while the search party is actively investigating their activity at the scene.

11. If the search fails to produce the items named in the warrant, those persons present at a search of non-public premises at the time of the officers' entry may then be searched for the property particularly described in the warrant, which may be concealed upon their person.

12. The search will be conducted as quickly, thoroughly, and with as little damage as possible.

13. Photographs will be taken of any damage.

14. The officer who swears to the affidavit will be the primary search officer when practical, and will collect the evidence to limit the number of officers required to testify in court, unless a Crime Scene Unit is used to collect the evidence.

15. Every legal effort will be made to associate evidence with one of the occupants of the premises.

16. All evidence will be handled in accordance with departmental procedures.

17. The primary search officer or his designee will note the location of evidence and occupants.

18. Photographs will be taken of evidence before it is moved or removed when possible.

### K. FORCED ENTRY TO EXECUTE SEARCH WARRANTS

1. When the Search Supervisor anticipates forcible entry into a structure, or the use of force against the occupants, they will:

    **a. Coordinate communications and equipment.**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000044 of 000128

**NOT ORIGINAL**

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

**b. Coordinate assistance from specialized support units.**

**c. Consider availability of medical resources.**

**d. Develop strategies for approaching; entering; securing and leaving the structure that will minimize risk of injury.**

**e. Discuss the threat potential and anticipated force with all members of the entry and search team.**

**f. When the potential for violence is imminent or significant, the Search Supervisor will review the situation with their immediate supervisor and the Chief of Police and consider using extra officers as outlined in the risk assessment matrix.**

## L. SEARCHING PREMISES TO SERVE AN ARREST WARRANT

1. Forcible entry of private premises to serve an arrest warrant may NOT be made without the issuance of a search warrant.

**a. The officers have a valid arrest warrant for a person, and they have reasonable information that leads them to believe that the place they are entering is that person's primary residence.**

**b. Officers may forcibly enter a third party's premises to arrest the subject of an arrest warrant only if a search warrant has been obtained for the premises, unless exigent circumstances exist justifying an entry without a search warrant or consent has been obtained from an occupant or resident with apparent authority to consent.**

## M. EXIGENT CIRCUMSTANCES

1. Nothing contained in this procedure shall prevent any officer from entering any premises or taking action under exigent circumstance.

2. All officers taking action under exigent circumstances shall take full responsibility for their actions and shall submit a written report documenting their actions through their Chain of Command.

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   1.8 | TITLE:  LESS LETHAL WEAPONS |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 1.8** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date:** | **Review Date:**<br><br>**Reviewed By:** |

**I.  POLICY**

This policy was established to give all London Police Officers a set of guidelines to follow when non-lethal weapons are used.

**II.  PROCEDURE**

    **A.  An officer may use non-lethal force at any level necessary to:**
        1.  Defend himself/herself or another person;
        2.  Subdue a person resisting arrest; attempting suicide or attempting to harm themselves; or
        3.  Prevent escape from custody.

    **B.  Supervisor Notification**
        1.  An officer will notify his/her immediate supervisor as soon as practical after an incident involving the use of force.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000046 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

**C. Medical Attention**

    1. Should any person involved require medical attention, the officer involved will notify the on duty supervisor who will determine the need for EMS.

**D. Submission of Use of force Form**

    1. Any use of force on/off duty requires that the officers involved submit a Use of Force Form prior to the end of his/her tour of duty or in the case of an off-duty officer, at the direction of the responding supervisor.

**E. Use of Oleoresin Capsicum Spray on/off duty**

    1. Officers are permitted to carry and use only the Oleoresin Capsicum (OC) Spray issued and approved by the London Police Department that is compatible with tasers.

    2. Officers may not carry or use OC Spray until they have successfully completed an approved LPD training course in its use. To continue to carry or use Pepper Spray, officers must successfully complete re-training programs as determined and scheduled by the LPD Training Officer.

    3. OC Spray may be used as a means of:
        a. Physical restraint or control of a person who is combative and presents a physical danger to the officer or any other person, or
        b. Defense of any person.
        c. Once a person is properly restrained or under control, the use of OC Spray is no longer justified.

    4. OC Spray will not be used for the following:
        a. To elicit information from a person; or
        b. To punish someone.

    5. A person who has been sprayed with OC spray:
        a. Will be allowed to flush the affected area with water as soon as practical after the incident is under control; and
        b. When appropriate will be informed by the officer involved that medical attention is available, if he/she so desires.
        c. After the use of OC Spray, whether or not an arrest was affected, the officer will:

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997/7

1.  Notify his/her immediate supervisor as soon as practical; and

2.  Complete and submit a Use of Force Form prior to the end of his/her tour of duty or at the direction of a supervisor, if off duty.

**F.  Use of Physical Force on/off duty**

1.  The use of physical force by an officer on/off duty, upon another person is justifiable when the officer, acting under official authority, is making or assisting in making an arrest, and the officer:

    a.  Believes that such force is necessary to effect the arrest;

    b.  Makes known the purpose of the arrest or believes that it is otherwise known to the person to be arrested; and

    c.  Believes the arrest to be lawful.

2.  Officers will use only enough force to affect lawful objectives.

3.  Physical force: Soft, empty hand control. This is a method of controlling resistive behavior utilizing escort positions and come-along holds.

4.  Physical force: Hard empty hand control. This is a method to stop the forward momentum of an aggressive offender and set the offender up for follow-up control techniques.

5.  Physical force may be used as a means of:

    a.  Physical restraint or control;

    b.  Subduing a person resisting arrest;

    c.  Defense of any person; or

    d.  Moving, removing, or arresting, any person who is obstructing a lawful law enforcement action in such a manner that the enforcement action cannot be accomplished.

6.  Officer are not permitted to use neck restraints, choke holds and/ or other similar compliance techniques that rely upon cutting off the flow of oxygen to the brain.

7.  Once a person is restrained or under control, the use of physical force will be restricted to that force necessary to maintain control.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000048 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

8.  Physical force will not be used for the following:

    a.  To elicit information from a person; or

    b.  To punish someone.

9.  After any use of force resulting in injury to an officer or another, or property damage, the on/or off duty officer will:

    a.  Seek immediate medical attention if warranted.

    b.  Notify his/her immediate supervisor as soon as is practical, and

    c.  Complete and submit a Use of Force Form prior to the end of his/her tour of duty. Off duty officers will submit a Use of Force Form at the direction of the supervisor.

**G.  Use of Bean-Bag Shotguns**

1.  Supervisors are permitted to carry and use only the Bean-Bag Shotguns approved by the London Police Department, on duty.

2.  Officers may not carry or use Bean-Bag Shotguns until they have successfully completed an approved LPD training course in its use. To continue to carry or use Bean-Bag Shotguns, officers must successfully complete re-training programs as determined and scheduled by the LPD Training Officer.

3.  Bean-Bag Shotguns may be used as a means of:

    a.  Physical restraint or control of a person who is combative, out of control and presents a physical danger to the officer, themselves or any other person, or

    b.  Defense of any person.

    c.  Once a person is properly restrained or under control, the use of Bean-Bag Shotguns is no longer justified.

4.  Bean-Bag Shotguns will not be used for the following:

    a.  As a threat to make a person comply with an officer's verbal order when no physical violence is imminent;

    b.  To elicit information from a person; or

    c.  To punish someone.

5.  A person who has been struck with a Bean-Bag Shotguns:

    a.  Will not be struck by more than two bean-bags at a time.

    b.  Will be be examined by EMS personnel prior to being removed from

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000049 of 000128

**NOT ORIGINAL**

**DOCUMENT**

**PM**

09/17/2025 03:04:13

the scene.

c.  After the use of the Bean-Bag Shotguns, whether or not an arrest was affected, the officer will:

> (1)  Notify onlookers (if the situation permits) that a beanbag shotgun, not a regular shotgun was used. Inform the onlookers the beanbag shotgun is a less than lethal alternative designed to apprehend individuals without causing serious injury.
>
> (2)  Call for medical attention prior removal from scene.
>
> (3)  Notify his/her immediate supervisor as soon as practical; and
>
> (4)  Complete and submit a Use of Force Form prior to the end of his/her tour of duty or at the direction of a supervisor.

### H.  Use of Taser

1.  Officers are permitted to carry and use only the Taser approved by the London Police Department on or off Duty.

2.  Officers may not carry or use a Taser unit until they have successfully completed an approved LPD training course in its use. To continue to carry or use a Taser, officers must successfully complete re-training programs as determined and scheduled by the LPD Training Officer.

3.  Trained officers will carry the properly functioning and charged Taser in the provided secure holster on their gun belt on the opposite side from their duty weapon in a cross draw position while on duty.

4.  A Taser may be used as a means of:

> a.  Physical restraint or control of a person who is combative and/or presents a physical danger to the officer, themselves or any other person, or
>
> b.  Defense of himself/ herself or of another person, or
>
> c.  Prevent escape from custody.

5.  A Taser will not be used for the following;

> a.  To elicit information from a person; or
>
> b.  To punish someone

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000050 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

6. Usage and Deployment Considerations

    a. The Taser is programmed to give a 5-second "electrical burst."

    b. Never aim the Taser at the eyes or the face.

    c. Prior to the use of the Taser, if practical, broadcast "Taser" indicating the use of the Taser is imminent to prevent unintentional shootings.

    d. **DO NOT** deploy the Taser near flammable liquids or fumes. The Taser can ignite gasoline or other flammables. Some self-defense sprays are flammable (Freeze +P has shown to be flammable) and would be extremely dangerous to use in conjunction with the Taser. Do not deploy in highly flammable environments such as meth labs, etc.

    e. Always replace air cartridges by their expiration date and use for training only.

    f. The Taser can function in stun mode after the probes have been fired as a backup weapon. Drive weapon aggressively into nerve or motor points for best effectiveness: Drive Stun. If only the stun mode is used, the Taser becomes a pain compliance technique with limited threat reduction. The Taser will always fire a live cartridge when activated if an unfired cartridge is present. To use the drive stun without firing probes, remove live cartridge from front of Taser.

    g. The Taser shall not be used against a handcuffed prisoner.

7. Tactical Considerations & Limitations

    **DO NOT USE IN ANY OF THE FOLLOWING SITUATIONS:**

    a. Any known or obviously pregnant female.

    b. Any subject who is saturated with or in the presence of highly flammable or combustible materials or liquids.

    c. Any subject who may receive a perceived serious secondary injury resulting from a fall from its use, i.e. ... standing on a roof ledge or high elevation.

    d. Avoid the facial area of the head, neck, groin and female breast, if possible.

    e. Excessive use of the Taser in subduing a subject is forbidden.

8. A person who has been struck with a Taser Air Cartridge:

    a. Once in custody, the arresting officer shall advise EMS personnel that the person has been subjected to the Taser and relate the approximate time the action occurred. If the Air Cartridge probes penetrate the skin, the puncture sites shall be brought to the attention of the EMS personnel

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000051 of 000128

and on-scene

supervisor or another on-scene officer. **Only Emergency Room Staff may remove Taser Air Cartridge probes that are in one or more of the following areas:** Head and Facial Area, Neck, Groin, Buttock, Female Breast, or deeply imbedded into the skin. Officers may cut the lead wires from the Air Cartridge probes to assist with transportation of the subject. A medical release will be obtained on any subject that is transported to the hospital for removal of probes.

b.   Officer's who are trained, may remove the Taser Air Cartridge Probes that are superficially in the skin and under the supervision of another officer. (See removal procedures)

c.   Officers must be aware that one easily overlooked aspect of injury when using a Taser on a subject is that of falling from a standing position. A physical examination with particular emphasis on injuries secondary to the fall should be performed by EMS personnel on-scene or by Emergency Room staff if

transported to a hospital.


9.   A person who has been struck with a Taser with no Air Cartridge:

a.   Once in custody, the arresting officer will notify the supervisor who should examine the area or areas of the subject where the Taser was used for any injuries prior to the subject being transported to the detention center.

b.   If any injuries are noted, the subject may be transported to a medical facility for evaluation and medical release prior to being transported to the detention center.


10.   After the use of a Taser with or with-out a Air Cartridge, whether or not an arrest was effected, the involved officer will:

a.   Request a back-up officer and supervisor as soon as practical

b.   Notify EMS Personnel immediately if needed.

c.   The air cartridge and probes used shall be collected. Since the probes will probably have blood on them (biohazard) the arresting officer should wear latex gloves when handling. The wires shall be wound around the cartridge. The probes shall be inverted into the portals from which they were fired (this will prevent sharp ends from penetrating anything). Tape should be placed over the portals to secure the probes in the cartridge. Place the Cartridge with probes and two to three pieces of

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000052 of 000128

**NOT ORIGINAL**

DOCUMENT

**09/17/2025 03:04:13**

PM

AFID serial number tags

into a Bio-hazard bag or sharps container and dispose of it in the bio-hazard can at the police department.

d.   Pictures **shall** be taken of the areas where the probes impacted the subject, or where they were drive stunned.

e.   The deploying officer will complete a "Use of Force Report" prior to the end of their shift and submit it to their immediate supervisor.

11.   Guidelines and Procedure for Police Officer Removal of Taser Probes from Subject

    a.   **DO NOT** attempt removal if subject is combative.

    b.   **DO NOT** attempt removal if location of the probe is:

        (1)   Head

        (2)   Facial Area

        (3)   Neck

        (4)   Groin

        (5)   Buttock

        (6)   Female Breast

        (7)   Deeply imbedded into skin

    c.   Removal Procedure:

        (1)   Officer shall use gloves for protection

        (2)   Place spent Taser Air Cartridge on the ground or other flat surface with holes up.

        (3)   Firmly grasp the probe and with one pull remove probe from subject and place probe point down in the spent cartridge.

        (4)   With antiseptic wipe, clean the skin in circular motion moving from puncture wound out - dirty skin will need more than one cleaning – use new antiseptic wipe for each cleaning. **DO NOT GO BACK AND FORTH ACROSS THE PUNCTURE WOUND, START IN CENTER AND MOVE OUTWARD IN A CIRCULAR MOTION.**

        (5)   After air-drying apply clean dry Band-Aid.

        (6)   If needed, follow same procedure for removal of second Taser probe.

        (7)   Each fired probe shall be treated as a biohazard whether it is in the skin or not at the time of post-deployment evaluation.

        (8)   Access subject for any injury or condition that may need medical attention and seek appropriate level of service for the subject.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000053 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

(9)  Secure Taser Air Cartridge and probes as described in section
II.10.C of this policy.

(10)  Remove gloves and clean hands with waterless hand
sanitizer.

12.  Supervisor Responsibilities

    a.  Incidents involving any discharge of a Taser will be investigated and
appropriately documented.

    b.  Ensure use of the Taser is delegated to a Taser trained officer.

    c.  Ensure that officers who deploy the Taser complete a "Use of Force
Report".

    d.  Ensure that the Taser used in the incident is secured until the
information can be downloaded from the unit.

13.  Officers Responsibilities

    a.  Upon encountering a situation, which may require the use of a Taser,
request the response of a back up officer and/ or supervisor.

    b.  When practical, don't escalate the situation prior to the arrival of a
back up officer.

    c.  If a Taser is used in the incident, the deploying officer will complete a
"Use of Force Report" prior to the end of their shift and submit it to their
immediate Supervisor and take pictures.

    d.  Warning a suspect of imminent deployment of a Taser should be
done prior to deployment unless exigent circumstances exist (i.e. active
physical assault/resistance, immediate threat of injury or death).

**I. Non-lethal Weapon Proficiency Requirements:**

1.  All officers are required to demonstrate proficiency in the use of all
authorized non-lethal weapons prior to being authorized to carry or use, on
duty. An officer may be authorized to use non-lethal weapon provided he/she:

    a.  Successfully completes a pass/fail, mandatory qualification course, as
established by department training procedures. Officers will meet this
requirement as listed below:

        (1)  Non-lethal (Taser and Bean Bag Shot Gun) - 1 time a year

        (2)  Non-lethal (OC Spray) - 1 time every 2 years

        (3)  Non-lethal (ASP) - 1 time every 2 years

    b.  Demonstrates knowledge of the laws concerning the use of non-lethal
weapons.

**NOT ORIGINAL**

**DOCUMENT**

**PM**

**09/17/2025 03:04:13**

**84997-7**

     c. Is familiar with approved safe-handling techniques as established by departmental training procedures.

     d. All newly hired sworn officers, prior to receiving authorization to carry or use lethal weapons will receive copies of and training on the following London Police Department policies:

        (1) 01.3 Use of Force

        (2) 01.8 Less Lethal Weapons

2. Officers who have received training and certifications as instructors, through other training agencies or manufacturers may be permitted to train, test and qualify officers on Taser, OC Spray and baton, with approval from the Chief of Police.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000055 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   1.9 | TITLE:  FIREARMS AND AMMUNITION |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 1.9** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date:** | **Review Date:**<br><br>**Reviewed By:** |

**I.   POLICY**

The use and possession of firearms and ammunition, both on and off duty, are limited to those authorized by this policy.

**II.   AUTHORIZED DUTY WEAPONS and AMMUNITION:**

**A.   Weapons - Only Departmental issued weapons and ammunition shall be used in performance of active duty.**

**B.   Maintaining of Firearms records**

1.   At the completion of firearms qualifications, the firearms instructor will verify the serial numbers of the weapons that the officer qualified with and log them into the firearms qualification record book. A record of the date, serial number and instructor's initials will be placed on a separate page for each individual officer. The qualification record book will be maintained by the range master.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000056 of 000128

**NOT ORIGINAL**

DOCUMENT

PM

09/17/2025 03:04:13

84997-7

**C. Ammunition (On-Duty/Off-Duty ) Only Department issued ammunition will be used in Department issued firearms.**

**D. Ammunition (Practice & Training) Only Department issued ammunition will be used in Department issued firearms.**

**E. The Firearms Instructor is to visually and physically inspect all weapons to be carried on and off duty to ensure that they are safe. If the DOCJT Certified Firearms Instructor deems a weapon un-safe to carry on or off duty, he will immediately notify the Chief of Police. The Officer will be forbidden to carry or use the firearm until it is determined safe by the Firearms Instructor and the Chief of Police. The Chief of Police will make the final decision regarding a firearm deemed un-safe to carry.**

**F. Firearms storage**

> 1. All firearms or dangerous weapons including agency authorized firearms not in use while at the London Police Department are to be secured and in-accessible to everyone but qualified members of a law enforcement agency. Officers will not draw, exhibit and or point or direct their firearm at a person unless circumstances create a strong reasonable belief that it may be necessary to lawfully use the weapon. Firearms that are to be stored within the department are to be unloaded and kept in a locker or gun storage rack within the security room in a locked cabinet except for the following exceptions:
>> a. General maintenance or cleaning
>> b. Evidence collection or examination

**G. The Chief of Police may authorize the use of other types of weapons and ammunition as deemed appropriate.**

**III. GENERAL PROVISIONS TO CARRY CONCEALED Off-DUTY WEAPONS**

**A. Officers are authorized to carry concealed deadly weapons on or about their person at all times within the Commonwealth of Kentucky.**

**B. Officers will have a departmental issued firearm readily accessible to them at all time's practical while in the geographical limits of Laurel County, Kentucky.**

**C. Officers must qualify semiannually with department issued firearms.**

**NOT ORIGINAL**

**DOCUMENT**

**PM**

09/17/2025 03:04:13

84997-7

**D.   Officers will insure that any firearm and ammunition carried off-duty is sufficiently and properly secured and safe at all times.**

**E.   Criteria for Authorization to Carry Off Duty Firearms:**

> 1. Police Department authorization to carry and use an off-duty firearm stipulates that the officer will maintain weapon inspection, training and qualification records pertaining to the officer's use of the off-duty firearm.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000058 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

# LONDON POLICE DEPARTMENT

84997-7

| POLICY #   1.13 | TITLE:  DUTY TO INTERVENE |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:   KRS 15.383, 237.140** | |
| **KACP Standards: 1.3, 1.13** | |
| **Date Implemented: 1-01-2021**  <br><br> **Revision Date:** | **Review Date:**  <br><br> **Reviewed By:** |

## I.    PURPOSE

It is the purpose of this policy to explain the legal and moral obligation members have regarding their duty to intervene.  This duty is embodied in the law enforcement officer's code of ethics and in the law. Agency members shall have a clear understanding of this agency's expectations pertaining to conduct and activities while on and off-duty.

A law enforcement officer has an affirmative duty to intervene on behalf of a citizen whose constitutional rights are being violated in his or her presence by other officers.

Officers of this agency also have a duty to intervene when they observe or hear conduct by a fellow member of this agency that is unethical, clearly violates the law, or violates agency policy.

## II.    POLICY

The policy of this department is to protect the citizens of the commonwealth by educating and informing officers on their duty to intervene. This agency is committed to protecting officers

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000059 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

who act on their duty to intervene to prevent or minimize misconduct by another agency member.

## III. DEFINITIONS

A. **Deescalate –** Reduce the intensity of a conflict or potentially violent situation
B. **Intervene** — To come between, whether verbally or physically, to change the course of events that clearly violate the law or agency policy.

## IV. DUTY TO INTERVENE

A. **Response to resistance:** Officers of this agency have an affirmative duty to intervene if they witness a response to resistance that is clearly unreasonable. Any officer present and observing another officer using force that is clearly beyond that which is reasonable under the circumstances shall, when in a position to safely do so, intervene to prevent the use of unreasonable force. An officer who observes another employee's response to resistance that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

B. Officers of this agency must recognize and act upon the duty to intervene to prevent or stop any member from conducting any act that clearly violates the law or agency policy. Intervention may be verbal and/or physical. Failure to intervene may subject an officer of this agency to disciplinary and or legal action.

## V. REQUIRED ACTION – Officer Responsibility:

A. Officers should take a **proactive** approach to deescalate situations that clearly indicate a risk of misconduct.

B. Officers must notify a supervisor after conducting any type of intervention in response to a clear violation of law or agency policy.

C. **Render Aid:** If any person is injured and requires medical attention, officers of this agency shall request medical assistance and may render aid in accordance with their training.

D. **Supervisor Responsibilities**:

1. Instruct officers/witness to complete appropriate documentation of the event. Supervisors need to be aware of Garrity Warning (KRS 15.520) when requesting documentation from an officer who is suspected of misconduct and could face agency reprimand or criminal charges.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000060 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

2. Conduct a preliminary investigation report (word document) into the circumstances surrounding the intervention and submit report to the Chief of Police.

84997-7

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000061 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   3.2 | TITLE:  PERSONNEL RESPONSIBILITIES |
|---|---|
| ● **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 3.2** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date:  5-5-2023** | **Review Date:**<br><br>**Reviewed By:** |

### I.  POLICY

In order for the London City Police Department to function properly, responsibilities given to employees must be accompanied with the necessary authority. The Chief of Police, through the use of the command structure, distributes responsibility and authority through all levels of the department. At every level of the department, employees are given the authority to make decisions necessary for effective performance of their job function. Each employee is accountable for their use or failure to use their delegated authority in meeting the responsibilities of their position.

It shall be the policy of the London City Police Department to adhere to the job descriptions set forth by the Chief of Police and approved by the Mayor.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000062 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   3.3 | TITLE:  DIVISION RESPONSIBILITIES |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 3.3, 22.1** | |

| Date Implemented: 5-9-2014 | Review Date: |
|---|---|
| Revision Date: | Reviewed By: |

**I.  POLICY**

The purpose of this policy is to establish general responsibilities for the sections within the London Police Department.

**II.  PROCEDURE**

The London Police Department consists of three sections; General responsibilities of each are as follows:

**A.  Administrative Section**

1.  Maintains record system, training, purchasing, planning and budgetary concerns.

2.  Oversees the Patrol and Criminal Investigation Sections

3.  Administrative Section will be under the direct supervision of the Chief of Police.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000063 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

**B.  Patrol Section**

    1.  Consists of Officers assigned to patrol units and those who respond to calls for service and conduct preliminary investigations.

    2.  Responsible for traffic oriented problems and enforcement of the laws and ordinances of the Commonwealth of Kentucky and the city of London.

    3.  The Patrol Section will be under the direct supervision of the Administrative Supervisor.

**C.  Criminal Investigation Section**

    1.  Investigative Section conducts follow up and long term criminal investigations.

    2.  Administration of departmental property and evidence.

    3.  The Criminal Investigation Section will be under the direct supervision of the Administrative Supervisor.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000064 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   4.4 | TITLE:  SUPERVISOR ACCOUNTABILITY |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards: 4.4** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date:** | **Review Date:**<br><br>**Reviewed By:** |

**I.  POLICY**

The purpose of this policy is to establish criteria and procedure for the accountability, authority and responsibility for supervisory officers.

**II.  PROCEDURE**

All London City Police Department supervisors will be accountable for insuring that all subordinates, under his/her command, will receive the following listed duties and responsibilities. It is not construed as an exhaustive statement of duties, requirements or responsibilities.

**A.  Supervisory Officers: In addition to the general and individual duties and responsibilities of all members and employees, supervisory officers are specifically responsible for the following duties and responsibilities.**

**1.  Supervision:**
Closely supervise the activities of their subordinates, making corrections where necessary and commending where appropriate.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000065 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

**2. Leadership:**

Provide on-the-job training as needed for efficient operation and coordination of effort when more than one member or employee is involved.

**3. Direction:**

Exercise direct command in a manner that assures the good order, conduct, discipline, and efficiency of subordinates. Exercise of command may extend to subordinates outside their usual spheres of supervision if the police objective or reputation of the department so requires; or if no other provision is made for personnel temporarily unsupervised. This authority shall not be exercised unnecessarily. If a supervisor requires a subordinate other than his or her own to leave a regular assignment, the supervisor so directing will inform the subordinate's own supervisor as soon as possible.

**4. Enforcement of Rules:**

Supervisor will enforcement and require compliance with all department rules and regulations.

**5. Inspection:**

Inspection of activities, personnel, and equipment under their supervision and initiation of suitable action in the event of a failure, error, violations, misconduct or neglect of duty by a subordinate.

**6. Assisting Subordinate:**

Have a working knowledge of the duties and responsibilities of his/her subordinates. Observing contacts made with the public by his /her subordinates and being available for assistance or instruction as may be required. He/she shall respond to calls of serious nature and others unless actively engaged in a police incident. He/she shall observe the conduct of the assigned personnel and take active charge when necessary.

**7. Knowledge of Conditions:**

Supervisory personnel have the duty of being thoroughly familiar with the conditions which affect the work of their subordinates. Supervisors will inform superiors concerning such conditions in as much detail as the superior desires.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000066 of 000128

**NOT ORIGINAL**

**DOCUMENT**

**09/17/2025 03:04:13**

**PM**

**84997-7**

8. **Knowledge of Subordinates:**

Supervisors will observe the work of their immediate subordinates and be prepared to evaluate it accurately for their superiors. Supervisors will make written reports initiating Departmental complaints against subordinates for any serious misconduct or unfitness for duty. Supervisors will make written reports to superiors on behalf of immediate subordinates for the recognition of outstanding or meritorious performance by a subordinate.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000067 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   12.1 | TITLE:  CODE OF CONDUCT |
|---|---|
| ● **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:   KRS 83A.010, 15.520** | |
| **KACP Standards:  12.1** | |
| **Date Implemented: 5-9-2014**<br><br>**Revision Date: 5-30-2023** | **Review Date:**<br><br>**Reviewed By:** |

## I.  PROCEDURAL RULES

General Statement:

This section specifies the behavioral requirements and prohibitions of all employees as related to position, rank and authority. All employees are required to comply with those guidelines laid out in the procedural manual which is to have the same force as these rules and standards of conduct. There will always be exceptions and emergencies which cannot be anticipated; the totality of the circumstances must be considered in applying these rules.

## II.  RULES

### RULE 1:   KNOWLEDGE OF RULES AND LAWS

A.   Employees of the Police Department shall establish and maintain a working knowledge of the rules, regulations, directives, and orders of the Department. Members of the Police Department shall not commit any acts or omit any acts

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000068 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

that constitute a violation of any of the rules, regulations, directives or orders of the Department, whether stated in these rules or elsewhere.

B.   Officers of the Police Department shall establish and maintain a working knowledge of the laws and ordinances applicable to the Commonwealth of Kentucky and the City of London. Officers of the Police Department shall not commit any acts or omit any acts that constitute a violation of any of the laws and ordinances applicable to the City of London, Commonwealth of Kentucky or the United States Constitution.

### RULE 2:   PATROLLING PROCEDURES

A.   An officer is required to faithfully, diligently, and constantly patrol his/her beat until properly relieved. An officer, not designated to patrol a beat, is required to diligently pursue his/her assigned duties until properly relieved. An officer is prohibited from leaving his/her beat, or assignment, unless required for police duties. An officer is prohibited from remaining out of service or unavailable for longer than is necessary to perform his/her required duties.

### RULE 3:   PROCESSING PROPERTY AND EVIDENCE

A.   Employees are required to process property or evidence which has been discovered, gathered or received in connection with departmental responsibilities in accordance with established policies and procedures of the London Police Department.

B.   Employees are prohibited from converting to their own use, manufacturing, concealing, falsifying, destroying, removing, tampering with or withholding any property or evidence in connection with an investigation or other police action, except in accordance with established Departmental procedures and statutory law.

### RULE 4:   PROPERTY OF THE DEPARTMENT

A.   Employees are required to report in writing the loss of, damage to, or unserviceable condition of, any departmental property or equipment assigned to their use, by the end of their tour of duty.

B.   Officers shall utilize City equipment only for its intended purpose in accordance with established departmental procedures and shall not intentionally abuse, damage, or lose through negligence departmental equipment.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000069 of 000128

NOT ORIGINAL

09/17/2025 03:04:13 PM

DOCUMENT

C.   Officers are required to promptly report to their supervisor any accident involving any motor vehicle of the Police Department operated by them or in their charge. Officers having knowledge of others involved in accidents involving Police Department vehicles that are not reported, will inform their supervisor of the same. Any motor vehicle accident investigation involving equipment of the London Police Department shall be supervised by a supervisor. Photographs will be taken of the vehicles and the scene.

D.   Employees are required to surrender immediately those items or equipment which is issued by the Department before an extended leave of absence, suspension, resignation, discharge, retirement, or other separation from the Department.

E.   Property belonging to the Police Department shall not be used for private purposes without approval by competent authority. Employees are prohibited from moving or causing to be moved, any office equipment or furnishings outside of the department to which it is assigned, without permission of competent authority.

F.   Employees are prohibited from handling or using property of the Department in an abusive, destructive, or careless manner.

G.   Departmental property is subject to entry and inspection without notice, even if the employee has placed a personally owned lock on departmental property. The employee may or may not be present at the time of the search.

H.   Employees are prohibited from making, or causing to be made, any duplicate key belonging to the Police Department without prior approval of competent authority.

I.   Officers are prohibited from carrying any equipment that has not been authorized by competent authority.

J.   Employees are prohibited from posting or displaying anything on bulletin boards, walls, or doors, in any police facility without permission from competent authority.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000070 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

K.   Officers and employees (authorized to handle firearms) are required to 84997-7
handle any and all firearms in a safe manner.

L.   Employees are required to obtain permission from a supervisor to use a spare
vehicle.

M.   A Participation in Ride Along Program form must be completed, signed and
approved by the Chief of Police to allow anyone to ride in an on-duty police
vehicle. Unauthorized persons are prohibited from riding in any police vehicle
while an officer is on duty, except in the performance of official duties or in an
emergency.

N.   Employees are prohibited from operating a City owned vehicle on or off-duty
after consuming alcohol or after consuming any other substance which could
impair their ability to operate a vehicle.

0.   Employees are prohibited from using police facilities, buildings, equipment or
resources in any way to conduct, enhance, or assist the business or affairs of any
private organization without the prior authorization of the Mayor or the Chief of
Police.

**RULE 5:   STATEMENTS CONCERNING INVESTIGATIONS**

A.   Employees are prohibited from making any public statements in any form
concerning any pending criminal investigation without the prior permission of
the Chief of Police or his designee.

B. Employees are prohibited from releasing names and addresses of victims of
sex crimes, juvenile defendants, (unless they are legally treated as adults),
witnesses, or deceased persons whose next of kin has not been notified, without
prior authorization of the Chief of Police or his designee.

C.   Employees are prohibited from making any public statements in any form
outside of formal legal channels, which indicate their personal or investigative
judgment concerning a pending criminal investigation.

D.   Employees are prohibited from making any public statements in any form
concerning any internal investigation without the prior permission of the Chief of
Police.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000071 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

E.   Officers shall treat the official business of the department as confidential.

F.   Information regarding official business shall be disseminated only to those for whom it is intended.

G.   Officers may remove or copy official records or reports from a police installation only in the performance of duty.

H. Officers shall not divulge the identity of persons giving confidential information except as authorized by proper authority in the performance of police duties.

## RULE 6:   CHANGE OF STATUS

A.   Employees are required to report in writing, through the chain of command, any change of address, telephone number or marital status within forty-eight (48) hours following the change. Employees are required to record the actual address and telephone numbers as such. Post office box addresses are not acceptable. Employees are required to identify alternate address and telephone numbers as such.

B.   Officers shall provide the Department with a means by which they may be notified immediately and directly when off-duty. This may include a telephone, cell phone or pager number.

C.   Officers who fail to provide such means of immediate and direct contact or who fail to immediately report any changes of telephone numbers or addresses to their superior officer and the Chief of Police shall be subject to disciplinary actions to include, but not be limited to, loss of privilege of home fleet use.

## RULE 7:   SUPERVISORS

A.   Supervisors are required to accept the responsibilities commensurate with their rank.

B.   Supervisors are required to thoroughly familiarize themselves with the responsibilities of their assigned command or function as established by Departmental policy, or procedure.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000072 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

84997-7

C.   Supervisors are required to set an example of sobriety, dignity, courtesy, discretion, skill, diligence, and the observance of proper disciplining.

D.   Supervisors are responsible for the detection and may investigate possible violations of departmental orders, policies, procedures, and rules and standards of conduct.

E.   A supervisor shall be subject to disciplinary action if that supervisor fails to:

1. Properly supervise subordinates in compliance with all rules, regulations, directives, orders, or policies of the department, or

2. Initiate a complaint when such action is appropriate and in accordance with rules, regulations, directives, orders, or policies of the department, or

3. Take other appropriate action authorized and in accordance with rules, regulations, directives, orders, or policies of the department.

**RULE 8:   CONFORMITY TO RULES AND STANDARDS OF CONDUCT**

A.   Officers shall obey all laws of the United States of America, Commonwealth of Kentucky, and London City Government. Employees are required to learn and obey the rules and standards of conduct set forth by the London Police Department.

B.   Employees are prohibited from violating any rules, standards of conduct, or departmental orders.

C.   Employees may be dismissed or suffer such other punishment as may be directed for such violation if found guilty of any of the following offenses:

1.   Incompetence
2.   General Inefficiency
3.   Neglect of duty
4.   Conduct unbecoming a police officer
5.   Absence without authorization
6.   Cowardice
7.   Insubordination or disrespect to another
8.   Incapacity for duty (mental or physical)

D.   A conviction in any court of a misdemeanor or violation shall be cause for disciplinary action.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000073 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

E.   A conviction in any court of a felony shall be cause for dismissal.          84997-7

### RULE 9:   COURT APPEARANCE

A.   Employees, properly subpoenaed, notified or summoned, are required to appear in court promptly, and shall remain in court until excused by competent authority.

B.   Any employee who has been served with a lawsuit pertaining to their employment with the City of London shall immediately notify the Chief of Police.

C.   Any employee who intends to, or has been summoned or subpoenaed to, testify on behalf of a party adverse to the City of London, its agencies or employees, is required to notify the Chief of Police, in writing, prior to testifying in such action.

D.   A copy of any summons, subpoena, or other writing shall be included with the notification to the Chief. This does not include normal criminal prosecution of arrestees.

### RULE 10:   CREDENTIALS

A.   Officers, acting in an official capacity, are required to identify themselves by displaying their badge and official credentials, unless such action is likely to jeopardize the success of the police assignment.

B.   Employees are required to have their official credentials on their person while on official duty, while in the City of London, or while they are on official police business outside the City of London.

C.   Employees are prohibited from giving or lending their official credentials to another person legally appointed to use the credential of the London Police Department, except when permission is granted by a competent authority.

D.   Employees are prohibited from giving or lending their official credentials to any person not legally appointed to use the official credentials of the London Police Department.

E.   Employees are prohibited from using their position of authority, or their

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

official credentials, to solicit personal or financial gain or obtaining privileges not otherwise available to them.

F.   Employees are prohibited from authorizing the use of their names, photographs, or official titles which identify them as employees in connection with testimonials or advertisements of any commodity or commercial enterprise, without the approval of the Chief of Police.

G.   Officers are prohibited from using their police authority for personal reasons.

### RULE 11:   COURTESY

A.   Officers are required to address supervisors in public places, by the appropriate rank.

B.   They are required to give their name and, where applicable, their badge numbers, upon request.

C.   Members of the Police Department shall treat the public, their superiors, and their associates with respect, courtesy, and consideration.

D.   Officers shall be tactful in the performance of their duties, shall control their tempers and exercise patience and discretion.

E.   In the performance of their duties, officers shall not use course, violent, profane, or insolent language or gestures, and shall not express any prejudice concerning race, religion, politics, national origin, lifestyle or similar personal characteristics.

### RULE 12:   UNBECOMING CONDUCT

Members of the Police Department shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Unbecoming conduct shall include that which brings the Department into disrepute or reflects discredit upon the individual as a member of the Police Department, or that which impairs the operation or efficiency of the Department or the individual.

### RULE 13:   IMMORAL CONDUCT

A.   Officers shall maintain a level of moral conduct in their personal and business affairs that is in keeping with the highest standards of the law enforcement profession.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000075 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
8499767

B.   Officers shall not participate in any incident involving moral turpitude which may impair their ability to perform as law enforcement officers or causes the Department to be brought into disrepute.

**RULE 14:   DERELICTION OF DUTY**

A.   Officers, while on duty, shall at all times remain alert and in sufficient state of readiness to quickly respond to any situation requiring police action.

B.   Officers, while on duty, shall not sleep, conduct personal business, attend to personal pleasures, or engage in any other activities which would cause them to neglect or be inattentive to duty.

C.   Officers shall not leave their work assignments except when authorized by a superior officer.

D.   Members of the Police Department shall not commit any acts expressly forbidden or omit any acts that are specifically required by the laws of this state, the ordinances of this city, these Rules of Conduct, or any other orders, policies, procedures or directives of the Police Department.

RULE 15:   UNSATISFACTORY PERFORMANCE OR INCOMPETENCE

A.   Officers shall maintain sufficient competency to properly perform their duties and assume the responsibility of their positions.

B.   Officers shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Department.

    1.   Repetitious or consistent lack of knowledge of the application of laws required to be enforced.

    2.   An unwillingness or inability to perform assigned tasks.

    3.   The failure to conform to work standards established for the officer's rank, grade, or position.

    4.   The failure to take appropriate action on the occasion of a crime, disorder, or other condition deserving police attention.

    5.   Absence without leave.

    6.   Unnecessary absence from the assigned patrol during a tour of duty.

C.  In addition to other indicators of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations or a written record of repeated infractions of rules, regulations, directives or orders of the Department.

**RULE 16:   INSUBORDINATION**

A.   Employees shall promptly obey any lawful orders of a superior officer. Should an order conflict with any order given previously by another superior, or with any Departmental order, the employee to whom such order is given shall respectfully call attention the conflict. If the superior giving such order does not change it to eliminate the conflict, the last order shall stand and the responsibility shall be the superior's.

B.   Employees are required to report in writing to the Chief of Police any unlawful order given to any employee by a superior officer within twenty-four (24) hours.

**RULE 17:   OUTSIDE EMPLOYMENT**

Employees are required to receive approval from the Chief of Police prior to engaging in outside (off-duty) employment.

**RULE 18:   POLICE BUSINESS-CONFIDENTIAL**

A.   Employees are required to treat official business of the Police Department as confidential.

B.   Employees are prohibited from imparting or making known to anyone, regardless of whether or not they are an employee of the Department any order or information which they may receive unless required by the nature of the order, or directed by competent authority.

**RULE 19:   REPORTING MISCONDUCT**

A.   Employees are required to communicate, within twenty-four (24) hours, to their supervisors, any violation of the rules and standards of conduct of the Police Department, any disobedience of orders by the other employees, or any mismanagement related to the effective and efficient operations of the Police Department.

NOT ORIGINAL
DOCUMENT

09/17/2025 03:04:13
PM

B.   Employees, inhibited by the chain of command from reporting any 84997-7 misconduct, may submit the information directly to the Chief of Police.

C.   Employees are prohibited from taking any punitive action or in any way discriminating against any other employee who reports a violation under this section.

### RULE 20:   REPORTING TO DUTY

A.   Employees are required to report to duty as directed by competent authority.

B.   Employees are required to familiarize themselves with those activities which have occurred during their absence.

C.   Employees are required to be punctual in reporting for their scheduled tour of duty. Officers being picked up will arrange to be at the station prior to the beginning of their shift. Punctuality is the responsibility of the arriving officer, not the on-duty shift supervisor.

D.   Employees are required to notify competent authority (60) minutes prior to their regularly scheduled tour of duty when unable to report for duty.

H.   Employees are required to report to duty in a declared emergency immediately upon receipt of, and in compliance with, the directions of competent authority.

I.   Officers shall be properly equipped and aware of the information required for the proper performance of duty so that they may immediately assume their duties. Judicial subpoenas shall constitute an order to appear under this section.

### RULE 21:   DEPARTMENTAL REPORTS

A.   Members of the Police Department shall submit all necessary reports on time and in accordance with established departmental procedures. Reports submitted by members shall be truthful and complete and no member shall knowingly enter or cause to be entered any inaccurate, false, or improper information, or alter, remove, or destroy any report once filed for the purpose of obstructing justice, misleading superior officers, or altering the natural order of information.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000078 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

8499797

B.   All non-sworn persons are prohibited from access to Departmental records except employees specifically assigned to custody and access of records, unless otherwise approved by competent authority.

C.   Departmental records are not to be removed from any police facility without authorization of competent authority.

D.   Employees are prohibited from knowingly revealing the contents of Departmental records to unauthorized persons and will not allow unauthorized persons to loiter in areas where records or police information is accessible.

E.   Employees are prohibited from using any police records for personal profit or gain.

## RULE 22:   CHAIN OF COMMAND

Employees are required to forward all communications through the chain of command unless established Departmental procedures or orders from proper authority dictate otherwise.

## RULE 23:   SAFEGUARDING PRISONERS

A.   Officers are required to protect and safeguard their prisoners and are charged with their safety during that time they are under the officer's control.

B.   Officers are required to take every precaution to prevent the escape of prisoners.

C.   Officers are required to thoroughly search all prisoners at the first immediate opportunity after arrest, or when accepting control of the prisoner from another officer.

D.   Officers are prohibited from abusing or permitting another to abuse a prisoner while in their custody.

## RULE 24:   TRUTHFULNESS

A.   Officers shall not willfully depart from the truth in giving testimony or reporting in connection with any official duties.

B.   Upon the order of a superior officer, officers shall truthfully answer all

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000079 of 000128

NOT ORIGINAL

84997-7

questions specifically directed and narrowly related to the scope of employment
and operations of the department which may be asked of them.

C.  Employees, ordered to divulge information that may compromise an
investigation, may respectfully decline, except to the Chief of Police.

### RULE 25:  USE OF COMMUNICATIONS

A.  Employees are required to obtain permission from the Chief of Police before
entering into any official police correspondence.

B.  Employees are prohibited from initiating a telephone communication or
other communication outside of their jurisdiction for personal use at cost to the
City of London.

C.  Employees are prohibited from accepting any long distance, collect calls
without authorization from competent authority.

### RULE 26:  ABUSE OF SICK LEAVE

A.  Whenever sick leave provisions may appear to be abused, the employee may
be required to furnish competent proof of the necessity for such absence. Proof
of abuse of sick leave shall constitute grounds for disciplinary action, including
dismissal.

B.  The consistent use of sick leave as it is earned shall be prima facie evidence
of abuse of sick leave.

### RULE 27:  CARRYING FIREARMS

A.  Officers are required to be armed with a departmentally issued service
weapon at all times while on duty unless competent authority dictates otherwise
due to the nature of an investigation.

B.  Ammunition must be departmental issued. Hand loads, reloaded ammunition
or factory-reloaded ammunition shall not be carried or used in an officer's
service weapon.

### RULE 28:  CARRYING FIREARMS OFF-DUTY

A.  Officers are encouraged to be armed off-duty at all times with a department
issued sidearm while within Laurel County, Kentucky.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000080 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

B.   Officers are required to be armed off-duty at all times with a department issued sidearm when operating a department vehicle.

C.   Officers are encouraged to use department issued handguns for off-duty concealed carry.

### RULE 29:   MERCHANDISING IN POLICE FACILITIES

Employees are prohibited from soliciting contributions, buying or selling any merchandise from any person within police facilities, except with permission of competent authority unless the solicitation, purchase, or sale is directly related to official police business.

### RULE 30:   USE OF ALCOHOLIC BEVERAGES OR DRUGS

A.   Employees are required to notify their supervisor at the beginning of their scheduled tour of duty, when using any drug, prescription drug, medicine, or alcoholic beverage that could possibly affect the employee's ability to perform his/her assigned duties.

B.   Employees are prohibited from using any drug while on duty except when prescribed by a competent medical authority. This excludes over-the-counter medicines.

C.   Employees are prohibited from transporting alcoholic beverages or drugs in police vehicles, except when necessary in the performance of their official duties.

D.   Employees are prohibited from bringing alcoholic beverages or drugs into any police building, except when held as evidence, or as a prescribed treatment.

E.   Employees are prohibited from consuming alcoholic beverages any drug or medication that may impair their driving ability while operating department vehicles while off-duty.

F.   Employees, while on duty, shall not consume alcohol or any drug or medication that may impair their driving ability or judgment.

G.   Employees shall not consume alcoholic beverages while wearing their uniform or any identifiable parts of the uniform, whether on or off-duty.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000081 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

**RULE 31:  USE OF CREDENTIALS**

A.   Employees are required to have their official credentials on their person while on official duty, while in the City of London, or while they are on official police business outside the City of London.

B.   Employees are prohibited from giving or lending their official credentials to another person legally appointed to use the credential of the London Police Department, except when permission is granted by a competent authority.

C.   Employees are prohibited from giving or lending their official credentials to any person not legally appointed to use the official credentials of the London Police Department.

**RULE 32:  SEXUAL HARASSMENT AND FRATERNIZATION**

A.   Employees are prohibited from engaging in sexual harassment. Sexual harassment shall include: (a) unwelcome sexual advances or conduct; (b) the offering of favorable treatment, or the threatening of unfavorable treatment, in any way related to sexual conduct or favors, or relating to the reporting of sexual harassment; or (c) conduct which creates or tends to create a sexually intimidating, hostile, or offensive work environment.

B.   Employees are required to notify the Chief of Police any incident of actual or suspected sexual harassment. The reports required herein shall be made without delay following the incident or conduct in question. The City Personnel Policies provide direction for reporting sexual harassment outside the normal chain of command.

C.   Employees are prohibited from hindering, or attempting to hinder, or in any way threatening retaliation for, the making of a report of sexual harassment.

D.   Employees are prohibited from engaging in sexual conduct of any kind while on duty.

**RULE 33:  ABUSE OF AUTHORITY**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000082 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84897/7

A.   Employees are prohibited from using their position of authority, or their official credentials, to solicit personal or financial gain or obtaining privileges not otherwise available to them.

B.   Employees are prohibited from authorizing the use of their names, photographs, or official titles which identify them as employees in connection with testimonials or advertisements of any commodity or commercial enterprise, without the approval of the Chief of Police.

C.   Officers are prohibited from using their police authority for personal reasons.

### RULE 34:   COMPROMISING CRIMINAL CASES

Employees are prohibited from participating in a pre-trial agreement to settle a criminal case in return for any personal gain.

### RULE 35:   GRATUITIES

It is improper for officers to solicit any gift, or accept any gift from any person, business, or organization for the benefit of the officer or the department if that person, business, or organization seeks to influence action of an official nature or seeks to affect the performance or non-performance of an official duty; or has an interest which may be substantially affected directly or indirectly by the performance or non-performance of an official duty.

A.   Employees are prohibited from soliciting, accepting, or agreeing to accept any gratuity, except as permitted by departmental policy.

B.   Rewards are to be accepted only with the approval and permission of the Chief of Police.

C.   Employees are required to notify their immediate superior as soon as possible when they have knowledge of a gratuity incident involving themselves or another employee.

D.   For the purpose of this rule, the word "gift" shall include money, tangible or intangible personal property, loan, promise, service, or entertainment.

### RULE 36:   ORGANIZATION MEMBERSHIP

Employees are prohibited from membership in, or participation in, the activities of any organization, association, society or group whose activities or purpose may, in any way, adversely influence or control the work or service of such employee in their official capacity.

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

84997-7

**RULE 37: USE OF POLICE PROPERTY**

Employees are prohibited from using police facilities, buildings, equipment or resources in any way to conduct, enhance, or assist the business or affairs of any private organization without the prior authorization of the Mayor or the Chief of Police.

**RULE 38: REFERRALS**

A. Officers shall not recommend or suggests in any manner, except in the transaction of personal business, the employment or procurement of a particular product, professional service, or commercial service (such as an attorney, ambulance service, towing service, bondsman, mortician, etc.).

B. In the case of ambulance or towing service, when such service is necessary and the person needing the service is unable or unwilling to procure it or requests assistance, officers shall proceed in accordance with established departmental procedures.

**RULE 39: STATEMENTS BY EMPLOYEES**

Employees are prohibited from criticizing or ridiculing the London Police Department and its policies or other employees by speech, writing, or other expression, if such actions are defamatory, obscene, unlawful, undermine the effectiveness of the department, interfere with the maintenance of discipline or demonstrate reckless disregard for truth or falsity.

**RULE 40: TRANSACTIONS WITH SUSPECTS**

Employees are prohibited from accepting or buying any article from any suspect or prisoner, or associates of any suspect or prisoner. Exceptions may be made for undercover investigations to gain evidence.

**RULE 41: USE OF AUTHORITY OFF DUTY**

Officers are required to initiate official action while off-duty only:

A. When there is an immediate threat of loss of life or serious injury in the presence of the police officer.

B. When a citizen requests assistance from a police officer, then assistance

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000084 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

must be rendered. This assistance may take the form of a referral or non-legal advice.

C.   When a police officer encounters an accident that is of such severity that he is required by Statute to render aid.

## RULE 42:   USE OF FORCE

A.   Officers shall not use more force in any situation than that which is reasonable and necessary under the circumstances.

B.   Officers shall use force in accordance with law and Departmental procedures.

C.   Officers shall not fire warning shots.

## RULE 43:   PERSONAL GROOMING

A.   Employees shall present a professional image at all times.

B.   Employees shall maintain a standard of personal grooming in accordance with the City of London Personnel Policies as well as the policies of the London Police Department.

## RULE 44:   TOBACCO

Employees are prohibited from smoking or chewing tobacco:

A.   When in the public view;

B.   While on the firing line;

C.   In any government building owned by the City of London (except in approved areas); or

D.   Under conditions which may be detrimental to good conduct or departmental procedures.

## RULE 45:   WEARING THE UNIFORM

A.   Officers and employees, assigned duties that necessitate the wearing of the uniform, are required to wear it in a manner which will command respect and reflect honor and esteem toward the department and the City of London.

B.   Employees are required to wear the uniform and carry prescribed uniform articles as established by departmental Policy and Procedures.

EXH : 000085 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

**RULE 46: VICE**

    A. Gambling: Officers shall not promote gambling activity as defined in KRS 528.010 (1) or intentionally frequent premises where gambling activity is promoted except in the performance of their duty.

    B. Prostitution: Officers shall not facilitate or solicit prostitution.

**RULE 47: CITIZEN COMPLAINTS**

    A. Officers shall courteously and promptly accept or refer any complaint made by a citizen against any officer or any department policy or procedure.

    B. Officers shall never, through threats or coercion, attempt to dissuade any citizen from lodging a complaint against any officer or any department policy or procedure.

**RULE 48: OPERATION OF VEHICLES**

    A. Officers should operate official vehicles in a careful and prudent manner and shall obey all laws of the state and all departmental orders pertaining to such operation.

    B. Officers shall set a proper example for other persons by their operation of a vehicle.

    C. Loss or suspension of a civilian driving license shall be reported to the supervisor immediately.

**RULE 49: INTERVENTION**

    Officers shall not interfere with cases being handled by other officers or by any other agency or person unless:
    A. Ordered to interfere by a superior officer; or

    B. The interfering officer believes beyond a reasonable doubt that a manifest injustice would result from inaction.

**RULE 50: POLITICAL ACTIVITY**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000086 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

A.   Officers may participate fully in public affairs to the extent that such endeavors do not impair the neutral and efficient performance of official Police Department duties, or create real or apparent conflicts of interest, and do not conflict with local, state (KRS Chapter 95), or federal laws.

B.   Officers are prohibited from using their official capacity to influence, interfere with, or affect the results of an election.

**RULE 51:   SUPERVISOR'S FAILURE TO ACT**

A supervisor shall be subject to disciplinary action if that supervisor fails to:

A.   Properly supervise subordinates in compliance with all rules, regulations, directives, orders, or policies of the department, or

B.   Initiate a complaint when such action is appropriate and in accordance with rules, regulations, directives, orders, or policies of the department, or

C.   Take other appropriate action authorized and in accordance with rules, regulations, directives, orders, or policies of the department.

**RULE 52:   REPORT OF ARREST**

Any member who is arrested or is likely to be arrested shall immediately report this information to the chief of police or the highest ranking official available.

**RULE 53:   COWARDICE**

Officers will carry out their duties with courage and determination and will remain steadfast in the face of opposition and resistance.

**RULE 54:   STRIKE**

Officers shall not engage in any strike.

"Strike" includes the concerted failure to report for duty, willful absence from one's position, or the abstinence in whole or in part from the full, faithful, and proper performance of the duties of employment for the purposes of inducing, influencing or coercing a change in conditions, compensation, rights, privileges, or obligations of employment.

**RULE 55:   PREJUDICE**

NOT ORIGINAL

DOCUMENT

PM

09/17/2025 03:04:13

Members shall not express any prejudice concerning gender, race, religion, politics, handicap, sexual orientation, national origin, or similar personal characteristics.

84997-7

### RULE 58:   APPROPRIATE ACTION

Officers on-duty are expected to seek out criminal activity, respond to calls for service, perform assigned job tasks, and take appropriate action when performing their duties. Non-sworn members are expected to respond to calls for service, perform assigned job tasks, and take appropriate action when performing their duties.

An off-duty officer is expected to take appropriate action to offenses that occur in his presence. Appropriate action is that which is both necessary, considering the totality of the circumstances, and within his ability to handle at the time (e.g., availability of weapon, radio communication, physical condition). At a minimum, an off-duty officer shall brief on-duty officers of pertinent information (i.e., license number, descriptions).

### RULE 57:   POSTING OF BOND

Members are prohibited from posting bond for any person under arrest, with the exception of a member's immediate family. Other exceptions can be made upon approval of competent authority.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000088 of 000128

NOT ORIGINAL
09/17/2025 03:04:13
PM
84997-7

DOCUMENT

# LONDON POLICE DEPARTMENT

| POLICY #   14.1 | TITLE:  TRAINING |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:**   KRS 15A.070, 95.955 | |
| **KACP Standards:  14.1, 14.2, 14.3, 14.4** | |
| **Date Implemented:  5-9-2014** | **Review Date:** |
| **Revision Date:** | **Reviewed By:** |

Presiding Judge: HON. GREGORY A. LAY (627226)

## I.  POLICY

The London Police Department has an obligation to provide a professional standard of law enforcement service to the community. In that regard, it is essential all Departmental personnel be properly trained. Training that begins at entry level and continues throughout the career will positively affect the employee's knowledge, skills, and abilities and should serve to generally improve the law enforcement services provided to the community.

## II.  PROCEDURE

### A.  Administration of Training:

1.  The administration of the training component is the responsibility of the Chief of Police or his designee. Specific functions of the training component include:

   a.  Scheduling officers and other personnel for training courses.

   b.  Notifying personnel of required training.

   c.  Ensuring that training programs are attended by the officers

EXH : 000089 of 000128

**NOT ORIGINAL**

**DOCUMENT**

09/17/2025 03:04:13

**PM**

84997-7

scheduled.

    d. Maintaining training records.

    e. Evaluating training programs.

    f. Acting as a liaison with the Department of Criminal Justice Training and other

educational institutions and training facilities.

**B. Recruit Training**

    1. General training requirements for Recruit officers:

        a. The recruit officers training program shall consist of the following two categories:

            • BASIC ACADEMY TRAINING:

            *Each officer having responsibility for the enforcement for the criminal laws in general, will graduate from a basic training program certified by the Kentucky Law Enforcement Council prior to the exercise of such authority, except when accompanied by and under direct supervision of a certified officer who is serving as a field training officer (FTO). Equivalent training will be accepted, however, the agency must demonstrate that the training is equal to or exceeds KLEC standards. Officers grandfathered by 503 KAR 1:110 who were hired prior to July 1, 1972 shall be considered to meet the basic requirements of the basic training program required above.*

            • POLICE TRAINING OFFICER (PTO) PROGRAM.

            *All recruit officers shall participate in and successfully complete the PTO program under the direct supervision and one-to-one training as administered by a PTO in accordance with the Department guidelines.*

            > The PTO program shall consist of a minimum of fourteen weeks for inexperienced recruits. For Recruits with prior experience, the PTO program length is at the discretion of the Chief of Police and PTO Supervisor.

            > The PTO program is designed to give the recruit officer "on street" experience under direct supervision of a certified PTO.

            > The PTO program requires the recruit officer to be assigned to

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000090 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

different PTO's on a rotational basis before completing the final
evaluation period with the original PTO.

> Daily Observation Reports (DOR) are completed each day by the
PTO, and are essential means by which the progress of the recruit
officer is measured.

> PTO responsibility includes instructing the recruit officer in all
agency policies, procedures, rules, and regulations.

> Recruit officers are referred to the PTO manual for detailed
guidelines to the program.

> The recruit training program is from date of hire to the finish of
the FTO program and then the 6 month probation period. A newly
hired officer that has already completed the basic academy (a
lateral) will complete the FTO program and then the 6 month
probation period.

**C. Specialized Training**

    1.  The Department shall provide more traditional "on-the-job" training to
personnel assigned to, or in specific areas of need, as soon as practical.

    2.  Specialized training goals are established as:
        a.  The development and/or enhancement of the skills, knowledge, and
abilities particular to the area of specialization.
        b.  Training the employee in the management, administration,
supervision, personnel policies, and support services of the specialized
function or component.
        c.  Informing the employee of the performance standards of the
specialized function or component.
        d.  Providing the employee with understanding of Department policies,
procedures, rules, and regulations related to the specialized function or
component.
        e.  Providing the employee with the beneficial influence of an
experienced supervisor during "on-the-job" training.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000091 of 000128

**NOT ORIGINAL**

DOCUMENT

09/17/2025 03:04:13

PM

3.  Advanced specialist training shall be given to an officer assigned in the following areas:

    a.  Breathalyzer Operator.

    b.  Police Training Officer (PTO).

    c.  Firearms Instructor.

    d.  Police Instructor.

    e.  Defensive Techniques Instructor.

**D.  First-Line Supervisors (Sergeants)**

1.  Every employee promoted to a first line supervisory position shall successfully complete a supervisory training course (Academy for Police Supervision) within one year of promotion.

**E.  Mid- management Positions (Lieutenants, Captains, Major)**

1.  Every employee appointed or promoted to a mid-level management position must have successfully completed a supervisory training course (Academy for Police Supervision) and shall successfully complete at least 40 hours of management training, which has been approved by the Kentucky Law Enforcement Council (KLEC) prior to or within one year of such an appointment or promotion.

**F.  Annual Retraining (All Officers)**

1.  The annual retraining of all sworn personnel is intended to ensure that officers remain up-to-date on Departmental issues, career interests, and changes in the Criminal Justice System. The retraining program is structured to motivate experienced officers, and to enhance the professionalism of the Department.

2.  Every regular officer having responsibility for the enforcement of the criminal laws annually shall complete at least 40 hours of certified in-service training.

3.  Annual retraining may consist of, but not necessarily limited to, any of the following programs:

    a.  Formal in-service training approved by the KLEC.

    b.  Advanced specialized training seminars and schools approved by KLEC.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000092 of 000128

DOCUMENT

PM

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   17.1 | TITLE:  COMMUNICATION, COORDINATION, & COOPERATION |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards:  17.1, 17.4, 17.5, 17.6, 17.8, 17.10** | |
| **Date Implemented:  5-9-2014**  **Revision Date:** | **Review Date:**  **Reviewed By:** |

**I.  POLICY**

Patrol is the backbone of the London Police Department. The uniformed patrol officer is the most visible representative of the city and police department. A professional service oriented patrol function is essential to the continued success of the London Police Department in developing and maintaining positive relationships with the community. This policy shall define the patrol function and the appropriate handling of commonly encountered patrol issues.

**II.  PATROL FUNCTIONS**

    **A.  The primary functions of the patrol division shall be:**

        1.  Preventive patrol (including inquiry and inspections activity) oriented toward prevention of crimes and accidents, maintenance of public order, the discovery of hazards and safety and security within the city limits of London.

        2.  Crime prevention activities.

*Presiding Judge: HON. GREGORY A. LAY (627226)*

*EXH : 000093 of 000128*

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

3.  Response to requests for services from the public.

84997-7

4.  Investigation of crimes, offenses, incidents and conditions, including the arrest of offenders.

5.  Traffic direction and control.

6.  Maintenance of public order.

7.  Provision of emergency services.

8.  Development of a positive relationship between the public and the London Police Department.

9.  Reporting of information concerning criminal activity or other items of interest to the Department.

III.  PATROL PERFORMANCE OBJECTIVES

**A.  The following general performance objectives will be followed by patrol officers in the interest of effective law enforcement:**

1.  To reduce personal injury and property damage relating to auto accidents through the use of directed patrol and aggressive traffic law enforcement.

2.  To reduce the overall crime rate by increasing the efficiency in preventive patrol, investigative efforts, and reporting.

3.  To promote community support through service efforts.

IV.  PATROL ADMINISTRATIVE PROCEDURES

A.  Patrol units and all other components of the Department shall communicate, coordinate, and cooperate in order to achieve the objectives of the Police Department.

B.  Information obtained by an officer concerning criminal activity or criminal intelligence will be passed to a supervisor or detective on a confidential report or in a memo and read by all officers.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000094 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

C.  All information concerning training announcements, off duty details, new legislation, and memos shall be posted on the bulletin board in the patrol office.

D.  Administrative reports and directives from the Chief or any other source which is of a personal nature shall be placed in the individual officer's mail bin.

E.  Court notifications will be placed in the individual officer's mail bin for processing.

F.  The Chief of Police will conduct staff meetings, on an as needed basis to discuss issues concerning Patrol and other department issues. Officers are encouraged to have items of interest brought to these staff meetings by their immediate supervisor for discussion by the entire Patrol supervisory staff.

G.  The Department operates 24 hours a day, seven days a week to provide citizens with law enforcement services. The Department will provide, generally, the same services at all hours of the day or night in relation to answering calls for service, emergencies, preventive patrol, or traffic enforcement.

**V.  PATROL RESPONSIBILITIES**

A.  Police officers shall be held accountable for the good order of the area, post or detail to which they are assigned.

B.  Notwithstanding the assignment of specific duties and responsibilities, police officers shall perform all other such duties as may be required of them by competent and legal authority.

C.  Officers assigned to respond to a call for service should make personal contact with the complainant whenever possible so the complainant will know the call was answered and what action, if any, was taken. Officers who find themselves in a position where no action can be taken shall advise the complainant of this fact and further explain why the officer is unable to take action. Officers should show discretion if advising the complainant of other courses of action open to them. In the event the officer is not sure of a course of action, the officer should not advise the complainant but contact a supervisor for assistance.

D.  Patrol officers who receive or initiate a call which indicates that a back-up may be

NOT ORIGINAL

necessary shall request by radio that a second unit be dispatched. At least two patrol units will respond to situations which have the actual or potential presence of any of the following factors:

1. Assault on an officer or requested assistance.
2. On scene arrest for a felony or violent misdemeanor.
3. Resistance to arrest.
4. Use of force.
5. Any crime in progress or activated emergency alarm.
6. Fleeing suspect.
7. Domestic argument.
8. Reports of unknown trouble.
9. Accidents involving injuries or in which the vehicles are blocking moving lanes of traffic.
10. Disorderly crowd reports or reported fighting.
11. Suicides.
12. Gun Calls.
13. Disturbances involving intoxicated or disorderly persons.
14. Vehicle searches, when there are more than one occupant or when the vehicle driver is not in custody.
15. Calls for service that, in the judgment of the dispatcher or supervisor, two officers be sent due to the known serious nature of the call, insufficient information or for the safety of the officers.

E. Supervisors who monitor an initial radio dispatch of an officer to any of the situations listed above shall immediately request another unit to be dispatched. Supervisors or responding officers may request a backup unit on initial dispatch for any situation for which they know or suspect another unit may be needed. Supervisors will also ensure that the communications center sends adequate backup for officer needs assistance.

F. Seniority as a factor in Command: When two or more departmental members of equal rank / classification are working together on the same assignment an emergency develops requiring a command decision, and authority, the senior member will assume command. In an overlap situation, the oncoming supervisor or Commander defers to the on-duty supervisor or

1. Determining Seniority

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000096 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

      a.  Seniority will be determined first by rank and second by continuous service in the rank. Seniority will not be used to determine command except in an emergency.

2.  Emergency Situations - chain of command:

      a.  Command of all police personnel assigned to the scene of an emergency will be assumed by the on-scene ranking officer. It shall be his responsibility to evaluate every situation and make the appropriate determination as to whether or not others of his superiors should be notified.

G.  The notification of a supervisor to assist or respond and assume command, conduct investigations and give direction shall be required at the scene of any incident involving the following circumstances:

1.  A police officer uses force of any type to effect an arrest.

2.  Any accident involving a city owned vehicle or any police vehicle.

3.  Any major crimes to include but not limited to homicides, robbery, kidnapping, or an assault where death may occur.

4.  Any arrest of a police officer or judge from this or another jurisdiction, or any arrest of governmental officials of the City of London.

      a.  NOTE: This directive is not meant to discourage such arrest, but to provide sufficient witnesses to verify information in the arrest.

5.  When any officer receives a complaint concerning questionable conduct of a member of the London Police Department.

6.  Serious injury to an officer.

7.  Any crime where an off-duty detective/investigator is needed to respond for crime scene processing and investigation.

8.  Disasters, catastrophes, or severe weather producing emergency conditions.

9.  Serious accident, injury, or incident involving on-duty personnel or property.

10.  Execution of search warrants.

11.  Whenever any patrol officer feels that a decision must be made by a person with more authority than the requesting officer.

H.  Patrol Methods

1.  Police officers assigned to patrol duties shall patrol their area constantly while on duty and not otherwise assigned.

2.  Officers should patrol at a speed that will enable effective patrol of their

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000097 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

areas. A recommended speed below the posted limit will better enable officers to effectively patrol their area; however, patrol at a speed that will not interfere with the normal traffic flow.

3.   Officers should patrol areas observing, recording and investigating any unusual or strange occurrence and should not establish routine patrol patterns.

## VI.   VIDEO RECORDINGS

### A.  In car video equipment

1.   All officers will receive training and familiarize themselves with the manufacturer suggested operating procedures prior to use of the in-car video recording equipment. This training should include but not limited to the use of;

    a.  Body microphone

    b.   Use of any and all controls

    c.   Activation of unit

2.   Officers are responsible for inspecting in-car recording equipment prior to tour of duty to insure equipment is working properly. Any damage or malfunctions will be immediately brought to the attention of the shift supervisor.

3.   Equipment can be used for any lawful police purpose to include but not limited to:

    a.  Traffic stops

    b.   Pursuits

    c.   Collision scenes

    d.   Surveillance

    e.   Any situation where documentation by video or audio would be beneficial to prosecution.

4.   Officers shall record all traffic stops or other appropriate citizen contacts while operating vehicles equipped with in-car video equipment. Video and audio recordings shall not be interrupted by an officer until the citizen contact has been completed either by contact termination or arrest and placement of the prisoner in the cruiser.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000098 of 000128

NOT ORIGINAL

09/17/2025 03:04:13 PM

84997-7

DOCUMENT

5.  No officer shall intentionally erase or tamper with any recorded video recordings of any traffic stops or citizen contact.

6.  Intentionally failing to record activity or tampering, erasing or altering any recording shall be a violation of this policy and will result in disciplinary action.

7.  Videos are stored on an in-car DVR that is locked and secured to the vehicle. The DVR also has a USB thumb drive which backs up the DVR recordings. When the officer drives his patrol vehicle to the station the DVR transfers all recordings to a secure server at the police department. Only the Chief of Police or his Designee has access to this server.

8.  Video will be kept according to the KY Records Retention schedule.

## VII.  TRAFFIC ENFORCEMENT

**A.  Tactics and strategies for traffic law enforcement should be consistent with the nature of the violation and its potential for interfering with the free and safe flow of traffic. This may involve one or more of the following types of traffic patrol:**
1. Line Patrol
2. Area Patrol
3. Directed Patrol
4. Stationary traffic observation:
5. Visible stationary traffic observation
6. Concealed stationary traffic observation

Note: Officers are not permitted to block a lane or impede the flow of traffic for the purposes of enforcing traffic violations.

7.  In normal patrol operations, it is the policy of the department to maintain a visible traffic patrol as a deterrent for traffic violators.

8.  In order to be effective, selective traffic enforcement directed at high crash areas may warrant the use of an unmarked police unit. Only those unmarked police units equipped with emergency lights and siren will be used for traffic enforcement activities.

**B.  Daily Shift Report/Contact Sheet**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000099 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

1.  Shift supervisors for patrol will complete a shift report detailing all shift activities including, but not limited to, all calls for services, all traffic stops, and any public contacts that require a report to be filed. Supervisors will list on their shift report the following information:
2.  Officers Name
3.  Date
4.  Shift Hours

**C.   At shifts end, supervisors will complete their shift report by totaling and recording their activities in the following areas:**

1.  Calls for Service
2.  Officer initiated Activities
3.  UOR/ Reports
4.  Assisting Other Agencies
5.  Uniform Citations Issued
6.  Arrests
7.  Business Checks
8.  City Citations
9.  Warnings (Written/Verbal)
10.  Alarm Drop
11.  Assist Fire Dept

**D.   Current shift supervisors will pass on information to the next shift supervisor which should include, but not limited to, any of the below listed information:**

1.  Officer Safety Issues
2.  Significant or Unusual Calls for Service
3.  Significant or Unusual Events, Reports or Arrests
4.  Incident involving the media or where the media may contact the department
5.  Criminal or suspicious activities or possible suspect information that may be beneficial to all members.
6.  Any general information that officers determine will assist the department.

**E.   Upon completion of their shift report it will be saved on the computer so all department members can review it.**

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000100 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

**F. Record Management System**

    1.  Supervisors will update all Calls for Service and officer initiated activities.

**G. Roll Call/Shift Briefing**

    1.  Officers assigned to patrol shall begin and end their shifts at the police department to discuss the occurrences of each shift.

    2.  Officers must check the shift reports for information from previous shifts, check schedule for assignment changes. Detail information and notification of new directives or changes in current directives will be addressed by the shift sergeants to patrol units.

**H. Police Hazards**

    1.  Any permanent or temporary police hazards identified by officers shall be reported to the appropriate agency. Officers who note actual or potential hazards through patrol, investigation or analysis of data should take whatever action they can to eliminate or diminish the hazard, and make all other officers and their supervisors aware of the condition.

**I. Traffic Enforcement by Department Personnel**

    1.  Since there is a close interrelationship between traffic enforcement and all other law enforcement activities, all uniformed officers in the Department share the responsibility for enforcement of traffic laws and regulations.

**J. Arraignment System**

    1.  Whenever a London Police officer makes an arrest and initiates criminal or traffic charges on an individual, the officer is not required to appear at arraignment proceedings in the Laurel County District Court.

    2.  The arresting officer shall be responsible for ensuring that all required affidavits, complaints and citations have been properly completed and routed to ensure the case will be properly prosecuted. The officer shall also be responsible for liaison with the prosecutor's office in regards to potential problems in the case.

    3.  Whenever there are extenuating circumstances in a case which indicate to the officer that the officer should attend the initial hearing, the officer may

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000101 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

attend the hearing to present facts in person or to monitor the presentation of
the case to the court.

**K. Radio Communications**

1.  Officers shall ensure that their portable radios are on at all times, except in
circumstances that may jeopardize officer safety (i.e., bomb searches,
undercover investigations).

2.  Officers, when out of their patrol unit, shall maintain radio contact with
dispatch regarding their location, nature and status of activities, out of service
and in-service time, etc.

3. Officers shall be identified by their badge numbers for radio communications.

**L. Investigations by Patrol**

1.  Patrol officers shall conduct preliminary investigations on all cases not
delegated to the Criminal Investigations Section at the time the initial report is
taken.

2.  Follow-up investigations should be conducted in the following areas by patrol
officers:
   a.  Accident investigation (minor, hit and run),
   b.  Thefts, Vandalism and other Misdemeanor Offenses, and
   c.  Minor assaults.

**VII. SPECIAL PATROL PROBLEMS**

**A. Hospital Response**

Officers may respond to calls for assistance from the hospital, or they may take
prisoners to medical facilities for treatment, or they may interview hospitalized
subjects. Officers must understand that they are not required to give up their
firearms upon request by hospital personnel.
   1.  Mental Patients
      a.  In the absence of a court order for mental commission, or
      criminal charges of any nature, officers responding to any medical
      facility requesting their assistance in detaining a mental patient
      must not initiate such action. The responsibility for detaining such

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

patient rests with the staff of the requesting facility. However, the officer responding to the facility will provide assistance should the situation escalate to a confrontation where the safety of the staff or preservation of peace becomes a police problem.

b.   When a court order for mental commission is present, the officer must take whatever action is necessary to enforce the court order.

2.   Handcuffed Prisoners

a.   Unless it is necessary to remove the handcuffs in order for the prisoner to receive medical treatment, the handcuffs or restraints shall remain.

3.   Interviews of Patients or Employees

a.   Officers entering a hospital for the purpose of interviewing a patient in the emergency room shall notify hospital personnel on duty of their presence and the identity of the party to be interviewed.

b.   Officers entering a hospital for the purpose of interviewing a patient in the patient's room or ward shall notify hospital personnel on duty at the nurse's station, who are responsible for the care of that patient, of their presence and the identity of the party to be interviewed.

c.   Officers who must interview an employee of a hospital should make every effort to conduct the interview away from the hospital unless the purpose of the interview is in conjunction with the person's employment.

## VIII.   PRELIMINARY DEATH INVESTIGATION

**A.   After arriving at the scene and until convinced to the contrary, all officers should consider every D.O.A. call as a possible homicide, and should be aware that a homicide may be "staged" to appear as a death by natural causes.**

1.   Responsibilities of the First Officer on the Scene.

If the death appears to be from other than natural causes, the officer should direct attention to the following in the order that his or her discretion dictates after an evaluation of the situation.

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
849997-7

a.   Assuring the safety of persons to prevent further injury or death.

b.   A preliminary determination that the subject is actually deceased.

c.   Preservation of the scene and possible evidence.

d.   Notify dispatch for police or rescue assistance, if needed.

e.   Gathering of witnesses.

f.   Notify their immediate supervisor.

g.   All deaths must be pronounced by the Coroner or a physician, which may happen to be at the scene. The officer should include in his/her report the time of pronouncement, the name of the person doing the pronouncing, and where the body is to be taken.

## IX.  RESIDENTIAL SECURITY CHECKS

The department will honor requests from citizens to conduct security checks of their homes when the owners are on vacation. The citizen should contact the London Police Department or a police officer and provide all necessary information.

## X.  SHOPLIFTING ARRESTS

Kentucky Revised Statutes 433.234, 433.236, and 514.030, directs the detention of shoplifters, arrests without warrants, booking procedure for adults, and authority of employees of mercantile establishments. Officers shall consult these statutes.

## XI.  VEHICLE LOCK-OUTS

**A.   The police department will assist citizens who are locked out of their vehicles.**

   1.   When called to a lock-out, the officer shall:

      a.   Determine if an emergency exists.

      b.   Call for assistance from the rescue squad or other appropriate agency, (except in life threatening situations or emergencies where immediate action is necessary)

      c.   Avoid forcible entry if possible and appropriate to the emergency.

## XII.  PROPERTY CONTROL SAFEGUARDS

The officer may deal a variety of situations (medical, collisions, suicidal, etc.) involving individuals that cannot physically protect their personal or business properties. Officers should assist those individuals to ensure that their belongings are protected from theft

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000104 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

and are removed to a place of safekeeping, or secured in place if possible, if the owner is unable to care for it.

### XIII.   OFFICER-SPECIAL CONSIDERATIONS

A.   Officers will employ the upmost care to protect themselves when stopping violators for infractions of the law. Consideration must also be given the stopping of vehicles from a safety standpoint, during inclement weather, on hills and curves, in dense traffic, or in any instance where life and property may be endangered.

B.   When an officer observes a violation of the law, he will either (1) warn, (2) issue a citation to the violator to appear before the court having jurisdiction, or (3) arrest.

1.   Any controversy incident to the warning, citation, or arrest will be avoided. The officer will merely inform the offender:

a.   The nature of the offense.

b.   Why the offense was detrimental to the safety of the public.

c.   The specific charge if a charge is made.

d.   The procedure the violator will follow in order to bring the matter to a conclusion.

e.   Without exception, when officers are transporting prisoners of the opposite sex they shall notify dispatch of the transport. The officer will give the point of origin, vehicle's odometer reading, and the destination. Upon arriving at the destination the officer will notify the dispatcher of the arrival and the odometer reading. The dispatcher will log the information and record the time of each notification.

In accordance with their training and qualifications, officers shall provide general and emergency assistance to motorists. This includes providing information and directions, assisting stranded or disabled motorists, and obtaining medical and other emergency assistance. Officers will ensure that the requested service is provided in a timely fashion. If, after arranging for assistance, the officer is unable to remain with the motorist until help arrives, he/she will take the necessary steps to provide safety to the motorist or arrange for transportation. However, this does not preclude transporting the motorist to a place of safety when a need arises.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000105 of 000128

NOT ORIGINAL
09/17/2025 03:04:13
PM
84997-7

DOCUMENT

# LONDON POLICE DEPARTMENT

| POLICY #   21.1 | TITLE:  VEHICLE POLICY |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:   KRS 189.910 THRU 189.950** | |
| **KACP Standards:  21.1, 21.2, 21.4** | |
| **Date Implemented:  5-9-2014** | **Review Date:** |
| **Revision Date:** | **Reviewed By:** |

### I.  POLICY

It shall be the policy of the London Police Department that all officers are required to exercise due regard for the safety of all persons. No task, call, or incident justifies disregard of public safety. Further, the public expects its police officers to demonstrate exemplary driving behavior. All department personnel who operate police vehicles will comply with safe driving procedures outlined herein with particular attention to responding to calls for service or engaging pursuits. Emergency warning devices shall be used consistent with both legal requirement and the safety of the public and police personnel.

### II.  DEFINITIONS

**A. Normal or routine driving** - That driving which dictates vehicle speed consistent with the normal flow of traffic, obedience to vehicle laws and posted signs, adherence to commonly understood "rules of the road" and courtesy.

**B. Emergency Operation** - For the purpose of this Policy, emergency operation is intended to refer to the manner of operation of a police vehicle, by an officer, in

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000106 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

response to a situation or occurrence that is and/or poses a risk of life threatening or serious physical injury and has developed suddenly and/or unexpectedly and demands immediate actions and response. Both lights and siren must be on during emergency operation of police vehicles.

**C. KRS 189.910** - "An 'emergency vehicle' means any vehicle used for emergency purposes by a fire department; any vehicle used for emergency purposes by the State Police, a public police department, or sheriff's office; any vehicle used for emergency by a rescue squad; any publicly owned vehicle used for emergency purposes by a civil defense agency; ambulances; any vehicle commandeered by a police officer; or any motor vehicle used by a volunteer fireman while responding to an emergency."

    **1. Marked vehicles** - Police vehicles used in routine or general patrol, which have distinct markings on them, i.e. striping, decals, and/or door emblems

    **2. Unmarked Vehicles** - a police vehicle not displaying the emblem or marking of the police department but which is equipped with emergency lighting

    **3. Emergency equipment** - Flashing, blinking, or alternating emergency lights and a siren, whistle, or air horn designed to give intermittent warning signals.

    **4. Pursuit** - An active attempt by an officer in a authorized emergency vehicle to apprehend fleeing suspects who are attempting to avoid apprehension through evasive tactics.

    **5. Boxing-in:** surrounding a violator's vehicle with emergency vehicles that are then slowed to a stop, forcing the violator's vehicle to do likewise.

    **6. Canalization**: a technique where objects or vehicles are positioned in a manner intended to direct or redirect a fleeing vehicle into a clearly identifiable and unobstructed path.

    **7. Caravan**: operating emergency vehicles in a line or alongside each other in a pursuit.

    **8. Paralleling**: operating an emergency vehicle on streets or a route parallel to the pursuit route.

    **9. Primary unit**: The authorized law enforcement vehicle that initiates a pursuit or any other unit, which assumes control of the pursuit.

    **10. Secondary unit**(s): Any authorized law enforcement vehicle that becomes involved as a backup to the primary unit and follows the primary unit at a safe distance.

    **11. PIT (Precision Immobilization Technique) maneuver**: a controlled deliberate contact with the rear of a fleeing vehicle by a marked police vehicle with the intention of spinning the vehicle in a predetermined direction to bring it to a stop.

    **12. Ramming**: deliberate contact with a violator's vehicle by a marked police

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000107 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

vehicle to force the violator's vehicle off the roadway.

**13. Roadblock**: a barricade or other physical obstruction across a roadway set up to stop or prevent the escape of a fleeing vehicle.

**14. Secondary vehicle**: the marked police vehicle that follows the primary vehicle in a pursuit acting as a back-up for the primary vehicle.

**15. Stop Stick/Spike Strip:** a rigid column or a strip of belting containing specially designed hollow spikes which when deployed across a lane of roadway, penetrates tires, slowing the pursued vehicle usually to a complete stop.

**16. Supervisor:** the supervisor assigned or assuming control of a pursuit situation.

**17. Terminate the Pursuit:** The decision to discontinue the pursuit.


## III.  DEPARTMENT VEHICLES

Every officer of the Department assigned to operate a Department vehicle shall be held accountable for the proper use and care of the vehicle, and of all accessories, equipment and tools assigned to such vehicle. Standard equipment of vehicles shall not be changed, interchanged, altered or removed from such vehicle unless directed by a commanding officer.


## IV.  MARKED PATROL VEHICLES

A.  All patrol vehicles will be marked so as to be easily recognizable to the general public both day and night. Marked police units will have the following minimum markings:

1. "London Police Department" decals;

2. Department emergency telephone number (911);

3. Blue and Red led light bars, a siren and speaker assembly with public address capability.

4. Any other markings as determined by the Chief of Police.


B.  All vehicles will be equipped with, at a minimum, the following emergency equipment:

1. Reflective traffic vest,

2. Hazardous materials handbook,

3. Fire extinguisher,

4. First Aid Kit

5. Flares

6. Sharps containers

7. Evidence bags

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000108 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

8. Binoculars, and

9. Blood borne pathogen kit.

10. CPRMask

11. Latex Gloves

12. Hand Sanitizer

13. Bio Hazard Kit

14. Bio Hazard Bags

15. Radios

16. Siren

17. Light Bar

** Officers are responsible for notifying the OIC when equipment/supplies are used so that they can be replenished.

C.   A security partition between the front and back seats provides protection for the officer, but is constructed so as to allow for communication between the front and rear compartments. On SUV's a security partition between the back seat and cargo area is constructed so as not to allow anyone to reach the cargo area.

D.   The rear doors can only be opened from the driver's area or the outside of the vehicle.

E.   Prisoners will usually be transported in marked units equipped with security partitions.

F.   Officers on duty and assigned a patrol vehicle shall observe all city parking regulations.

> 1. Officers will park vehicles in a position so as to provide a quick and easy exit in an emergency situation.

> 2. If an emergency requires parking in a restricted or prohibited area, vehicles shall be parked in such manner as not to unnecessarily interfere with the movement of traffic. At least one warning light on the vehicle must be in operation at all times.
> (KRS 189.940(4))

> 3. When the emergency has ceased to exist, the area shall be vacated immediately.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000109 of 000128

NOT ORIGINAL

DOCUMENT

PM

09/17/2025 03:04:13

84997-7

4. Officers shall not permit the engine of the Department vehicle to be left running while the vehicle is unattended or occupied by non-departmental persons unless it is a K.-9 vehicle.

5. When it is necessary to leave a vehicle unattended and unoccupied, the officer shall, except in an extreme emergency, lock the ignition and doors.

6. Marked patrol vehicles, with ignition and doors locked, will be parked only in the designated area at the rear of the Police Station when not in use.

G.   Department vehicles are normally to be driven within the limits of London jurisdiction. Officers shall not respond to radio calls in other areas unless authorized:
     1. As backup for another Department's unit,
     2. In pursuit situations,
     3. Responding in an authorized manner to emergency situations, or
     4. On official business.
     5. Assisting another agency

H.   Officers will not transport unauthorized persons in patrol vehicles unless such transportation is in connection with official Department business, except on direct orders of the Chief of Police or supervising officer.
     1. If an officer observes a person in obvious distress, the officer will render assistance as indicated by circumstances.

     2. If the officer transports the person, it will be the responsibility of the officer to ensure that:
         a. The individual has nothing on his/her person that could harm the officer and
         b. All passengers will use seat belts.
         c. If the circumstances require medical assistance, the Ambulance service will be asked to respond.
         d. If small children or infants must be transported, Child Safety Seats or Booster Seats will be used, as required by state statue.
         e. In all circumstances the officer will advise the communications center of the following information:
             (1) Sex,
             (2) Reason for the transport,
             (3) Destination,

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000110 of 000128

**NOT ORIGINAL**
**DOCUMENT**
**PM**

09/17/2025 03:04:13

84997-7

(4) Beginning and ending mileage in instances where person is of the opposite sex.

### V.  UNMARKED VEHICLES

A.   Unmarked Department vehicles will be used mainly by plainclothes officers for investigative use and by members of the Administration Division.

B.   Although unmarked vehicles may be equipped with blue lights and siren, the use of unmarked vehicles and plainclothes officers in the stopping of suspected vehicles will be avoided whenever possible.

C.   Every effort will be made to employ a marked police vehicle to stop a suspect vehicle.

D. Unmarked vehicles should not be utilized as a primary unit in vehicle pursuits, but may be used as secondary/backup units.

E. All unmarked Department vehicles, with ignition and doors locked, will be parked only in the designated area at the rear of the Police Station when not in use.

### F.  Procedure

1. Daily Operations of Department Vehicles

a. All officers will check their vehicles every tour of duty for the following:
(1) Cleanliness.
(2) Tires.
(3) Rear Seat Check.
(4) Fuel level

2. All members of the Department will use seat belts when operating Department vehicles.

a. Driving Rules

(1) Circumstances permitting, the driver must check the safety features of his vehicle before commencing operation. The check should include (but not be limited to) all lights, brakes, hom, siren, radios and steering.
(2) No driver shall modify, remove, deactivate, or otherwise tamper with the vehicle safety belts, emission control device, or any part of the vehicle that affects its operation.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000111 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

(3) No officer or employee shall operate any police vehicle that he believes to be unsafe.

84997-7

(4) The driver must recognize the variable factors of weather, road surface conditions, road contour, and traffic congestion, all of which directly affect the safe operation of any motor vehicle, and shall govern the operation of the vehicle in accordance with these factors. During periods of inclement weather when police vehicles cannot be washed regularly, the driver must assure that the headlights and tail light lenses are kept clean.

(5) The nature of certain crimes in progress may call for the use of the siren to be discontinued upon close approach to the location of the occurrence, and although such action is permitted by authority of this order, police vehicle operations under these conditions require extreme caution. Keep in mind that KRS 189.940 states no exemption when lights and siren are not in continuous use. Under no circumstances shall an officer respond in emergency mode without both lights and siren in operation.

(6) Emergency driving to the scene of a motor vehicle accident is permissible ONLY when an emergency exists, or when specific information indicates that the conditions at the scene require the immediate presence of an officer.

(7) When approaching an intersection or other location where there is great possibility of collision, the driver who is responding under emergency conditions shall reduce the speed of his vehicle and control it to avoid collision with another vehicle or pedestrian, stopping completely if necessary, before entering and crossing the intersection. When faced with a red traffic signal or stop sign, the officer shall stop his vehicle and assure by careful observation that the way is clear before proceeding through the intersection.

(8) The operator of a police vehicle shall be held accountable for the manner in which he operates his vehicle.

(9) The driver should lower one front window far enough to hear other sirens and traffic warning signals (except when in pursuits).

(10) Drivers shall operate their police units in accordance to this policy and procedure and KRS 189.910 through KRS 189.950 and City of London Policies.

(11) Emergency warning devices shall be used consistent with

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000112 of 000128

**NOT ORIGINAL**

**DOCUMENT**

**PM**

09/17/2025 03:04:13

84997-7

both legal requirement and the safety of the public and police personnel.

(12) Drivers will report any accidents or damage to city property to the shift supervisor including hit and run, with or without injuries, and death. If city property has to be towed the shift supervisor will call for next on the list.

3. Emergency Response

During an emergency response, officers need to reach the emergency location by the most expedient means. In any emergency response situation when officers exceed the speed limit and/or use any other means which contradict traffic regulations, emergency lights AND siren shall be in operation. (KRS 189.940)

   a. Emergency operation of a police vehicle is authorized, but not limited to, the following emergency situations:

      (1) Officer needs assistance,

      (2) Report of an explosion,

      (3) Report of shooting, cutting or other serious injury,

      (4) Fleeing vehicle pursuits,

      (5) Auto accident with reported injury, and

      (6) Crimes in progress or similar instances requiring the immediate and urgent presence of a police officer.

   b. When responding to an emergency, the officer will not operate the vehicle at a speed or in a manner that interferes with the officer's complete control of the vehicle at all times.

      (1) Under no circumstances shall an officer proceed through intersections or traffic signals until all other traffic and pedestrians have yielded the right-of-way.

      (2) Under no circumstances shall an officer drive his vehicle against the normal flow of traffic, i.e. one way streets.

      (3) The basic rules of traffic safety will be adhered to at all times, regardless of the nature of the assignment.

      (4) At no time shall the safety of any person be placed in jeopardy by the operation of a Department vehicle.

      (5) No emergency response will be in such a manner that the principles of safety become secondary.

      (6) Officers will be held strictly responsible for the consequences of reckless disregard for the safety of others.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000113 of 000128

**NOT ORIGINAL**

**DOCUMENT**

**09/17/2025 03:04:13**

**PM**

(7) Seat belts will be worn.

(8) The emergency lights and siren must be used.

**84997-7**

(9) Four-way flashers interfere with turn signals and will not be used.

(10) Vehicles that have prisoners, witnesses, suspects, complainants or other non-police personnel as passengers will not be operated in the emergency mode.

(11) When approaching a loading or unloading School bus Officers shall stop and wait until it is safe to continue.

4.  Responsibilities of the Supervisor:

a. Monitor the emergency response.

b. Control the number of authorized vehicles making the emergency run depending on the nature of the run and the number of officers needed for safety and a proper tactical response.

c. Continually evaluate the seriousness of the situation against the hazards to the health and welfare of the citizens generated by emergency operation.

d. Continually evaluate external factors which may have a bearing on the emergency operation of the vehicle.

e. Order the discontinuation of the emergency operation at any time hazardous circumstances or environmental factors present an unreasonable risk to public safety.

5.  Responsibilities of the Communications Center

a. Assure that the on duty supervisor is aware of the emergency response call for service.

b. Assure that that all critical information is received from the officers involved and relayed to other units.

c. Keep the supervisor apprised of all relevant information that have and might impact the emergency response.

d. Clear the radio channel when officers arrive on scene of high risk incidents.

e. Continue monitoring the emergency response and provide any updated information received by communications center.

6.  Non-emergency Response

When an officer is not on an emergency call, all normal safe-driving practices

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000114 of 000128

84997-7

must be observed, including obedience to all traffic laws and basic rules of courtesy. Courteous, intelligent driving practices are to be adopted by all officers. Nonemergency responses will be:

a. Complaints that are minor or service calls, and do not require an immediate response.

b. A minor criminal violation which requires only a reporting of the incident.

c. Generally, an incident which occurred more than half an hour prior to its being reported.

7. Defensive Driving

a. The defensive driver perceives what pedestrians and other motorists will do and is prepared to meet any situation that may arise from the actions of others.

8. Emergency Equipment

a. Use your headlights. In the daytime, your high beams are easier to see that traditional red or blue overhead lights. Most drivers will notice them before they hear your siren or see your overheads. However, do not use your high beams after dark. They tend to obliterate the emergency lights and blind oncoming traffic.

b. Change your siren patterns. The alternating sounds will draw more attention, especially through intersections.

c. Slow down when near pedestrians, especially in school zones and sub-divisions. This gives people more time to notice your approach and respond safely.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000115 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

# LONDON POLICE DEPARTMENT

84997-7

| POLICY #   21.3 | TITLE:  SPECIAL PURPOSE VEHICLES |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards:  21.3** | |
| **Date Implemented:  5-9-2014** | **Review Date:** |
| **Revision Date:** | **Reviewed By:** |

**I.  PURPOSE**

The purpose of this directive is to establish a policy of this Department in the use of Special Purpose Vehicles.

**A.  4 WHEEL DRIVE VEHICLES**

1 .  The only special purpose vehicles utilized by this department are four wheel drive vehicles. They are to be utilized at such time as inclement weather would dictate.

2.   Normally, the vehicles are assigned to an officer as any other home fleet unit, but at such time as needed by the department, the decision will be made by the ranking Commander on duty to have the vehicle made available for patrol use.

**B.  SPECIAL GOLF CARTS**

1.  The city has a varying number of golf carts utilized at festival events and parade activities. The units are low speed units and are assigned on a temporary basis to officers at the time of need and according to that need. Due to large capacity crowds, officers are to exercise extreme care in the use of these units

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000116 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

## C.  BICYCLES

The city has no bicycle patrols at this time.

84997-7

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000117 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

# LONDON POLICE DEPARTMENT

| POLICY #   27.1 | TITLE:  COLLECTION & PRESERVATION OF EVIDENCE |
|---|---|
| • **This policy shall apply to all London Police Personnel and shall remain in effect until such time it is superseded, revoked, or rescinded.** | |
| **Applicable State Statutes:** | |
| **KACP Standards:  27.1** | |
| **Date Implemented:  5-9-2014** **Revision Date:** | **Review Date:** **Reviewed By:** |

## I.  PURPOSE

The purpose of this general order is to establish responsibilities for officers/investigators processing crime scenes and to establish guidelines for the proper documentation, collection, packaging, and submission of physical evidence to the forensic laboratory, and to consider the legal dimension of the use of physical evidence.

## II.  POLICY

Proper documentation, collection, preservation, and submission of physical evidence to forensic laboratories may provide the key ingredients of any investigation. The crime scene is usually the starting point of a criminal investigation. Through evidence located at the scene, suspects are developed or eliminated, investigative leads are established, and theories concerning the crime are substantiated or disproved. The officer or investigator must always be aware that any physical evidence collected might someday have to be presented in court and not to overlook, contaminate or

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000118 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

destroy evidence. Physical evidence appears in many shapes, sizes and forms, thereby necessitating various recovery, preservation, and submission techniques. The officer or investigator shall be prepared to collect, identify, and package the evidence so that it will not be changed in form and value when it reaches the laboratory. The officer collecting ensures that it is presented to the court professionally and in compliance with the law.

### III.  PROCEDURES

#### A.  Responsibilities of first officer on a crime scene.

1.  Respond to the scene promptly and safely. Officers shall not rush into the crime scene. Rushing into the scene may also result in the accidental destruction or contamination of evidence.

2.  Determine if perpetrator(s) are still on scene. An armed suspect may still be present. If the officer has probable cause to believe that the suspect committed a felony, he should place him under arrest, search him, and note any spontaneous statements the suspect may make, and advise him of his rights if he is to be questioned further.

3.  Protect the scene to prevent the destruction or contamination of evidence. Rushing into the scene may result in the accidental destruction or contamination of evidence.
   a.  The first officer on the scene shall establish a perimeter around the scene and direct assisting officers to help secure the scene.
   b.  Crime scenes may be secured by the following methods:
      (1)  Police officer(s).
      (2)  Barricades or rope or banner guard used to define area to be protected.
      (3)  Signs used to control access.
      (4)  Summons medical assistance, if necessary, for anyone injured. Officers must first render aid to a victim at the scene, unless the officer must immediately protect himself from a suspect still at the scene, or an active shooter incident.

#### B.  Officer's responsibilities after crime scene is secured.

1. Prepare the original offense report.
2. Locate items of evidence.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000119 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

3. Locate witnesses.

4. Photograph and sketch the scene when appropriate.

5. Collect physical evidence.

6. Preserve and package physical evidence.

7. Submit evidence to forensic lab for analysis.

**C. Scene processing by a Detective.**

1. Certain serious offenses require that a detective process the crime scene determined by shift supervisor after consulting with on scene officer. Shift supervisor will then notify command staff that will then approve or disapprove a detective being called out.

**D. Crime scene processing equipment.**

1. Officer/Detective responding to a crime scene will make a determination of equipment needed for processing. The department shall maintain a complete evidence collection kit to include a camera, film, sketching equipment, fingerprint recovery tools, blood recovery materials, tweezers, scissors, boxes, bags, envelopes, tape, marking tools, evidence tags, and materials for lifting impressions (footprints, tire tracks).

**E. Notes and reports -valuable records.**

1. The officer's original notes are his personal and most readily available record of the crime scene. He must refer to those notes to complete any or all other finished reports required of actions taken on the scene of the crime.

2. Types of information the officer/ detective should record at the scene include:

    a. Case number.

    b. Date & time of arrival at scene.

    c. Location of scene.

    d. Name of victim.

    e. Name of suspect, if known.

    f. Actions taken at scene.

    g. Name of collecting officer(s).

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000120 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM
84997-7

**F.  Preliminary scene survey:** Officer/ detective actions at the crime scene should include the following:

1. Observe and record (look but don't touch).
2. Determine nature and extent of crime scene.
3. Determine location of evidence.
4. Determine order of collection.
5. Duplicate movement of perpetrator, and plan search accordingly.
6. Note all existing conditions (lighting, environment).
7. Note items out of place or damaged.
8. Note relationship between items.
9. Initial rough sketch should be made.

**G.  Crime scene sketch:** Detailed crime scene sketches normally are prepared only in major crimes. Minimum detail to be contained in the sketch should include:

1. Time and date of preparation.
2. Location of offense.
3. Location of items of evidence in the scene.
4. Location and names of victims, witnesses, and suspects.
5. Relationship of the crime scene to other rooms, buildings, or roads.
6. Name of person preparing the sketch.
7. Direction of north.
8. What lights were on/off.
9. What windows were open.
10. Radio/television, on or off.

**H.  Photographing the scene**: At the end of the preliminary scene survey, overall photographs of the scene should be taken.

1. Overall photos should be taken from several different locations.
2. If an interior scene, a wide-angle lens should be used.
3. Photograph the surrounding area thoroughly.

**I.  Information to be recorded on photographs:** The officer processing the scene will maintain a record of each photo taken at the crime/ incident scene. Information recorded when taking the photos should include:

1. Type of camera used.
2. Kind of lighting used (existing light or flash).
3. Date and time of exposure.
4. Person taking photos.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000121 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

DOCUMENT

PM

5. A brief description of subject in photos.
6. Kind of film used.
7. Case number.

**J. Mid-range photography**: Mid-range photography is used to orient the viewer as to the exact location of items of evidence in the scene.

1. If possible, the officer should attempt to include two items of evidence into the field of view. If this is not possible, then a common item (desk, bed, table, etc.) should be included in all the mid-range photos. It is always recommended to record each photo taken at a major crime scene with the frame number, f/stop, shutter speed, or other information for court purposes.

2. Mid-range photos should always be taken with a normal lens to prevent distortion. Lenses of 50MM to 55MM are commonly used as normal non-distorting lenses.

**K. Close-up photography**: Before any item of evidence is moved, a close-up should be taken as follows:

1. Fill field of vision with item.
2. Take on close-up shot of item with a scale. A ruler in the evidence collection kit can be used for this purpose.
3. The officer can place a strip of masking tape across the face of the ruler, making sure not to cover the measuring increments. Information to be written on the tape includes:
   a. Item number.
   b. Case number.
   c. Date.
   d. Officer's initials.

**L. Location of evidence/ measurements**: Before collecting any item of evidence, take measurements using triangulation or the coordinate method.

**M. Collection of evidence:** A physical evidence collection guide published by the Kentucky State Police which contains information on the collection, packaging and submission of different types of physical evidence to the lab will be made available to officers/detectives. This guide book can be located in the Criminal Investigation Department's offices.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000122 of 000128

NOT ORIGINAL
DOCUMENT
09/17/2025 03:04:13
PM

**When collecting items of evidence the officer/detective should consider the following:**

    1.  The use of tongs or tweezers where possible. The officer should avoid touching the item of evidence with his hands or anything that might contaminate the item.

    2.  Proper order of collection:

        a.  The officer should collect perishable evidence first.

        b.  If destruction of evidence is not a concern, then the officer should work his way through the scene, collecting in a logical sequence, trying to avoid disruption of other items of evidence.

    3.  Collection of known samples: The forensic laboratory can only compare known items with those showing similar characteristics. Sufficient specimens or controls must be submitted for comparisons of such items as hairs, fibers, paint, glass, soil, and tool marks.

    4.  Documentation of each item collected: All items of evidence that are collected by the officer processing the crime scene will be listed on the property card. For each item listed, the following information will be noted:

        a.  A complete description of the item (including make, model, and serial numbers, if any).

        b.  The source (from whom or location from which the item was obtained).

        c.  The name of the person collecting the item.

**N.  Marking evidence:**

    1.  In many instances, marking and labeling of evidence may represent a single process. In instances where the evidence is large, complete identifying data may be recorded directly on the evidence. This will include the officer's name, date, time, recovery location, item, number, and case number.

    2.  In other instances, the small size or nature of the item collected will not permit complete information noted directly on the item. In these instances, the container or attached tag should be marked.

    3.  The crime scene search officer should establish the habit of marking similar items in the same location; for example, on the trouser band, or under the right front pocket of the trousers, or on the right hand side of the handgun.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000123 of 000128

**NOT ORIGINAL**

**DOCUMENT**

**PM**

09/17/2025 03:04:13

84997-7

This will save time and embarrassment in looking for the identifying marks when asked to identify the evidence on the witness stand.

4.   Instruments which may be used for marking physical evidence include permanent markers (felt tip pens), scribes (diamond tip or awl), or, where labels are used, ball point pens.

5.   The officer collecting the item of evidence will be the person responsible for marking or labeling the item at the time it first comes into custody.

6.   Each officer or detective should develop his own identifying mark. Normally it shall be his initials, but may be some other mark.

**O.   Packaging items of evidence:**

1.   The collecting officer should choose a container suitable to the type of evidence he intends to package. Considerations in choosing the proper container include:

   a.   The size and weight of the item.

   b.   Whether the item is moist (which could rot or deteriorate if packaged in plastic or an airtight container).

   c.   Wet (soaked) items should be air dried or placed in a paper bag to prevent mildew, (refer to evidence handbook).

2.   The officer should avoid any contamination of evidence by packaging all items separately.

3.   Fluids or stains shouldn't be allowed to touch and should be carefully rolled in paper.

4.   Pack the item to minimize interior movement within the package.

5.   Seal the package with tape.

6.   The collecting officer should initial across the seal.

7.   The officer should label the exterior of the package.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000124 of 000128

NOT ORIGINAL

DOCUMENT

09/17/2025 03:04:13

PM

8.  Whenever possible, the package should be labeled before placing the
    evidence in it so as not to damage contents while writing on it.

**P.  Latent fingerprinting**: When processing the crime scene for latent fingerprints,
the officer/detective shall take the following into consideration:

1.  The size of the item to be dusted.

2.  The type of surface.

3.  Potential for destruction if moved. If moving or transporting the object will
    destroy latent prints, the object should be processed at the scene.

4.  If the item requires specialized chemical processing, i.e. ninhydrin, iodine
    fuming etc.

**Q.  Overall measurements**: Obtaining of wall, room, and building measurements is
one of the last operations to be performed in the processing of a major crime scene.
The overall measurements are vital in the production of the final crime scene sketch
but must be obtained last so as not to damage or destroy items of evidence.

**R.  Final organized search**: A final, thorough search should be conducted at the
crime scene in case evidence may have been overlooked. Wherever possible the
use of a fresh officer on a final search is preferred; he may find what you overlooked.

**S.  Preservation and submission of evidence to the forensic laboratory:**

1.  Responsibility for requesting lab examinations:

    a.  Under normal circumstances, the responsibility for the submission
        and request for lab examination will lie with the officer or detective who
        actually processed the scene and took custody of the evidence.

    b.  In those cases where there may be more than one officer
        processing the scene, the officer will be appointed by the supervisor to
        take custody of all evidence collected and to be responsible for the
        submission of same to the forensic laboratory for analysis. If the case
        has been taken over by a member of CIS the detective in charge may
        submit the evidence for lab examination.

2.  Preservation of perishable or deteriorating items:

    a.  When a rapidly deteriorating item of evidence has been collected
        (for example, a liquid sample of semen, a blood soaked shirt, etc.), it
        should be transported to the forensic laboratory the same day, if at all

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000125 of 000128

**NOT ORIGINAL**

09/17/2025 03:04:13

**DOCUMENT**

**PM**

possible.

b.   Any time an officer transports a perishable item to the laboratory for immediate analysis, the laboratory should be called first so they will be ready to receive the item.

c.   In those cases where immediate transport to the forensic lab is not possible:

> (1)   Refrigerate (no more than one week) and transport to lab.
>
> (2)   Air dry (no more than one week) and transport to lab.

3.   Non-perishable items of evidence: Avoid contamination and package properly.

4.   Many items submitted to the lab must be accompanied by a known specimen so a comparison can be made. The investigating officer/ detective on the case will be responsible for obtaining any required known specimens, following legal procedures, and submitting them, along with the items of evidence, to the forensic lab for analysis and comparison.

5.   The request for Laboratory Examination (form KSP 26):

a.   Any evidence submitted to the Kentucky State Police Crime Laboratory will be accompanied by a completed Request for Laboratory Examination form (KSP 26). The Crime Laboratory automatically will supply written results on all requested examinations.

b.   The investigating officer/ detective is responsible for completing the request form and include it with the submitted evidence.

c.   Documentation of chain/ custody/ property-evidence control must be completed by relinquishing officer as well as receiving person at the lab.

**T.   Special consideration:**

1.   Failure to recover physical evidence/photograph scenes of serious offense/incidents: Whenever photographs are not taken or where physical evidence is not recovered from the scene of a serious crime against person or property, the officer/detective assigned will prepare a report giving the reasons why these things were not done. This may be included in offense report or subsequent follow-ups.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000126 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

DOCUMENT

PM

**U.  Legal requirements:**

Officers need to understand several important legal principles regarding the legal
use of physical evidence. As noted above, officers must exercise a chain of
custody of all evidence.

1.  Definition: A chain of custody is the series of documented links between
the time evidence was obtained until it is presented in court. The links are
officers who handled the evidence, and where and when they did so.

2.  The most crucial principle for the collection and handling of evidence is the
exclusionary rule.

a.  Definition: The exclusionary rule requires that evidence seized or
discovered in violation of the suspect's Fourth, Fifth, and Sixth
Amendment Rights cannot be admitted in court.

**Officers shall rigorously maintain a chain of custody and shall always remain
mindful of constitutional safeguards.**

**V.  Handling and processing of police photographs**:

The use of photographs is strongly recommended by the London Police
Department to document crime scenes and serious accident scenes. All fatal
accident scenes (or possible fatal accidents) shall be photographed; likewise,
major crimes where photographs would be a valuable tool in solving and
prosecuting crimes. It shall be within the officer's discretion whether or not
photographs are to be taken at minor crime or non- accident scenes.
Officers are encouraged to do so.

The use of video recording equipment and still photography equipment of the
London Police Department shall be used primarily for the purpose of gathering
visually recorded evidence for court prosecution of violators of both traffic and
criminal statutes, as well as the recording of crime and accident scenes.

The use of video equipment shall also assist the department in providing a
training aid, defense of frivolous complaints against personnel, quality
assessment of officers – citizen contacts, and the officer's safety.

1.  The police personnel taking the photographs are to down load the
photographs to the digital photo drive under their unit # and list the
following information for each series:

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000127 of 000128

NOT ORIGINAL

09/17/2025 03:04:13

84997-7

**DOCUMENT**

**PM**

        a.  Case # or

        b.  Accident #

2.  Training

    a.  Officers using video or photography equipment should read the directions or receive training from personnel when needed in order to proficiently operate the equipment.

    b.  Storage of tapes, discs and memory cards:

        (1)  Pictures should be moved off camera and placed on the digital photo drive as soon as practical and memory card in camera erased.

        (2)  Original surveillance video provided by victims should be logged into evidence and a copy made to work with.

3.  Supplies and Equipment

Photographic supplies and equipment will be monitored by the evidence custodian. Any time supplies are needed the custodian shall notify the Chief of Police or his designee for restocking of necessary equipment and supplies.

Presiding Judge: HON. GREGORY A. LAY (627226)

EXH : 000128 of 000128